1

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARK EVANS, | * | Civil Action |
| | * | No. 02-1436 |
| Plaintiff, | * | |
| | * | Section "B"(1) |
| v. | * | |
| | * | New Orleans, Louisiana |
| FORD MOTOR COMPANY, INC. | * | March 8, 2004 |
| and FORD MOTOR CREDIT COMPANY | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## JURY TRIAL,
### BEFORE THE HONORABLE SALLY SHUSHAN,
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:              Souhlas Law Firm
                               By:  ERNEST N. SOUHLAS, ESQ.
                               201 Holiday Blvd., Ste. 106
                               Covington, Louisiana 70433

                               Law Offices of Carter B. Wright
                               By:  CARTER B. WRIGHT, ESQ.
                               201 Holiday Blvd., Ste. 204
                               Covington, Louisiana, 70433

                               Taggart, Morton, Ogden, Staub,
                                 Rougelot, & O'Brien, LLC
                               By:  EUGENE G. TAGGART, ESQ.
                               1100 Poydras St., Ste. 2100
                               New Orleans, Louisiana 70163

For the Defendant:             McCranie, Sistrunk, Anzelmo,
                                 Hardy, Maxwell & McDaniel
                               By:  ROBERT W. MAXWELL, ESQ.
                               By:  HILLIARD F. KELLY, ESQ.
                               434 N. Columbia St., Ste. 200
                               Covington, Louisiana 70433

2

APPEARANCES: (Cont'd)


For the Intervenor,          Keogh, Cox & Wilson
Continental Casualty Co.:     By:  AARON J. CHAISSON, JR., ESQ.
                              701 Main Street
                              Baton Rouge, Louisiana 70821


Court Audio Operator:         Dee Malouse

Transcriptionist:             Dorothy Bourgeois
                              c/o U.S. District Court
                              500 Poydras Street, Room C151
                              New Orleans, Louisiana 70130
                              (504) 589-7721


Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

**I N D E X**

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Mark Evans | 61 | 87 | 117 | -- |
| Herbert Shoemake | 126 | 132 | -- | -- |
| Dr. Allan Larcena | 137 | (Deposition) | | |
| Dr. Mark Hontas | (By Deposition; see Exhibit P-3) | | | |
| Dr. James Butler | (By Deposition; see Exhibit P-4) | | | |
| Shael Wolfson | 160 | 166 | 181 | 182 |
| Dr. Kenneth Boudreaux | 187 | 200 | -- | -- |

| EXHIBITS: | Marked | Received |
|---|---|---|
| **(Intervenor)** | | |
| No.1    Affidavit of Christine Stoker | 5 | 6 |
| **(Joint)** | | |
| P-1    Medical Records | 8 | 11 |
| P-2    Medical Test Results | 8 | 11 |
| P-3    Deposition of Dr. Hontas | 8 | 11 |
| P-4    Deposition of Dr. Butler | 8 | 11 |
| P-5    W-2 and 1099s | 65 | 66 |
| P-8    (See Bench Book) | 11 | 11 |
| P-9    Slip and Fall Accident Report | 11 | 11 |
| P-10    (See Bench Book) | 11 | 11 |
| **(Ford)** | | |
| F-1    (See Bench Book) | | |
| F-2    (See Bench Book) | | |
| F-3    Evans Deposition Excerpt | 124 | 124 |

4

1                     **P R O C E E D I N G S**

2                     (Monday, March 8, 2004)

3                    (Call to Order of the Court)

4                 (Prospective jurors are not present)

5          THE COURT: Let's go on the record and take care of

6    our preliminary things before we bring the jury in.

7          Bob, we've already distributed copies of the charges,

8    which are the same, unrevised, from last week, but I wanted to

9    make sure you all had the latest version.

10         MR. MAXWELL:  Okay.

11         THE COURT:  Let's state for the record whether or not

12   there are any objections to that version of the jury charges.

13         MR. MAXWELL:  Well, Judge, on behalf of Ford Motor

14   Company, -- and this is, I assume, Judge, what we agreed to in

15   chambers -- we have no objection to this.

16         THE COURT:  Yes.  We just want to go on the record

17   relative to objections, if any.

18         All right.  Mr. Wright?

19         MR. WRIGHT:  No, Your Honor, we have no objections.

20         THE COURT:  All right.  Good.

21         Next is the jury interrogatories.  I've given you a

22   revised version.  The only revision is that we put in the

23   stipulated amount of past medical expenses.  Otherwise, there

24   have been no revisions to the jury interrogatories.

25         Mr. Wright, any objections?

1          MR. WRIGHT:  No, Your Honor.  We have no objections.

2          THE COURT:  All right.

3          MR. MAXWELL:  Judge, we have no objection -- oh, I

4   see you've added the loss of capacity for enjoyment of life.

5   Since that's all in one line, --

6          MR. SOUHLAS:   We covered that Friday, Bob.

7          MR. MAXWELL:  -- we don't have any objection.

8          THE COURT:  All right.  Good.

9          MR. MAXWELL:  But, thanks, Ernie.

10         THE COURT:  Okay, we have stipulated and I'd like to

11  put the stipulation on the record as to past medical expenses.

12  Mr. Maxwell, do you want to go ahead and just put that

13  stipulation on the record --

14         MR. MAXWELL:  Yes, Your Honor.

15         THE COURT:  -- from the interrogatories?

16         MR. MAXWELL:  Mr. Wright and I have reached a

17  stipulation that the past medical expenses are $16,371.07, and

18  that that will be printed on the jury interrogatory form.

19         THE COURT:  Okay.  And then we've got the

20  compensation carrier intervention.  Do you want to come on up

21  and make an appearance?

22         MR. CHAISSON:   Yes, Your Honor.  Aaron Chaisson on

23  behalf of Continental Casualty Company.  I've got the affidavit

24  of Ms. Christine Stokes, which I think we'll introduce as I-1.

25  Is that how you want to --

6

1          THE COURT:  That will be fine.

2          MR. CHAISSON:   And I've got copies for each party,

3    and I would like to formally offer, file and introduce that

4    into the record at this time.  And, I believe that and the

5    three uncontested facts in the Pre-Trial Order regarding the

6    Workers' Comp. carrier should be all you need from me.

7          Is that correct, Your Honor?

8          THE COURT:  That is correct.  Any objections?

9          MR. MAXWELL:  Judge, we have no objection to the

10   affidavit being admitted into the record.  We don't stipulate

11   that these are reasonable and necessary, but certainly that

12   these are the payments made by the Workers' Compensation

13   carrier.

14         THE COURT:  All right.  Mr. Wright?

15         MR. WRIGHT:  We have no objection.

16         THE COURT:  All right.  I-1 is going to be introduced

17   into evidence.  That takes care of that.

18         Let's go through any objections to exhibits.  You all

19   have exchanged exhibits marked 1 through 10; some of which are

20   in globo exhibits.  I believe that you all worked those out on

21   Friday.  Am I correct with regard to that?

22         MR. MAXWELL:  Judge, I believe the only objection

23   that we had was to the non-W-2, non-pay stub information in

24   Plaintiff's Exhibit Number 5.

25         THE COURT:  All right.

1          MR. MAXWELL:  And we, I believe, have worked out the

2    problems with the depositions that are going to be read.  And,

3    the only other thing I would note for the record is that, when

4    I reviewed over the weekend, Plaintiff's Exhibit Number 1,

5    there's sometimes two, sometimes three copies of the same thing

6    in there; which I just think needs to perhaps be cleaned up.

7          THE COURT:  Okay.

8          MR. MAXWELL:  It's not really an objection, other

9    than the fact that there's multiple copies of the same pages.

10         THE COURT:  All right.

11         MR. MAXWELL:  And, Judge, I believe that you

12   indicated last week that the report of Mr. Wolfson would not be

13   an exhibit.  If I'm incorrect on that, we would object to

14   Number 7.

15         THE COURT:  Mr. Wolfson is going to be called live,

16   and so we won't be using his report as an exhibit.

17         Is that right, Mr. Wright?

18         MR. WRIGHT:  That's correct.

19         THE COURT:  Okay.

20         MR. MAXWELL:  And, Judge, while we're on objections,

21   I want to make sure that the record is clear that we do object

22   to Mr. Wolfson being able to testify at all, because adopting

23   the reasons filed in Ford's Motion in Limine on that point.

24         THE COURT:  Okay.  The objection is noted.

25         Mr. Wright, let's talk about Exhibit Number 5.  Have

1    you agreed to take out those five pages that we discussed on

2    Friday?

3              MR. WRIGHT:  Your Honor, we have --

4              THE COURT:  Those were the projections of goals at

5    the Slidell Ford/Lincoln/Mercury dealership.

6              MR. WRIGHT:  Correct, Your Honor.  What we'd like to

7    do, Your Honor, first of all, is offer and file as Plaintiff's

8    Exhibit 1 and 2, from the bench book, as evidence in the case,

9    the medical records, which is Number 1 and then the medical

10   tests, which is Plaintiff Number 2 from the bench book.  We're

11   going to offer Number 3 and Number 4 as depositions, Dr. Hontas

12   and Dr. Butler's depositions.

13             THE COURT:  Right.

14             MR. WRIGHT:  As Number 5, we'll go ahead and

15   introduce the first, second, third, fourth, fifth and sixth,

16   and we'll go ahead and leave the other ones out, unless they

17   come in --

18             THE COURT:  Okay, good.  So, that takes care of the

19   objection to Number 5.

20             MR. WRIGHT:  Right.

21             MR. MAXWELL:  Just so we're correct, Judge; from the

22   page it says "base on goal."  The following three, four, five

23   pages will come out.

24             THE COURT:  That's right.

25             MR. WRIGHT:  I may try to introduce, like, his card,

 1   just showing that he worked --

 2           MR. MAXWELL:  I have no objection to his card.

 3           THE COURT:  There's no objection to that.

 4           No objection to that?

 5           MR. MAXWELL:  No.

 6           THE COURT:  Okay.

 7           MR. WRIGHT:  Well, I'll go ahead and introduce that

 8   at this time.

 9           THE COURT:  Okay.  And then Number 7 will not come

10   in.  That's the forensic economics report.

11           MR. MAXWELL:  And, Number 6, Judge, the Workers' Comp

12   record.

13           THE COURT:  And, Number 6 is not going to come in.

14   And then Mr. Wright, what about 8, 9 and 10?

15           MR. WRIGHT:  Actually, Number 8 is the same thing

16   that we already have.

17           THE COURT:  Okay.

18           MR. WRIGHT:  And, then Number 9 we wanted to have the

19   top section of that, but I don't think we have it right now,

20   but we'll try to get it later on.

21           MR. MAXWELL:  And, Judge, I'll tell you what, I'm not

22   even sure I'm going to offer that, because, you know, depending

23   on Mr. Evans when he testifies.  That may not even be

24   necessary.  So, maybe we could take that up at the time.

25           THE COURT:  Okay.  Well, Mr. Wright might use it and,

1    if he wants to, he can use it on the unredacted note or, if he

2    can't find the unredacted note, he can use it as currently in

3    the bench book.

4              MR. MAXWELL:  Okay.

5              THE COURT:  All right.  Mr. Wright, on the medical

6    record, under Tab Number 1, if there are some duplications,

7    let's take the duplications out before we show them to the

8    jury.

9              MR. WRIGHT:  Well, Judge, I don't have a problem

10   doing that, but I sure wish Mr. Maxwell had told us about it

11   before this morning, --

12             THE COURT:  I sure wish he would have, too.

13             MR. WRIGHT:  -- because I don't think the fact that

14   there's duplicates in there is going to prejudice anybody, and

15   I do have some copies that we're going to give the jury.  So, I

16   hate to have to go through all that, just time-wise.

17             THE COURT:  Well, if we have the time.

18             MR. WRIGHT:  What happened is we requested the

19   medical records in different sequences and some of them had

20   duplicate copies.

21             THE COURT:  Well, if we have the time, I'd like to do

22   it.  If we don't have the time, they can go in as is.

23             MR. MAXWELL:  Judge, it's just a matter of cleaning

24   it up.

25             THE COURT:  Okay.

1          MR. MAXWELL:  It will have, like, sometimes, the same

2   page appears three straight times, right behind each other.

3          THE COURT:  Right.

4          Okay, is everybody ready or does anybody have

5   anything else that we need to cover before we see if the jury

6   is ready for us?

7      (Off-the-record discussion)

8          THE COURT: We're going to admit Joint Exhibits 1

9   through 5 and 8 through 10, without objection.

10     (Short Recess)

11         THE COURT:  Okay, gentlemen, why don't you all have a

12  seat.

13     (Prospective jury enters courtroom)

14     (Matter is called by Clerk)

15         THE COURT:  Good morning, ladies and gentlemen, how

16  are you today?

17     (Positive response from panel)

18         THE COURT:  Good.  I want to welcome you to federal

19  court.  My name is Magistrate Judge Sally Shushan.  You all are

20  about to participate in one of the most important exercises in

21  our system of government, and we certainly appreciate your

22  participation today.

23         This morning, we are selecting a jury for a trial on

24  a civil case to be tried before me.  This case should be

25  completed today, but it may go over until tomorrow.

1           This matter before you involves an accident that

2    occurred on May 24th, 2001, that involved the plaintiff, Mark

3    Evans, and a vehicle manufactured by the Ford Motor Company.

4           At a prior trial, a jury reached a finding of

5    liability against Ford for this accident, and determined that

6    the injuries sustained by Mark Evans were caused by this

7    accident.

8           This trial is solely about the amount and the extent

9    of damages due to the plaintiff as a result of the accident of

10   May 24th, 2001.

11          You are not to speculate or consider the liability of

12   Ford Motor Company, which was determined by the first trial.

13          We're going to be selecting this morning a jury of

14   six persons.  All jurors will have the same duties and

15   obligations as the other jurors and all will participate in the

16   deliberations.

17          Is the plaintiff ready?

18          MR. WRIGHT:  Yes, Your Honor.

19          THE COURT:  All right.  Is the defense ready?

20          MR. MAXWELL:  Yes, ma'am, we are.

21          THE COURT:  All right.  The parties in this case, the

22   plaintiff and the defendant, have a right to have this case

23   tried by a fair and impartial jury.  A qualified and impartial

24   jury is one which is responsible and which is capable.  A jury

25   must, without fear, favor, bias, prejudice, sympathy or

1  passion, objectively hear and decide the issues to be tried,

2  and render its verdict based solely on the evidence presented

3  at this trial and the law applicable to this case, as I will

4  give it to you.

5          A juror's qualifications and impartiality may not be

6  assumed without inquiry.  The inquiry which we are about to

7  make is known as the voir dire.  Its purpose is to develop the

8  truth about a juror's competency, his or her frame of mind, and

9  the ability to do his or her sworn duty in accordance with the

10  juror's oath.

11          Your answers to the questions that I am about to ask

12  will enable me to determine whether a juror should be excused

13  for cause, either on my motion or upon the motion of a party.

14          They will also allow counsel to make intelligent use

15  of their peremptory challenges.  Peremptory challenges are

16  challenges which the law gives each party to exercise without

17  assigning any reason for the challenge.

18          It is absolutely essential that your answers to the

19  questions are complete and are truthful.  Each of you is

20  required to disclose, upon general questioning, any and all

21  matters which might tend to disqualify you for any reason from

22  sitting as a juror in this case.

23          While the questions may be broad, it is your

24  affirmative duty to honestly and conscientiously answer the

25  real implications of the questions asked and to make your

1    answers as full and complete as possible under the

2    circumstances.

3            False or misleading answers may result in the seating

4    of a juror who might have been discharged by the Court for

5    cause or stricken through the exercise of a peremptory

6    challenge and could result in a miscarriage of justice.

7            So, consider each question very carefully.  Do not

8    wait until after you are selected and sworn as a juror to

9    disclose something that ought to have been made known when the

10   question was asked or when one question suggests to you some

11   other reason for disqualification.  Don't be shy.  If there is

12   something you need to tell me, but it's personal, raise your

13   hand and we'll talk about it up here at the bench.

14           The questions I will ask you will be addressed to all

15   of you, collectively, but they must be considered as though

16   directed to each of you individually.

17           Our clerk is going to administer an oath to the

18   entire group, and you should understand that the answers that

19   you give to these questions are given under oath.

20                   *    *    *    *    *

21              **PROSPECTIVE JURY PANEL SWORN**

22                   *    *    *    *    *

23           THE COURT:  All right.  What we're going to do is,

24   we're going to talk to each of you, individually, just to get

25   to know a little something about each of you, and then we're

1   going to ask the collective question.  So, beginning with Juror

2   Number 1, I'm going to ask each of you to stand and give us

3   your name, your marital status, your spouse's name, present

4   occupation or business, and the name of your employer and that

5   will give us a little feel for each of you, individually.

6           PROSPECTIVE JUROR NUMBER 15:  (Raises hand)

7           THE COURT:  Yes, ma'am?

8           PROSPECTIVE JUROR NUMBER 15:  Could I see you a

9   moment, please?

10          THE COURT:  Yes, ma'am.  Come on up.  What's your

11  juror number?

12          PROSPECTIVE JUROR NUMBER 15:  I thought it was 15,

13  but I'm not sure.

14          THE COURT:  Well, when you come up, I'll look at your

15  tag and tell you.

16      (Prospective Juror Number 15 approaches side bar)

17      **(At side bar)**

18          PROSPECTIVE JUROR NUMBER 15:  Hi, my name is Billie

19  Encar.

20          THE COURT:  Yes, ma'am.

21          PROSPECTIVE JUROR NUMBER 15:  I told them that I

22  didn't hear well.

23          THE COURT:  You have a hearing problem?

24          PROSPECTIVE JUROR NUMBER 15:  Yes.

25          THE COURT:  Okay.

1          PROSPECTIVE JUROR NUMBER 15:  On this side.  So, I

2    just don't want to make a mistake.

3          THE COURT:  No problem.  Don't get nervous.  We'll

4    cover that, and I appreciate your coming up.  You think you're

5    Juror Number 15?

6          PROSPECTIVE JUROR NUMBER 15:  I thought I was.  I'm

7    not quite sure.

8          THE COURT:  Okay.  Now, don't get nervous.  Go sit

9    down and we will take that into account.  Thank you so much for

10   coming up.

11       (Prospective Juror 15 leaves sidebar)

12       **(Side bar concluded)**

13         THE COURT:  Yes, sir, your juror number?

14         PROSPECTIVE JUROR NUMBER 14:  I don't know.  I'm

15   sorry.

16         THE COURT:  Everybody forgets.  Hold on.

17         Okay, Number 14, and that's Mr. Barrilleaux.  How are

18   you today?

19       **(At side bar)**

20       (Prospective Juror 14 approaches sidebar)

21         PROSPECTIVE JUROR NUMBER 14:  I have a lot of

22   medication and all that.  Of course, I can't drive.  I own a

23   business, but I can't work due to my health and all.

24         THE COURT:  So, you're on what kind of medication,

25   Mr. Barrilleaux?

1          PROSPECTIVE JUROR NUMBER 14:  About 10 different

2     ones.  I got heart problems.  I pass out and all that; things

3     like that.

4          THE COURT:  I appreciate your coming up to tell me

5     that.

6          PROSPECTIVE JUROR NUMBER 14:  I can't drive and all.

7          THE COURT:  All right.  I appreciate it very much.

8          PROSPECTIVE JUROR NUMBER 14:  Okay; thank you.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR NUMBER 14:  Just have a seat here?

11         THE COURT:  Yes, sir.

12        (Prospective Juror 14 leaves sidebar)

13        **(Side bar concluded)**

14         THE COURT:  All right.  Getting back to the schedule.

15    Mr. Tran, good morning.  How are you today?

16         PROSPECTIVE JUROR NUMBER 1:  I'm doing fine, thank

17    you.

18         THE COURT:  Fine; good.  Let's see, we were going to

19    start with your name, which we have, and your marital status.

20         PROSPECTIVE JUROR NUMBER 1:  Okay.  My name is Kim,

21    my first name.  My last name is Tran.  I'm married for 22

22    years.

23         THE COURT:  Good.

24         PROSPECTIVE JUROR NUMBER 1:  My occupation, I'm a

25    pastor of a multi-racial church in New Orleans.

1              THE COURT:  Good.  And, what about your wife, is she

2    employed?

3              PROSPECTIVE JUROR NUMBER 1:  Yes, she's a physical

4    therapist at Touro.

5              THE COURT:  At Touro Infirmary?

6              PROSPECTIVE JUROR NUMBER 1:  Yes.

7              THE COURT:  All right, sir.  Thank you very much.

8              All right.  Juror Number 2, that's Ms. Moore.  How

9    are you today?

10             PROSPECTIVE JUROR NUMBER 2:  (Inaudible)

11             THE COURT:  Good.

12             PROSPECTIVE JUROR NUMBER 2:  My name is Carol Moore.

13   I'm single.  I work with St. Mary Academy, and I'm a cook.

14             THE COURT:  Good.  And, any children?

15             PROSPECTIVE JUROR NUMBER 2:  I've got three.

16             THE COURT:  Three.  How old are they?

17             PROSPECTIVE JUROR NUMBER 2:  Thirty-two, 29 and 18.

18             THE COURT:  Almost all out of the house, huh?

19             PROSPECTIVE JUROR NUMBER 2:  (Inaudible response)

20             THE COURT:  Good.

21             All right.  Juror Number 3.  That's Mr. Guyan.

22             PROSPECTIVE JUROR NUMBER 3:  My name is Joey Guyan.

23   I'm married for three years.  My occupation is the assistant

24   manager of a detail shop, and that's about it.

25             THE COURT:  Is your wife employed?

1          PROSPECTIVE JUROR NUMBER 3:  Yeah, for Terrebonne

2    Parish Library.

3          THE COURT:  Okay; very good.  Thank you very much.

4          All right, Number 4, and that's Rodriguez-Robles.

5          PROSPECTIVE JUROR NUMBER 4:  Wilfredo Rodriguez-

6    Robles, and I work for the U.S. Department of Agriculture as a

7    computer programmer.  I've been married for the last three

8    years.  My wife's name is Paula Rodriguez-Robles.

9          THE COURT:  And, is she employed?

10          PROSPECTIVE JUROR NUMBER 4:  She is a housewife, and

11    she is studying to pass the bar, hopefully.

12          THE COURT:  Good.  Good; that's very nice.

13          All right.  Next is Number 5, and it's Mr. Naquin.

14          PROSPECTIVE JUROR NUMBER 5:  Right.  My name is

15    Adrian Naquin.  I've been married 34 years.  My wife's name is

16    Linda.  She's a retired school teacher.  I'm retired from Shell

17    Chemical Company in Norco.  I worked there for 34 years; 24

18    years of it was a safety inspector.

19          And, I have two children and three grandchildren.

20          THE COURT:  Good.  Thank you very much.

21          And, next is Mr. Juneau.  Good morning, sir.

22          PROSPECTIVE JUROR NUMBER 6:  How you doing?

23          THE COURT:  Fine, thank you.

24          PROSPECTIVE JUROR NUMBER 6:  Aubrey Juneau.  I'm

25    married.  My wife retired with the federal government and I'm a

 1    retired police officer.

 2              THE COURT:  Here in Orleans?

 3              PROSPECTIVE JUROR NUMBER 6:  Jefferson Parish.

 4              THE COURT:  Jefferson.

 5              PROSPECTIVE JUROR NUMBER 6:  JPSO.  And, I live on

 6    the northshore.  And, that's about it.

 7              THE COURT:  Good.  Thank you very much.

 8              All right.  Next we've got Mr. Darcey.  How are you

 9    today?

10              PROSPECTIVE JUROR NUMBER 7:  Good morning.

11              THE COURT:  Good morning.

12              PROSPECTIVE JUROR NUMBER 7:  My name is Terry Darcey.

13    I'm married coming up on 13 years.  I'm an offshore supply boat

14    captain; two children, one son, 19, that works offshore, and

15    one daughter 12, still in school.

16              THE COURT:  Good.  Thank you very much.

17              PROSPECTIVE JUROR NUMBER 7:  My wife is a physical

18    therapist at a nursing home in Houma.

19              THE COURT:  Terrific.  Thank you.

20              All right.  Ms. Longo, how are you?

21              PROSPECTIVE JUROR NUMBER 8:  I'm a little nauseous,

22    but I'll be all right -- since you asked.

23              THE COURT:  I'm sorry to hear that.  It's not your

24    best day, huh?

25              PROSPECTIVE JUROR NUMBER 8:  I am married.  I have

1   two children, 32 and 37.

2              THE COURT:  All right.  And, your husband's

3   employment?

4              PROSPECTIVE JUROR NUMBER 8:  He is employed with

5   Delta Business Communications, and I am not employed.

6              THE COURT:  Okay.  Good; thank you so much.

7              All right.  Next up is Ms. Jessie.  Good morning.

8              PROSPECTIVE JUROR NUMBER 9:  Good morning.  My name

9   is Alena Jessie.  I'm widowed, and I work for a child care

10  service in Marrero.

11             THE COURT:  Okay.  Terrific; and how long have you

12  been doing that, Ms. Jessie?

13             PROSPECTIVE JUROR NUMBER 9:  Three years.

14             THE COURT:  Good.  Thank you very much.

15             Okay.  Mr. Vicknair.

16             PROSPECTIVE JUROR NUMBER 10:  My name is Jody

17  Vicknair.  I'm an assistant manager for Enterprise Rent-a-car

18  here in New Orleans.  I am married.  I've been married for

19  three years.  My wife, she's a dental assistant uptown.

20             THE COURT:  All right.  Thank you.

21             And we've got Ms. McKay.  Good morning, Ms. McKay.

22             PROSPECTIVE JUROR NUMBER 11:  Good morning.  My name

23  is Anitra McKay.  I'm single.  I have no kids.  I'm a human

24  resource manager for the Home Depot.

25             THE COURT:  Okay.  Thank you.

1              Okay, we've got Mr. Benoit.

2              PROSPECTIVE JUROR NUMBER 12:  Good morning.

3              THE COURT:  Good morning.

4              PROSPECTIVE JUROR NUMBER 12:  My name is Floyd

5    Benoit.  I work for Lafourche Parish School Board as a central

6    office supervisor.  My wife is employed by Nicholls State

7    University in the Financial Aid Department.  We've been married

8    for 20 years with three children; 19, 15 and 6.

9              THE COURT:  Thank you very much.

10             Okay, this one is easy, Mr. Rome.  Good morning.

11             PROSPECTIVE JUROR NUMBER 13:  How you all doing?

12   Good morning.  My name is Carl Rome.  I work for the Department

13   of Transportation.  I've been there 10 years, maintenance

14   repair.  My wife works at Terrebonne General.  She's an R.N.

15   nurse.  And, we have two boys; 10 and 5.

16             THE COURT:  All right.  Thank you very much.

17             PROSPECTIVE JUROR NUMBER 13:  We've been married 17

18   years.

19             THE COURT:  All right.  Mr. Barrilleaux; we meet

20   again.

21             PROSPECTIVE JUROR NUMBER 14:  My name is Gary

22   Barrilleaux.  I'm divorced.  I'm a barroom owner, and, of

23   course, I don't work at it due to my health.

24             THE COURT:  Okay.  Thank you very much.

25             All right.  Encar, is that correct?

Jury Voir Dire                                              23

1          PROSPECTIVE JUROR NUMBER 15:  Yes.

2          THE COURT:  All right.

3          PROSPECTIVE JUROR NUMBER 15:  My name is Billie

4    Encar.  I've been married for 38 years; three children, two

5    grandchildren.  I work at the Metairie Photo and Gifts.

6          THE COURT:  Terrific.  Thank you very much.

7          Okay, Ms. Jones, how are you today?

8          PROSPECTIVE JUROR NUMBER 16:  I'm fine, thank you.

9          THE COURT:  Good.

10         PROSPECTIVE JUROR NUMBER 16:  I'm Joyce Jones.  I'm a

11   widow for seven and a half years.  I have two daughters, twins,

12   20 years old.  I work at Sears in Metairie.  I've been there

13   for 18 years.

14         THE COURT:  Good.  Thank you so much.

15         All right.  And, we've got Ms. Kelly.  How are you?

16         PROSPECTIVE JUROR NUMBER 17:  Good.  Adaline Kelly.

17   I've been married for 34 years.  I'm a pre-school assistant

18   teacher at St. Christopher and my husband is retired from U.S.

19   Airways, but he works part-time, now, at Pep Boys.

20         THE COURT:  Terrific.  Thank you.

21         And, last but not least, Mr. Roussel, how are you

22   today?

23         PROSPECTIVE JUROR NUMBER 18:  Just fine.  My name is

24   Troy Roussel.  I'm married for 18 years.  I've worked at Dupont

25   Dow for 23 years.  My wife works at Marathon Oil for 20 years.

Jury Voir Dire                                    24

1    I have two kids, two girls; one 12 and one 10.

2         THE COURT:  Terrific.  Thank you very much.

3         All right.  Now, I'm going to ask you all some

4    questions.  If any of you want to say something specific in

5    response to any particular question, please raise your hand,

6    and I'm going to call on you.  And, again, don't be shy.  If

7    you have any difficulty hearing me, let me know.  Most people

8    don't have difficulty hearing me, even without the microphone.

9         Okay, do any of you have any problems reading,

10   writing, speaking or understanding the English language?

11        And, do any of you have any problems seeing or

12   hearing?

13        PROSPECTIVE JUROR NUMBER 6:  (Affirmative response)

14        THE COURT:  Yes, sir.  That's Juror Number 6, is that

15   right, sir?

16        PROSPECTIVE JUROR NUMBER 6:  Uh-huh.

17        THE COURT:  Yes, sir.  What's your problem?

18        PROSPECTIVE JUROR NUMBER 6:  Well, I do have a slight

19   hearing problem.  I have --

20        THE COURT:  Have you been able to hear me okay so far

21   today?

22        PROSPECTIVE JUROR NUMBER 6:  So far, I can hear you.

23        THE COURT:  Most people can.

24        PROSPECTIVE JUROR NUMBER 6:  I have tinnitus.

25        THE COURT:  You do?  You have ringing in your ears?

1          PROSPECTIVE JUROR NUMBER 6:  Very severe; yes, ma'am.

2          THE COURT:  Okay.  And who else raised their hand?

3          PROSPECTIVE JUROR NUMBER 14:  (Affirmative response)

4          THE COURT:  Okay.  Juror Number 14.

5          PROSPECTIVE JUROR NUMBER 14:  Fourteen; yeah.

6          THE COURT:  Yes, sir.

7          PROSPECTIVE JUROR NUMBER 14:  I have a hearing

8  problem.  In fact, I don't hear that good.

9          THE COURT:  Okay.  And, Ms. Encar?

10          PROSPECTIVE JUROR NUMBER 15:  I have a hearing

11  problem.

12          THE COURT:  Also a hearing problem.

13          All right.  Anybody else raised their hand in

14  response to that question?

15          Is there any juror who would be unduly burdened with

16  financial, business or family problems if this trial goes as

17  late as 5:30 today and may go into tomorrow?

18          Do you think that you know anything about this case;

19  that is, have you read anything about it?  Have you heard any

20  discussions with regard to this case at all?

21          If any of you have previously served on a jury of any

22  kind, either state or federal court, either civil or criminal,

23  I'd like you to please raise your hand, tell us your juror

24  number, and tell us where and what kind of case you sat on the

25  jury for, and whether a verdict was reached in that case.

1          Raise your hand for me, and we're going to go through

2    the list.

3          Okay, we've got, first, Juror Number 5.  Yes, sir.

4          PROSPECTIVE JUROR NUMBER 5:  It's been a long time

5    ago and it was in Hahnville for a manslaughter trial and a

6    verdict was --

7          THE COURT:  Was reached?

8          PROSPECTIVE JUROR NUMBER 5:  -- reached.

9          THE COURT:  Was it a guilty verdict?

10         PROSPECTIVE JUROR NUMBER 5:  It was a non-guilty

11   verdict.

12         THE COURT:  Non-guilty?

13         PROSPECTIVE JUROR NUMBER 5:  Yes.

14         THE COURT:  Good.  All right, we've got Juror

15   Number 6, Mr. Juneau.

16         PROSPECTIVE JUROR NUMBER 6:  What was the last

17   question, Your Honor?

18         THE COURT:  Prior jury service, and tell us the kind

19   of case and whether or not it reached a verdict.

20         PROSPECTIVE JUROR NUMBER 6:  Oh, no.  Never been on a

21   jury.

22         THE COURT:  Okay.  All right, Mr. Darcey, Number 7.

23         PROSPECTIVE JUROR NUMBER 7:  Yes, ma'am.  It was

24   approximately 14 years ago.  I served on a grand jury case here

25   in the federal courthouse in New Orleans, and it was concerning

1    two employees that were involved in a chemical accident

2    explosion.

3              THE COURT:  All right.  Did you all --

4              PROSPECTIVE JUROR NUMBER 7:  And, as far as the

5    settlement, after four days, the parties had settled out of

6    court.

7              THE COURT:  Gotcha.

8              Okay, who else had their hand up?

9              PROSPECTIVE JUROR NUMBER 8:  (Affirmative response)

10             THE COURT:  Yes, ma'am.  Number 8; that's Ms. Longo.

11             PROSPECTIVE JUROR NUMBER 8:  I served on a jury.  It

12   was a drug case, possession of drugs, and the verdict was

13   guilty.  Ten out of 12 voted guilty.

14             THE COURT:  Gotcha.  All right; thank you.

15             On our next row, we've got Mr. Vicknair, Number 10.

16             PROSPECTIVE JUROR NUMBER 10:  It was about four years

17   ago.  It was in parish court, and there was not a verdict

18   rendered.

19             THE COURT:  It was a civil case?

20             PROSPECTIVE JUROR NUMBER 10:  No, ma'am.  It was a

21   murder case.

22             THE COURT:  A hung jury?

23             PROSPECTIVE JUROR NUMBER 10:  No, ma'am.  It was

24   settled out of court.

25             THE COURT:  Okay.  Good.

1            And, who was next with their hand up?

2            That's it, huh?  That's unusual.

3            Okay, the plaintiff in this case is Mark Evans.

4            Mr. Evans, would you stand up, please, so the jury

5    will know who you are?

6            PLAINTIFF MARK EVANS:  (Stands at counsel table)

7            THE COURT:  Thank you.

8            The defendant in this case is Ford Motor Company,

9    Incorporated.  Do you or any of your close friends or relatives

10   work for or have any business with the parties to this action;

11   that is, either with Mr. Mark Evans or with Ford Motor Company,

12   or Ford Motor Credit Company?

13           PROSPECTIVE JUROR NUMBER 5:  I've got a cousin that

14   works for Laplace Ford.  He's a manager, sales manager.

15           THE COURT:  Okay.  That's Juror Number 5.  And, he

16   works for one of the dealerships?

17           PROSPECTIVE JUROR NUMBER 5:  Yes.

18           THE COURT:  Okay.  And, he's a sales manager?

19           PROSPECTIVE JUROR NUMBER 5:  Yes.

20           THE COURT:  Does the fact that he works for one of

21   the dealerships, would that, in any way, influence your ability

22   to render a verdict in this case, based solely on the evidence

23   you hear in this case?

24           PROSPECTIVE JUROR NUMBER 5:  No, Your Honor.

25           THE COURT:  Okay.  You could be fair and impartial?

1          PROSPECTIVE JUROR NUMBER 5:  Yes.

2          THE COURT:  All right.  Juror Number 3, you also

3     raised your hand.

4          PROSPECTIVE JUROR NUMBER 3:  Well, I work for a

5     dealership in Houma that also has Ford as one of their

6     vehicles.

7          THE COURT:  Would that, in any way, influence your

8     ability to render a fair decision, based solely on the evidence

9     presented in this case?

10          PROSPECTIVE JUROR NUMBER 3:  No, ma'am.

11          THE COURT:  All right.  Good.

12          Anybody else?  Good.

13          Each party in this case is represented by counsel,

14     and I'm going to ask each of them to stand and introduce

15     themselves to you.

16          MR. WRIGHT:  My name is Carter Wright.

17          MR. TAGGART:  My name is Gene Taggart.

18          MR. SOUHLAS:  I'm Ernie Souhlas.

19          THE COURT:  Okay, those are the attorneys for the

20     plaintiff.

21          The attorneys for the defendants, --

22          Go ahead.

23          MR. MAXWELL:  Good morning.  I'm Bob Maxwell from

24     Covington and, along with Trey Kelly, we represent Ford Motor

25     Company.  And, he's behind the pole.

1          THE COURT:  It's a wonderful courtroom, except for

2    one problem.

3          What we need to know is whether any of you are

4    related by blood or marriage or have any of you ever been

5    represented by any of the attorneys connected with this case,

6    or with their law firms, that you know of?

7          Good.

8          In connection with your employment, do you have

9    anything to do with the adjustment of claims or the settlement

10   of claims for damages?  Do any of you work in that regard?

11         Have you or any member of your immediate family ever

12   had a claim against anyone for damages?

13         PROSPECTIVE JUROR NUMBER 7:  Excuse me.

14         THE COURT:  Yes, sir.

15         PROSPECTIVE JUROR NUMBER 7:  Are you talking about as

16   far as vehicular accidents?

17         THE COURT:  Any kind of claim for damages.

18         PROSPECTIVE JUROR NUMBER 7:  Number 7.

19         THE COURT:  Number 7.

20         PROSPECTIVE JUROR NUMBER 7:  I had two claims for

21   missing parts off the hands.  That was all settled.

22         THE COURT:  You were involved in accidents on the

23   job?

24         PROSPECTIVE JUROR NUMBER 7:  Yes.

25         THE COURT:  Okay.  And, were those settled,

1    ultimately?

2            PROSPECTIVE JUROR NUMBER 7:  Yes.

3            THE COURT:  Were lawsuits filed as a result of those

4    claims?

5            PROSPECTIVE JUROR NUMBER 7:  No, ma'am.  They were

6    all settled out of court.

7            THE COURT:  Good.  Okay.

8            And we had Number 4.  Yes, sir.

9            PROSPECTIVE JUROR NUMBER 4:  Rodriguez.

10           THE COURT:  Rodriguez; okay.

11           PROSPECTIVE JUROR NUMBER 4:  That's okay.  It was

12   just recently it was a small court, this court right in Kenner,

13   and it was for breach of contract.  I was repair, this

14   mechanic, and it was in our favor.

15           THE COURT:  He did a lousy job for you, huh?

16           PROSPECTIVE JUROR NUMBER 4:  I'm sorry?

17           THE COURT:  The mechanic did a lousy job for you?

18           PROSPECTIVE JUROR NUMBER 4:  Actually, he charged us

19   more than he should.

20           THE COURT:  And, that was successfully concluded?

21           PROSPECTIVE JUROR NUMBER 4:  Well, not yet.  We're

22   still trying to get the money from him, but it's going in our

23   favor.  We already made it public.

24           THE COURT:  Good.

25           Anybody else raised their hand?

1          Okay, good.

2          Now, has anyone in the jury pool ever had a claim for

3    damages asserted against you or against a member of your

4    immediate family?

5          PROSPECTIVE JUROR NUMBER 6:  (Affirmative response.)

6          THE COURT:  Yes, sir; that's Juror Number 6.

7          PROSPECTIVE JUROR NUMBER 6:  Well, I had -- my father

8    was fatally -- well, he was killed in an auto accident.

9          THE COURT:  Okay.  And, you asserted a claim --

10          PROSPECTIVE JUROR NUMBER 6:  We did.  We filed a suit

11    and we settled.

12          THE COURT:  And, so you settled the case before it

13    could be tried?

14          PROSPECTIVE JUROR NUMBER 6:  We settled the case

15    before the trial.

16          THE COURT:  All right, sir.  Thank you.

17          Now, I'm going to ask you whether you know any of the

18    people who may be called as witnesses at this trial.

19          We've got Mr. Evans;

20          Dr. Mark Hontas, H-O-N-T-A-S;

21          Dr. James Butler;

22          Shael Wolfson;

23          Ken Boudreaux, and;

24          Dr. Allan Larcena, it's L-A-R-C-E-N-A.

25          Do any of you know any of those witnesses?

1          Okay.  Now, if you are selected as a juror in this

2   case, you will be required to put aside any feeling of passion

3   or prejudice and decide this case solely on the evidence

4   introduced during the trial and the instructions that I will

5   give you concerning the law.

6          Will you be able to do that?  Does anybody think they

7   can't do that?

8          All right.  Now, I'm going to ask the lawyers at this

9   point whether they have any additional questions for you, and

10  let's start with the plaintiff.

11         Mr. Wright?

12         MR. WRIGHT:  I just wanted to ask Mr. Naquin --

13         PROSPECTIVE JUROR NUMBER 5:  Yes?

14         MR. WRIGHT:  You were a safety representative --

15         PROSPECTIVE JUROR NUMBER 5:  Yes, sir.

16         MR. WRIGHT:  -- for many years for Shell Chemical.

17         PROSPECTIVE JUROR NUMBER 5:  That's right, sir.

18         MR. WRIGHT:  Do you understand that the Judge has

19  instructed us that we're not to consider the liability of Ford,

20  that that's already been determined?  So, for you to go back

21  and consider your safety days at Shell, you're not to consider

22  the fault of any parties; that that's already been decided.

23  Can you forgo --

24         PROSPECTIVE JUROR NUMBER 5:  I think I can.

25         MR. WRIGHT:  -- your many years of --

1          Judge, I think that's the only question I have.

2          THE COURT:  Okay.  Mr. Maxwell.

3          MR. MAXWELL:  I just have a couple.

4          Does anyone have any feelings, either negative or

5    positive, about Ford Motor Company?  And I'll tell you why I

6    asked that.  It's okay if you do.  I just want to know.  My dad

7    was a Pontiac man, and if you didn't have a Pontiac, he thought

8    there was something wrong with you.  And, there's some people

9    that are just that way.

10         So, anyone have strongly positive or any strongly

11   negative feelings about Ford Motor Company?

12         I don't see any hands go up.

13         And, let me ask you this:  Since there has been a

14   prior proceeding in this case, and we're here today to talk

15   about what damages, if any, are due to Mr. Evans, are you able

16   to put me on an even plane?  Because neither one of us wants to

17   be in a little bit of a hole or has to work a little bit harder

18   to put on our case.  Would you still be able to treat Ford

19   fairly, even though there has been a determination that

20   Mr. Evans was injured in an accident involving a Ford vehicle?

21         Are you going to listen to me just as carefully as

22   you listen to Mr. Wright here in his case?  Is that going to be

23   a problem for anyone?

24         All right.  That's all I have.  Thanks very much.

25         THE COURT:  All right.  What we're going to do now is

1    I'm going to ask the attorneys to approach the bench and we're

2    going to talk about selecting the actual jury out of the group

3    that we have here in the courtroom.  So, if you'll just bear

4    with us for a little bit.

5            MR. MAXWELL:   Could we have about two minutes to

6    consult?

7            THE COURT:  Sure.  You all want a couple of minutes

8    to consult?

9            MR. WRIGHT:  Yes.

10           **(Short Break)**

11           **(At side bar)**

12           MR. WRIGHT:  We're just going to seat six, Judge?

13           THE COURT:  Yes.

14           All right, gentlemen, we're going to each have three

15   peremptory challenges.  We're going to go back and forth.  The

16   plaintiff will go first, go over to the defendant, back again.

17           MR. WRIGHT:  Okay, are we going to start with

18   Number 1 and just see if we challenge?  Is that the way --

19           THE COURT:  Yes, that will be fine.  Let me just tell

20   you that you all were not up here at the time, but Number 14,

21   that's Mr. Barrilleaux, is on five different kinds of heart

22   medication, and he's hard of hearing.  I'm going to strike him

23   for cause.

24           MR. WRIGHT:  Okay, which one is that?

25           THE COURT:  Number 14.

1           THE COURT:  And, then the next one, Ms. Encar, also

2    has no hearing in one ear, at all, and she's very nervous about

3    it.  So, I'm also going to dismiss her for cause.

4           Okay, let's start with Juror Number 1.  Do you want

5    to strike Juror Number one?

6           MR. MAXWELL:  We'll use a challenge on him.

7           MR. WRIGHT:  What did you say?

8           MR. MAXWELL:  Yes.

9           MR. WRIGHT:  Yes?  He's a minister.

10          THE COURT:  Okay.  Juror Number 2?

11          MR. WRIGHT:  We're fine with her.

12          THE COURT:  Juror Number 2?

13          MR. MAXWELL:  We challenge.

14          THE COURT:  You challenge?

15          MR. MAXWELL:  Yes.

16          THE COURT:  Okay.  Juror Number 3?

17          MR. WRIGHT:  We're fine with three.

18          THE COURT:  Three?

19          MR. MAXWELL:  Three is fine.

20          THE COURT:  Juror Number 4?

21          MR. WRIGHT:  We're fine with him.

22          MR. MAXWELL:  Yes.

23          THE COURT:  Juror Number 5?

24          MR. WRIGHT:  We strike.

25          THE COURT:  You strike him.

1           MR. WRIGHT:  (Nods affirmatively)

2           THE COURT:  Juror Number 6?

3           MR. WRIGHT:  We strike.

4           MR. MAXWELL:  He had a hard time hearing, too, Judge.

5           THE COURT:  Based on the other strikes, I'm going to

6    strike him for cause.

7           Okay, Juror Number 7?

8           MR. WRIGHT:  He's fine.

9           MR. MAXWELL:  He's fine.

10          THE COURT:  Juror Number 8?  She told us she was

11   nauseous, if you will remember.

12          MR. MAXWELL:  Yeah, she's looking really bad.  I

13   think you should let her go.

14          MR. WRIGHT:  Let her go.

15          THE COURT:  Let her go?

16          MR. WRIGHT:  Yeah.

17          THE COURT:  That's for cause.

18          THE COURT:  Juror Number 9?

19          MR. WRIGHT:  We're okay.

20          MR. MAXWELL:  I'm skewed up.  That's the white man in

21   the second row?

22          THE COURT:  No, that's Ms. Jessie, Number 9.  She's

23   the first lady in the second row.

24          MR. MAXWELL:  She's fine.

25          THE COURT:  Okay, Juror Number 10?

1           MR. WRIGHT:  We'll scratch him.

2           THE COURT:  Juror Number 10 is being scratched by the

3    plaintiff.

4           Juror Number 11.

5           MR. WRIGHT:  We're okay.

6           THE COURT:  Juror Number 11?

7           MR. MAXWELL:  Fine.

8           MR. WRIGHT:  Do you have any challenges left?

9           MR. MAXWELL:  Uh-huh.

10          THE COURT:  He's got one left, you've got one left.

11          Juror Number 12?

12          MR. SOUHLAS:  Let's keep him.

13          MR. MAXWELL:  He's fine.

14          THE COURT:  We are going to be selecting the

15   following, read with me, gentlemen:  Jurors Number 3, 4, 7, 9,

16   11 and 12.

17          MR. MAXWELL:  That's it.

18       **(Side bar concluded)**

19          THE COURT:  All right, we've now got our jury.  When

20   I read your name, if you'll come on up and sit in the jury box.

21   That will be:

22          Juror Number 3, Mr. Guyan;

23          Juror Number 4, Mr. Rodriguez;

24          Juror Number 7, Mr. Darcey;

25          Juror Number 9, Ms. Jessie;

1          Juror Number 11, Ms. McKay, and;

2          Juror Number 12, Mr. Benoit.

3          I want to thank the rest of you for participating

4   this morning.  I know that it brought you away from family and

5   jobs, and I certainly appreciate your taking the time with us.

6   Without your participation this morning, we couldn't have

7   selected our jury.  So, thank you very much.  The court

8   security officer is going to take you back down.  Thank you.  I

9   appreciate it.

10       (Jurors not selected exit courtroom)

11          Gentlemen, I'd like you, on behalf of the plaintiff

12  and on behalf of the defendant, to state for the record that

13  this is the jury you have selected.

14          MR. WRIGHT:  Yes, Your Honor.

15          MR. MAXWELL:  Yes, Your Honor.

16          THE COURT:  All right.  Ladies and gentlemen of the

17  jury is how I can address you at this point.  I instruct you

18  not to discuss this case with anyone while it's ongoing.  If

19  anyone attempts to discuss the case with you, please report it

20  to the court security officer or to me.

21          You must remember that, until this case is over, you

22  have heard only a part of it and you must reserve your judgment

23  in this case until the case is completed and it is given to you

24  for deliberations.

25          I further instruct you that you are not to speak to

1    or fraternize with any of the parties to this suit, or with the

2    attorneys or the witnesses in the case while it is being tried.

3    Even if the subject of your conversation has nothing to do with

4    the case, your conversation with any of the people involved is

5    bound to be misunderstood by your fellow jurors and by the

6    parties, themselves.

7        We all tend to be polite and say "good morning" to

8    each other when we meet in the hall or the elevator, but you

9    should avoid that with the parties and with the attorneys or

10   witnesses, so that you can avoid any question with regard to

11   your impartiality.  No one will think that you're rude.

12       I remind you that you have a great responsibility as

13   jurors.  Your conduct during the trial of this case is the

14   subject of scrutiny by the court, by your fellow jurors, and by

15   the parties and the attorneys.  It is most important that you

16   be entirely circumspect in the manner in which you come and go

17   from the courtroom, so that no one may doubt that this case is

18   being tried fully and fairly and the ends of justice are being

19   served.

20       By the same token, I want to caution the lawyers and

21   the parties and the witnesses that under no circumstances may

22   they talk with or fraternize with members of the jury during

23   the course of this trial.

24       Okay, I'm going to ask the deputy clerk to go ahead

25   and swear you in as members of the jury.

1                         *    *    *    *    *

2                         **JURY PANEL SWORN**

3                         *    *    *    *    *

4              THE COURT:  All right, ladies and gentlemen.  We're

5     going to take a brief recess, so that if you all need to make a

6     call, let people know that you've been selected for the jury

7     and take a bathroom break.  We'll come back.  I'll give you

8     some preliminary instruction.  We'll have opening arguments,

9     and then we'll start the trial.

10         (Jury exits courtroom)

11         **(Recess from 9:25 a.m. to 9:40 a.m.)**

12         (Jury enters courtroom)

13             THE COURT:  All right, you all can have a seat,

14    please.

15             Members of the jury, you all have now been sworn and

16    you are the jury in this case.  As the jury, you will decide

17    the disputed issues of fact.  As the judge, I will decide all

18    questions of law and procedure.  From time to time during the

19    trial and at the end of trial, I will instruct you on the rules

20    of law that you must follow in making your decision.

21             This case will proceed in the following order:

22             Counsel for the plaintiff will make an opening

23    statement outlining his case;

24             Then counsel for the defendant may make an opening

25    statement outlining Ford's case.

1          The opening statements are not evidence, but are

2     merely to aid you in understanding the significance of the

3     evidence which is going to be introduced.

4          After the opening statements, if any, counsel for the

5     plaintiff will introduce evidence.  At the conclusion of the

6     plaintiff's case, counsel for the defendant may introduce

7     evidence, and rebuttal evidence may be introduced.

8          At the conclusion of all of the evidence, the

9     attorneys will make closing arguments to you.

10          After the closing arguments, you will be given

11     further instructions and you will deliberate and reach your

12     verdict.

13          Before you hear the evidence in this case, I will

14     partially instruct you on the law, which you must apply.  At

15     the conclusion of the case, after closing arguments, I will

16     further instruct you on the law that is to be applied in this

17     case.

18          It is your duty to follow the law as I give it to

19     you.  On the other hand, you are the sole judges of the facts.

20     Do not consider any statement that I might make in the course

21     of the trial or in these instructions as an indication that I

22     have any opinion whatsoever with regard to the facts of the

23     case.

24          The burden of proof is on the plaintiff in a civil

25     action such, as this one, to prove every essential element of

1    the claim by a preponderance of the evidence.  If the proof

2    should fail to establish any essential element of the

3    plaintiff's claim by a preponderance of the evidence, then you

4    should find for the defendant.

5         To establish something by a preponderance of the

6    evidence means simply to prove that something is more likely so

7    than not so.  By this is meant, the greater weight and degree

8    of credible evidence, which is given to you.  In other words, a

9    preponderance of the evidence just means the amount of evidence

10   which persuades you that a claim is more likely so than not so.

11        In determining whether any fact has been proved by a

12   preponderance of the evidence in this case, you may, unless

13   otherwise instructed, consider the testimony of all witnesses,

14   regardless of who may have called them, and all exhibits

15   received in evidence, regardless of who may have produced the

16   exhibit.

17        In deciding this case, you are expected to use your

18   good sense.  Give the evidence and the testimony of the

19   witnesses a reasonable and fair interpretation, in light of the

20   knowledge of the natural tendency of human beings.

21        In weighing the testimony and in determining the

22   credibility of any witness, you may consider the conduct and

23   appearance of the witness, any personal feelings demonstrated

24   by the testimony, any interest shown in the outcome of the

25   case, any prejudice or bias shown, and any partiality

1    demonstrated.

2         You are not, of course, bound to believe something

3    merely because somebody swore to it, because we all know that a

4    person can swear to an untruth if one has the will to do so.

5         You may find inconsistencies in the testimony of a

6    witness or discrepancies between the testimony of different

7    witnesses.  These should not necessarily cause you to discredit

8    the testimony.  You should keep in mind that a simple mistake

9    by a witness does not necessarily mean that the witness was not

10   telling the truth as he or she remembers it.  Because people

11   may forget some things or remember other things inaccurately.

12        So, if a witness has made a misstatement, you need to

13   consider whether that misstatement was simply an innocent lapse

14   of memory or an intentional falsehood.  The significance of

15   that may depend on whether it has to do with an important fact

16   or with only an unimportant detail.

17        If a witness has shown knowingly to have testified

18   falsely concerning any material matter, you have a right to

19   distrust that witness' testimony in other particulars, and you

20   may reject all of the testimony of that witness or give it such

21   weight and credibility as you think it deserves.

22        During the course of the trial, you may hear

23   objections to the evidence.  It is the duty of the attorney on

24   each side of the case to object when the other side offers

25   testimony or other evidence which is not properly admissible

1    according to the law.  You should not draw any inference

2    against or show any prejudice against a lawyer or his client

3    because of the making of an objection.

4           Upon allowing testimony or other evidence to be

5    introduced over the objection of an attorney, I do not, unless

6    expressly stated, indicate any opinion as to the weight or the

7    effect of such testimony or evidence.

8           When the Court has sustained an objection to a

9    question addressed to a witness, the jury must disregard the

10   question entirely and may draw no inference from the wording of

11   it or speculate as to what the witness would have said if

12   permitted to answer the question.

13          Do not let bias, prejudice or sympathy play any part

14   in your deliberations.  A government entity, a city official, a

15   corporation are all persons equal before the law, and must be

16   treated as equals in a court of justice.

17          You must consider only the evidence in this case.

18   However, you may draw such reasonable inferences from the

19   testimony and exhibits as you feel is justified in the light of

20   common experience.  You may make deductions and reach

21   conclusions which reason and common sense lead you to make from

22   the testimony and the evidence.

23          The testimony of a single witness may be sufficient

24   for the proof of any fact, even if a greater number of

25   witnesses may have testified to the contrary if, after

1    considering all the other evidence, you believe that single

2    witness.

3            Now, there are two types of evidence which you may

4    consider.  One is direct evidence, such as testimony of an

5    eyewitness.  The other is indirect or circumstantial evidence,

6    the proof of circumstances which tend to prove or disprove the

7    existence or non-existence of certain other facts.

8            The law makes no distinction between direct and

9    circumstantial evidence, but simply requires that you find the

10   facts from a preponderance of all of the evidence, both direct

11   and circumstantial.

12           Now, at this time, I'd like to give you the following

13   specific instructions.  Again, you are not to discuss this case

14   with anyone, and this includes your spouse, your relatives,

15   your friends.  You should not discuss this case even among

16   yourselves, until it is concluded and you begin your

17   deliberations.

18           From this moment on, you are not to read any accounts

19   of it and listen to any kind of reports of the trial.  This is

20   necessary because your verdict must be based solely on the

21   evidence presented to you during the course of this trial in

22   accordance with my instructions on the applicable law.

23           Finally, you are not to reach any conclusions in this

24   case until all of the evidence has been presented and I have

25   instructed you on the law applicable to the case, and it is

47

1  give to you for deliberation and decision.

2           All right, ladies and gentlemen, it is now time for

3  opening statements.

4           JUROR NUMBER 7:  Excuse me, Your Honor.

5           THE COURT:  Yes, sir.

6           JUROR NUMBER 7:  During introductions this morning,

7  we had a gentleman against the wall and a lady and gentleman in

8  the gallery that were never introduced.  Are they related to

9  these two parties here, or witnesses?

10          THE COURT:  Well, they're here observing the trial.

11  A trial is an open proceeding that the public can come in and

12  sit.  And so, you might see people coming and going -- law

13  clerks, other people who just want to sit in and listen to some

14  testimony.  And, it is an open proceeding.

15          JUROR NUMBER 7:  Okay.

16          THE COURT:  Okay?

17          JUROR NUMBER 7:  I just wanted to make sure all the

18  players were introduced.

19          THE COURT:  Right.  All the players have been

20  introduced.

21          JUROR NUMBER 7:  Okay.

22          THE COURT:  Thank you.

23          Mr. Wright.

24          MR. WRIGHT:  Thank you.

25

1               *    *    *    *    *

2                   **OPENING STATEMENT**

3               *    *    *    *    *

4           MR. WRIGHT:  My name is Carter Wright and I,

5   along with Ernie Souhlas and Gene Taggart represent Mark Evans.

6   We thank you very much for your time today.  We thank you for

7   exercising your civic duty.  Fortunately for you, this is a one

8   day trial.  We think we can finish it today.

9           When we pick jurors, sometimes, and they're sitting

10  out in the wings and the judge says it's a month long trial, we

11  get some real good excuses.  And, we thank you for your time

12  today, but we're going to try to minimize the inconvenience as

13  much as possible.

14          Because it's a one day trial does not mean it's an

15  insignificant case.  This is a very important case.  Mark Evans

16  is going to have to live with your decision the rest of his

17  life.

18          It's also a little bit unusual, in the sense that

19  this case has been tried on the liability portion of the case,

20  so you don't have to sit and hear the evidence on the liability

21  portion.  That has already been decided.  In fact, the Judge

22  has already given you the statement of the case, which is the

23  foundation upon which you determine your findings today, which

24  is the damage case.

25          The Judge instructed you at a prior trial that a jury

 1  reached a finding of liability against Ford for this accident

 2  and determined that the injuries sustained to Mark Evans were

 3  caused by that accident.

 4          The trial is solely about the amount and the extent

 5  of damages due to the plaintiff as a result of the accident of

 6  May 24th, 2001.

 7          In the opening statement, this is the time the

 8  attorneys get to tell you what we think we will prove during

 9  the case.  We'll come back at the end and give you our closing

10  argument where we get to argue our case.

11          I'm going to give you a little bit of ground work,

12  what I think you'll hear today.  Much of the evidence that's

13  going to be presented, three depositions will be read to you,

14  and those are three doctors who have treated Mark Evans.  The

15  doctors won't be coming to court, but you have to listen very

16  carefully to what these doctors say about the injuries that

17  Mr. Evans sustained.

18          Dr. Hontas was his treating physician over almost a

19  two year period, and he will explain to you all the injuries

20  that Mr. Evans sustained in this accident.

21          On May 24th, 2001, which is almost three years ago,

22  Mark Evans was working at the Extreme Nissan dealership in

23  New Orleans East.  He was the assistant used car manager on

24  that day.  We won't go into the details of exactly what

25  happened as far as the Ford Explorer and the reason it

1  malfunctioned, but what we will have to go through is what

2  happened to Mr. Evans when that vehicle went into reverse,

3  knocked him down while he was standing by the left front door,

4  it knocked him over and caused him to flip underneath the

5  vehicle, and he was actually run over by the front left tire of

6  the Ford Explorer.  It went up his left leg and his low back,

7  and caused him serious injuries.

8          He was taken by ambulance to the trauma unit at

9  Charity Hospital and he was there for many hours where they

10 X-rayed his body -- mostly his left leg, his low back -- and he

11 was actually released later that day.  They didn't find any

12 broken bones.

13         A few days later, he went to see his family doctor,

14 Dr. Larcena, and he referred him to an orthopedic surgeon, and

15 that is Dr. Mark Hontas.

16         And, Dr. Hontas treated him, saw him about once a

17 month for almost two years, and it took a long time to find out

18 exactly all of the medical problems that he was having.  Some

19 of you may be familiar with some of the type of treatments and

20 X-rays and those type of tests.

21         He was initially given physical therapy, an MRI, a

22 nerve conduction study.  He was given injections, steroid

23 injections in his back, and he was finally given a myelogram.

24         And, through all these tests that were done, the

25 doctors figured out that he had two herniated discs -- on at

1   the L4-5 level, which is causing radiating pain into his left

2   leg, and the other one is at the L5-S1 level, which is the

3   lower part of your spine.  And that's causing some problems in

4   his right leg; not as much as his left.  And he has severe back

5   pain.

6          There's another injury that was sustained because of

7   the direct trauma of the vehicle rolling up his left leg, and

8   that's nerve damage to the left leg, itself.  And, you'll hear

9   the doctors testify concerning that.

10          Dr. Mark Hontas doesn't do back surgeries.  His

11   partner, Dr. Butler, does.  So, after about a year and finding

12   out all of these medical problems, Dr. Hontas referred Mark to

13   his partner, Dr. Butler.

14          Dr. Butler saw him once, maybe twice, and said, "I

15   can do surgery to your low back for the L4-5 disc."

16          Mark has not had surgery, and Dr. Hontas will talk

17   about some of the ramifications of surgery, whether or not it's

18   going to help him, the risks involved and that kind of thing.

19   But, Mark has not has had the surgical procedure.

20          About four or five weeks before this accident, Mark

21   -- again, working at Extreme Nissan, slipped on a deck and

22   landed on his buttock, on his left buttocks.  And, he didn't go

23   to the doctor, initially.  About two weeks later, he went to

24   his family doctor, Dr. Larcena -- Dr. Larcena, we'll hear his

25   testimony -- and he injured his right foot.  He had swelling in

1  his right foot when he slipped on the deck.  He also had a

2  bruise on his left buttocks, which went into his hip.

3        Mark recovered from that before this accident, and he

4  was fine.  He didn't miss any work -- maybe one day to go to

5  the doctor.

6        The defense is going to make a big deal about this

7  slip and fall, but there's going to be no testimony from any

8  doctors in this courtroom that's going to relate any of the

9  problems that Mr. Evans has to that slip and fall, and Mark's

10 testimony is going to be that he didn't hurt his back.  He had

11 a bruise in his buttocks and he hurt his right toe in that

12 accident.

13       There is going to be evidence presented in the case

14 about his economic loss.  From the date of Mr. Evans being

15 rolled over by the Ford Explorer, he has not been back to work.

16 It's been almost three years and, because of the type of work

17 that you do in the used car business as a manager, you spend

18 many hours on your feet, and he cannot work.

19       And, the doctors will testify about the type of

20 medical injuries that he sustained in this accident, and there

21 will be two economists that will testify today -- one by the

22 plaintiff, Shael Wolfson, and by the defense -- and they'll

23 discuss the lost wage projections into the future, relating to

24 this accident.

25       And, Mr. Evans will tell you about his work history.

1   Mr. Evans was 46 years old when this accident happened.  He's

2   49, now, and he's had various, different employments.  And,

3   we'll go through that in his testimony.  He'll be the first

4   witness to testify.

5          The damages in this case -- we'll come back in our

6   closing argument and talk about them specifically.  Of course,

7   the pain and suffering that he's experienced with what he has

8   to live with every single day, with his back condition and his

9   nerve damage.

10          You'll decide the loss of enjoyment of life, his

11   disability; the past lost wages, because he has been out of

12   work for three years; and you'll also consider the future lost

13   wages.

14          Mark had a period of time where he didn't work after

15   his divorce and his community property settlement, but he was

16   back to work for a period of time before this accident

17   occurred, and he had many years, of course, in the future where

18   he, of course, needs to work like we all do.

19          So, we thank you again.  You'll be making very

20   important decisions today on the value of the damages that were

21   sustained in this accident.

22          Thank you for your time.

23          THE COURT:  Thank you, Mr. Wright.

24          MR. WRIGHT:  Thank you, Your Honor.

25          THE COURT:  Mr. Maxwell.

1                    *    *    *    *    *

2                      **OPENING STATEMENT**

3                    *    *    *    *    *

4          MR. MAXWELL:  Good morning, again.  I'm Bob Maxwell

5   and, along with Trey Kelly, we represent Ford Motor Company.

6          And, there's really one simple issue that you're here

7   to decide today and that is what fair and reasonable

8   compensation is due to Mr. Evans.

9          Now, I'm not here saying he's not due anything.  In

10  fact, at the end, I think we're going to show you what we think

11  is fair and reasonable.

12         But, fair and reasonable compensation is due to the

13  fact that he did have an accident back on May 24th of 2001.  It

14  involved a Ford vehicle.  He was struck by a Ford vehicle, so

15  that's why we're here.  That's why we had a prior proceeding.

16         And, I'm going to ask you to determine what is fair

17  and reasonable.

18         Now, the Judge will give you the law at the end.

19  She's already given you some.  But, the law requires in

20  Louisiana that a party fixes or makes compensation when they

21  cause an accident or when someone is injured or some property

22  is damaged.

23         Well, to give you an example, let's say -- and since

24  I'm representing Ford, I'll use Ford vehicles.  Let's say you

25  have a Ford Taurus and someone backs into the side of your Ford

1   Taurus and damages a door.  That person would be responsible to

2   fix the door on your Ford Taurus.

3           Now, if you had had a prior accident and damaged your

4   rear bumper, the law doesn't require that person that backed

5   into your door to fix that.

6           The law also wouldn't require you to replace the Ford

7   Taurus with a Lincoln Towncar.  If the person that owed the

8   Taurus decided, "Well, I don't want to drive this car anymore,"

9   the law wouldn't require you to replace it with a limousine and

10  a driver.  It just requires you to fix the damage that you did.

11          And that's why we're here and that's what I'm going

12  to be asking you to do today.

13          Now, there's three different items that I'm going to

14  ask you to look at.  We're going to look at the medical

15  injuries.  We're going to look at the disability issue.  And

16  then we're going to look at potential damages.

17          The first thing I'm going to ask you to look at are

18  the injuries.  Now, Mr. Wright was injured on May 24th of 2001.

19          Did I just say "Mr. Wright"?

20          MR. WRIGHT:  Yes, you did.

21          MR. MAXWELL:  I'm sorry.  Sorry, Ernie.

22          MR. WRIGHT:  I'm doing okay.

23          MR. MAXWELL:  You're doing okay.

24          Mr. Evans was injured back on May 24th of 2001.

25  Mr. Wright has told you that these were very serious injuries,

1   and we're not minimizing them, but I'm going to show you what

2   the medical records actually show the injuries were; the

3   emergency room records, the doctor's records.

4            They're going to show you that there were no broken

5   bones.  There was no bony injury to the back.  The soft tissues

6   were even normal when he was seen by his physicians, and his

7   back was not even tender on the date of this accident.  I think

8   that's significant, and I'm going to show you the medical

9   records and show you the portions of the doctor's testimony

10  that say that.

11           And, you'll be asked to decide whether all of

12  Mr. Evans' complaints are related to this one accident on May

13  24th, 2001.

14           Mr. Wright told you I'm going to make a big deal

15  about another accident, and I'm not going to make a big deal

16  about it, but it's very significant for two reasons:  Mr. Evans

17  had another accident on the job at the used car lot three weeks

18  before this accident.  He fell down some stairs.  He went to

19  see the doctor.

20           When he went to see the doctor, he told the doctor he

21  was in severe pain.  In fact, the pain was so severe he

22  couldn't stand up.  He couldn't sit down.  And, you're going to

23  hear from Dr. Larcena.  We're going to read his deposition to

24  you, where he describes that.

25           And, why it was brought up with Mr. Wright is

 1   something very significant and that is:  When Mr. Evans

 2   previously testified -- you'll hear about his prior testimony

 3   -- he didn't admit to this prior accident.  He denied that he

 4   had ever had an accident, had ever had an on-the-job injury,

 5   had ever hurt his back, had ever hurt his leg, had ever hurt

 6   the same portions of his body that he says were injured on May

 7   24th.

 8             So, that's going to be a significant part of the

 9   case, and I'm not going to make a big deal out of it, but I

10   think that you ladies and gentlemen certainly have the right to

11   know that there was another accident.

12             And also, his doctors will tell you that he has

13   degenerative disc disease in his back.  And everyone, when you

14   reach your late 40s or early 50s, you can start maybe feeling

15   those little twinges in your back, and it's something called

16   degenerative disc disorder, where you'll have some bulging

17   discs that are consistent with the aging process.

18             It doesn't mean that there's been an injury.  In

19   fact, they're not caused by injuries.  It's caused by when

20   people get older.

21             Mr. Evans has that.

22             So, he's got three things going for him.  He's got

23   the two accidents and he's got an aging process going on in his

24   back.  And, you'll have to sort those out and determine how

25   they combine together to cause the complaints.

1        Mr. Wright, of course, will say everything, 100

2   percent of it, is related to that accident on May 24th of 2001,

3   and I'm going to present the other side of the story; that

4   there are other factors.

5        The second thing you'll have to consider is the

6   disability.  Mr. Evans and his lawyers say he not only can't

7   work, but he won't be able to work for the rest of his life.

8   His back problems, the herniated disc, is described as a mild

9   herniated disc by his own doctors -- and when I'm talking about

10  medical testimony here, let me be clear:  None of these are

11  Ford doctors.  These are what his doctors will tell you in

12  deposition.  I didn't hire a doctor and have him look.  This is

13  simply the doctors that have treated him that I'm commenting

14  on.

15       But, the doctors will not say that Mr. Evans is

16  disabled.  There won't be any medical testimony from the

17  doctors that Mr. Evans has treated with to say that he can't

18  work.

19       In fact, it's going to be to the contrary.  One of

20  the doctors that evaluated Mr. Evans, and did a functional

21  capacity evaluation, said he can return to work.

22       Now, that brings us to damages, the third point.

23  And, Mr. Wright didn't introduce you to what his economist is

24  going to say, but his economist has given me a report and he

25  says in his report that Mr. Evans has a potential of losing

1  approximately a half a million dollars in lost wages.

2          Now, I want you to very carefully listen to what that

3  is based on, and I'm going to suggest to you that the evidence

4  will be that there are no documents, there's no evidence to

5  support that.  That's a hired witness who is going to come in

6  and tell you, "I calculate his lost wages to be about a half a

7  million dollars."

8          I'm going to show you what the evidence is, what

9  Mr. Evans actually has earned over the years, and it's going to

10 be vastly different.

11         Now, one final point:  --

12         So, we've looked at the injuries that you're going to

13 hear about, the lost income that's been claimed, and the

14 damages.

15         -- There's also a factor that the Judge will tell you

16 about; essentially, what the law requires of an individual when

17 they're injured.  And, when you're injured, the law requires

18 that you take reasonable steps to take care of yourself and do

19 the things that are necessary to return to gainful employment,

20 and try and minimize your losses.

21         Mr. Evans' doctors -- and, again, these are not

22 Ford's doctors.  Mr. Evans' doctors say that, if his complaints

23 of pain keep him from working, that if he would have a surgery,

24 he would be able to return to work.

25         First, they're not saying he's disabled, but they

1    say, if the pain makes him feel that he can't work, if he would

2    have a surgery, fix that one disc area that has a herniation on

3    one side, a mild herniation on one side, if he would do that,

4    he could then return to gainful employment.

5              But, Mr. Evans, during the pendency of this lawsuit,

6    has refused to do that and his doctors say it's his decision,

7    and I certainly support that.  It's his decision.

8              But, you'll have to decide if he's doing what

9    essentially the law requires him to do, and I'll suggest the

10   evidence is going to show that he has not done that and that

11   the damages that Mr. Wright is claiming is going to be a gross

12   over-exaggeration.

13             And, with that, it's only 10:15, and we're doing

14   great.  We'll hopefully get you home today, and thank you very

15   much for your time.

16             THE COURT:  Okay.  Thank you, Mr. Maxwell.

17             MR. MAXWELL:  Thank you, ma'am.

18             THE COURT:  Okay, are you ready?

19             MR. WRIGHT:  Your Honor, we'd call Mark Evans to the

20   stand.

21             THE COURT:  Okay.

22

23

24

25

Evans - Direct                                    61

1                  *   *   *   *   *

2           **MARK D. EVANS, PLAINTIFF, SWORN**

3                  *   *   *   *   *

4               DIRECT EXAMINATION

5    BY MR. WRIGHT:

6    Q.   Mark, could you tell the jury where you were born, what

7    state?

8    A.   Yes.  I was born in Gulfport, Mississippi; the Mississippi

9    Gulf Coast.

10   Q.   And, where do you live at present?

11   A.   I live in Pearlington, Mississippi.

12   Q.   What is your date of birth?

13   A.   It's 10/3/54.

14   Q.   That makes you how old today?

15   A.   I'm 49.

16   Q.   Are you married?

17   A.   Yes, I am.

18   Q.   And, who is your wife?

19   A.   Janyne Maria.

20   Q.   And that's Janyne in the back of the courtroom?

21   A.   Correct.

22   Q.   How long have you and Janyne been married?

23   A.   We've been married roughly coming on two years, now.

24   Q.   Have you been married before?

25   A.   Yes, sir.

Evans - Direct                                                62

1   Q.   And, when did that divorce take place?

2   A.   In '95.

3   Q.   Do you have any children?

4   A.   Yes, I do.

5   Q.   And, how many children do you have?

6   A.   I have one child.

7   Q.   And, how old is she?

8   A.   She is 30 years old.

9   Q.   Amy is her name?

10  A.   Amy is her name, yes.

11  Q.   All right.  Where did you grow up?

12  A.   In Gulfport, Mississippi.

13  Q.   And, could you tell the jury a little bit about your

14  educational background?

15  A.   I completed high school and played some ball in college,

16  and basically never graduated from college.  I just played ball

17  in college and then went back to work for my family afterwards.

18  Q.   Where did you go to college?

19  A.   At the University of Florida.

20  Q.   What type of jobs -- just give the jury a little

21  background about your employment, starting when you left

22  college.

23  A.   I went back to work for my family, originally, which was

24  in the hardware business.  We owned -- our family owns a

25  hardware store in Gulfport.  And, after that, I went on the

 1   road selling hardware wholesale to other hardware stores.

 2        And, from there, I went into the bar and restaurant

 3   business.  I owned four or five bars and restaurants across the

 4   country.

 5        And, I got out of that and moved to Florida.  I went to

 6   work in the pipe, valve and steel business.  I owned my own

 7   pipe, valve and steel business.

 8        Then in the late '80s, I got involved in the car business.

 9   I sold my pipe company, and for the last -- up until the time

10   of this accident, I pretty much remained in the car business.

11   I did own another bar and restaurant in Slidell, Louisiana.

12   Q.   When is the last time you've worked?

13   A.   May 24th, 2001.

14   Q.   And, at the time of this accident, where were you working,

15   Mark?

16   A.   I was working for Extreme Nissan, in New Orleans East.

17   Q.   What was your job?

18   A.   I was the assistant used car manager.

19   Q.   How long had you worked for Extreme Nissan?

20   A.   I started in -- approximately, three months.

21   Q.   And, what was your position -- tell the jury what type of

22   duties you had.

23   A.   I kept up inventory control, sales desk, making sure the

24   cars were cleaned, detailed; just general upkeep of the cars.

25   Making sure the lot was in specific order; you know, keeping

1   everything straight.

2   Q.   As far as the dealerships in Louisiana, which ones did you

3   work in before the Extreme Nissan dealership?

4   A.   I was sales manager at John Brown of Slidell, which was a

5   number of years ago.

6        I was sales manager at Slidell Ford/Lincoln/Mercury.

7   Q.   When was that?

8   A.   John Brown, I was sales manager there from '90 to about

9   '92, and then I moved from there and I went to Slidell

10  Ford/Lincoln/Mercury.

11  Q.   How long did you work there?

12  A.   Three years.

13  Q.   And, what was your position at Ford/Lincoln/Mercury?

14  A.   I was sales director.

15  Q.   What type of money did you make back then?

16  A.   I was making approximately $80,000 to $90,000 a year.

17  Q.   And, then what happened at Ford/Lincoln/Mercury?

18  A.   We had a disagreement and I got fired.

19  Q.   And, what type of job did you have after that?

20  A.   Basically, nothing.  I had just -- when that happened, I

21  had just got a divorce, and we had a big bar and restaurant in

22  Slidell and I had a sizeable property settlement coming to me.

23  So, for the next three years I just kind of -- I'd buy and sell

24  a few cars on the side, but basically I took some time off.

25  Q.   And, who owned the bar/restaurant after your property

1   settlement?

2   A.    My wife owned it, my ex-wife.

3   Q.    What type of work did you do after your period of time

4   where you didn't work?

5   A.    I was back in the car business.  I went back as a

6   salesman, and then I went over to Extreme Nissan.

7         I was at Bryan Harris GMC in Slidell, and I left there.

8   They offered me to come over to Extreme Nissan in New Orleans

9   East, because I knew a lot of the guys over there and they knew

10  my management background, and I was working my way back up

11  through management.

12  Q.    Approximately, how much money were you making at the

13  Extreme Nissan, before your accident?

14  A.    My base salary was a little over $2,000 a month, plus a

15  vehicle and medical, and plus I was also allowed to sell cars

16  on top of that.  And, I also made commission on that, on our

17  sales.

18  Q.    After your accident, did you get all your commissions that

19  were due?

20  A.    No.  It's a saying they have in the car business.  They

21  "pencil whip you."  In other words, once I got hurt, they

22  didn't feel obligated to pay me my commission.

23         MR. WRIGHT:  Your Honor, we've already stipulated to

24  some of the wage information, and I'll just go ahead and reurge

25  the introduction of Exhibit Number 5, the W-2 with Extreme

1  Nissan, and the W-2 from Crescent City, the W-2 from Bryan

2  Harris, and the 1099 from Hey, Jude, and the Ford/Lincoln/

3  Mercury, the one document from Ford/Lincoln/Mercury.  And,

4  we'll give those to the jury at the close of our case.

5         THE COURT:  Those will be introduced.

6  BY MR. WRIGHT:

7  Q.   Before we get into the accident, what were your plans,

8  your future plans, as far as employment, before this accident?

9  A.   I wanted to get back into major management, not the middle

10  management type.  I wanted to eventually own my own dealership

11  and maybe, you know, my own place in the car business.

12      I had no intentions of doing anything else.  I enjoyed the

13  business.  You know, the money was pretty good.  And, that's

14  what my goals were, working towards.  I figured I had quite a

15  few good years left.

16  Q.   Mark, I want you to focus on the day of this accident, May

17  24th, 2001.  And, as we've told the jury, we don't want to go

18  into the whole day, what happened, all that.  We just want to

19  focus on the accident, itself.  Could you tell the jury what

20  happened?

21  A.   Yes.  We had just went to a Ford program car sale, and we

22  had a shipment of approximately -- I don't remember exactly how

23  many cars were on the truck.

24  Q.   Okay, let me stop you for a minute.

25  A.   Okay.

1    Q.    We're not going all into that.  I just want to focus on

2    the accident, itself.  We don't need to talk about the car,

3    specifically.  Just tell the jury how you came to be injured on

4    that day.

5    A.    Okay.  What had happened was, once we got them in, as you

6    would quite understand, that you have to move the cars into a

7    particular area, you know, and park them and make them look

8    sharp.

9         Well, I had put a Ford Explorer into "Park," got out and

10   was talking to another sales person of mine, who was helping me

11   move the cars around --

12            MR. MAXWELL:  Your Honor, could we approach for a

13   second?

14            THE COURT:  Sure.

15            Excuse me.

16      **(At side bar)**

17            MR. MAXWELL:  If he's going to start talking about

18   this popping out of "Park" and everything, then I have to

19   cross-examine him on that.  I didn't think that's why we were

20   here.

21            MR. WRIGHT:  Let me go tell him just --

22            THE COURT:  To talk about the injury, yes.

23      **(Side bar concluded)**

24            THE WITNESS:  Okay, I didn't quite understand.

25            I had gotten out of the car and had the car in

Evans - Direct                                          68

1   "Park."  As soon as I got out of the vehicle, the vehicle

2   jumped out of gear.  The door hit me, threw me to the ground

3   and semi-knocked me unconscious -- they said I was unconscious

4   -- but rolled over my left leg and my lower back, on my left

5   side.

6   Q.   And, Mark, after that happened, what was your condition,

7   while you were on the ground?

8   A.   I was in a daze.  I was being supported by people.  The

9   extreme pain in my back and legs, and just basically --

10  Q.   Could you get up?

11  A.   No.  Absolutely not.

12  Q.   And, what happened to you when the people from the

13  dealership came to your aid?

14  A.   They called 9-1-1, and an ambulance, of course, came and

15  took me to Charity Hospital at the trauma center there.

16  Q.   And, what happened at Charity Hospital?

17  A.   They run me through a battery of tests, a lot of different

18  -- there's so many different things.  I did a CAT scan, many,

19  many X-rays, and I spent quite a number of time.  They were

20  making sure I didn't have any internal bleeding from the nature

21  of the accident, and I spent quite a long time at Charity.

22  Q.   What type of injuries did you have as a result of the

23  rollover?

24  A.   Lower back disc, peroneal -- I guess that's how you

25  pronounce it -- nerve damage, permanent in my left leg.  I have

Evans - Direct                                        69

1    severe numbness in my left leg, some minor numbness in my right

2    leg, but I still have severe lower back pain from the accident.

3    Q.    What type of -- did you have any marks on your body or

4    anything like that?

5    A.    Oh, yes.  I had severe trauma in my left arm, where the

6    tire rolled over it.  I had some wounds on my legs where the

7    tires had rolled over my legs, and just banged and bruised.

8    Q.    How long were you at Charity Hospital that day?

9    A.    Nine hours or so.

10   Q.    Okay.  And, who came to the hospital?

11   A.    My wife, Janyne, came to pick me up.

12   Q.    And, about what time of the day did the accident happen?

13   A.    Somewhere between 2:00 and 3:00, I think.

14   Q.    And, what time did you leave Charity?

15   A.    It was around midnight.  Somewhere, you know, between

16   11:00 and 12:00.  I'm not exactly sure.

17   Q.    Did you seek any medical assistance after that accident?

18   A.    Yes, I did.  I went through -- first, I went to my

19   internist, Dr. Larcena, in Slidell, Louisiana, who referred me

20   to an orthopedic surgeon.

21   Q.    And, when did you first see the orthopedic surgeon?

22   A.    Approximately, a week after the accident happened.

23   Q.    And, what doctor did you go see?

24   A.    Dr. Mark Hontas.

25   Q.    And, where is he located?

1   A.    He's in Slidell.

2   Q.    And, Dr. Larcena, did he refer you to an orthopedic or did

3   Charity?

4   A.    Charity did the first night that -- I mean, there.  I was

5   treated by an orthopedic surgeon while I was there, and they

6   referred me to a Tulane orthopedic doctor there, but at the

7   time, I was in so much pain I couldn't make that trip back and

8   forth to New Orleans, so that's why I eventually went to

9   Dr. Hontas in Slidell -- which I was living very, very close

10  to.

11  Q.    And, who referred you to see Dr. Hontas?

12  A.    Mr. Souhlas.

13  Q.    Mr. Souhlas?

14  A.    Souhlas; excuse me.

15  Q.    Okay.  What was your condition when you went to see

16  Dr. Hontas the first time?

17  A.    It hadn't changed.  I was having severe back pain and some

18  right leg trouble, but I was having a lot of left leg trouble

19  with, you know, lower back pain.  But, from the CAT scan and

20  stuff, there was no -- they couldn't determine what was wrong,

21  what was causing my problem.

22  Q.    And, did he prescribe anything for you, initially?

23  A.    Yes.  I had an MRI.

24  Q.    And, did you undergo any physical therapy first?

25  A.    Yes.  The physical therapy absolutely was just causing me

1    too much pain.  They tried to get me to walk on a treadmill

2    and, like, walking up hill or getting on steps or stairs and

3    things like that.  It just became too much of a problem.  I

4    mean, the pain was -- it was just too much pain.

5    Q.   We're going to have the doctors testify, so I don't want

6    you to go into a lot of detail, but you testified you had an

7    MRI.  Did you meet with Dr. Hontas after the MRI?

8    A.   Yes, I did.

9    Q.   And what, basically, did he explain to you?

10   A.   That I did have a herniated disc, and I can't remember all

11   the numbers, exactly.

12   Q.   Did he recommend anything to you at that point?

13   A.   Yes.  The pain, after the physical therapy, kept getting

14   severe.  I had epidural steroids.

15   Q.   Do you remember approximately when that happened, the

16   epidural steroids?

17   A.   Not the dates; no, sir.  I'm sorry.

18   Q.   Okay.  Can you tell the jury what the epidural steroid

19   injections are like?

20   A.   It's probably the most painful thing I've ever been

21   through.  I mean, it was just about as much pain as the initial

22   accident, because they take a needle and they go in -- I guess

23   you'd call it the epidural.  It's the space in between your

24   spine and your disc.  And, they put the needle in and inject

25   you with steroids.  And, they had a hard time trying to find my

1    epidural, and it was just very painful.  I had no results from

2    that at all.

3    Q.   Did you go back to Dr. Hontas after that test?

4    A.   Yes, I did.

5    Q.   And, what happened after you met with Dr. Hontas?

6    A.   He prescribed another epidural.

7    Q.   Did you undergo another one?

8    A.   Yes, sir, I did.

9    Q.   What happened with that one?

10   A.   The same problem, trying to find the epidural, and I had

11   no response, no relief in pain whatsoever.

12   Q.   How many epidurals did Dr. Hontas want to do?

13   A.   He wanted to do three, but after the second one, when I

14   had no relief, he said there's no sense in doing a third one.

15   Q.   Did he recommend any other testing?

16   A.   Yes, a nerve conduction test, because of the problems I

17   have.  Well, I stayed on a TENS machine.  That's hard to

18   explain.  It's kind of like a warming therapy, electrical

19   currents.  But, the nerve conduction test is where they go in

20   and they stick needles in the affected area, and they hook

21   electricity to it, to see, you know, what kind of response you

22   do and what's the extent of your nerve damage.

23   Q.   Did Dr. Hontas tell you what the results of that test was?

24   A.   Yes.  After I saw Dr. Fischer, he related to Dr. Hontas

25   that I did have permanent left leg damage, nerve damage in my

Evans - Direct                                    73

1   left leg, and some numbness in my right leg.

2   Q.   Did Dr. Hontas recommend you for any other tests?

3   A.   Yes.  I was still having so much problem that wasn't

4   showing up on my MRI or anything.  I was having a problem on my

5   left side, so -- there was really no basis for it, so he said

6   there was one more test we could run, and I had a myelogram,

7   which did indicate and showed up the nerve problem I was having

8   on my left side.

9   Q.   The nerve problem, as far as coming from your back?

10  A.   Coming from my back into my left leg.

11  Q.   All right.  Tell the jury what a myelogram is like.

12  A.   That's where they take you into an X-ray room and put some

13  type of dye or fluid -- I don't know if it's radioactive or

14  what -- into your body, and they put you on a flat X-ray table,

15  but they strap you in.

16          And, they turn you in all different kinds of

17  directions -- up, down, sideways, in every kind of different

18  direction.  And, once that's completed, you have to, you know,

19  just lay in -- you can't move for, like, 18 hours after that.

20  Q.   After that test, you went back to Dr. Hontas?

21  A.   Yes.

22  Q.   And, he told you the results of the myelogram?

23  A.   And, that's when he told me the results of the myelogram,

24  correct; about the damage to the nerves that go into my left

25  side, causing my pain into the left side.  It wouldn't show up

Evans - Direct                                              74

1    on anything else.

2    Q.   What did he want to do at that point?

3    A.   At that point, he wanted surgery, and referred me to

4    Dr. Butler.

5    Q.   Why did he refer you to Dr. Butler?

6    A.   He doesn't do surgery, and he said that that would be the

7    only -- the course of action that could possibly help me in any

8    type of manner.

9    Q.   Okay.  Dr. Hontas doesn't do back surgery?

10   A.   No, sir.

11   Q.   Did you see --

12   A.   Not nerve -- you know, that type of surgery.

13   Q.   Did you see Dr. Butler?

14   A.   Yes.

15   Q.   And, where is Dr. Butler located?

16   A.   He's in the Tulane Orthopedic Clinic, in Slidell.

17   Q.   What did you do when you met with Dr. Butler?  Do you know

18   approximately when this was, in relationship to the accident?

19   A.   It was nearly two years -- I guess a year and a half after

20   the accident.

21   Q.   Well, we'll have the doctors testify.

22        Go ahead and tell us what happened with Dr. Butler.

23   A.   Well, Dr. Butler explained to me the procedures and what

24   would be required of it.  And I listened to it and I weighed it

25   out, and, you know, it's just -- I asked, "Well, is there any

Evans - Direct                                          75

1    guarantee?"

2        And, he said, "There is no guarantees."

3        I said, "What level of help could it give me?"

4        And he said, "It might help your nerve, the nerve part of

5    it," but there's no way to -- like they say, there's no

6    guarantees in life, you know.

7    Q.   Are there any risks involved in the surgery?

8    A.   Yes; paralysis.  You know, they have to give you, you

9    know, the bad parts.  He said I could be paralyzed.  I could

10   even be crippled, and it could even result in death.

11   Q.   Did you consider surgery, Mark?

12   A.   I have considered it, yes.

13   Q.   And, what have you decided?

14   A.   At this point right now, I've just decided that if I could

15   get any quality of life that I'm just not willing to roll those

16   dice and, you know, take that chance that something -- you

17   know, I could be worse off instead of better.

18   Q.   Could you tell the jury some of the problems that you're

19   having because of the injuries that you sustained?

20   A.   Yes.  I have -- I was a very active person.  There's no

21   more golf in my life whatsoever.

22       Intimacy is definitely a problem.  Thank God I have a good

23   wife.

24       I can't -- I'm a large man.  I mean, I can't bend over and

25   pick up things like I used to.  I mean, I can't stand on my

1    feet for any long period of time.  And, at this point, I've

2    been sitting in this courtroom for, you know, periods of time,

3    and I can't sit too long.

4        I can't sleep.  I can't stand for any period of time.

5        It's just darned if I do and darned if I don't; either

6    way.

7    Q.   What type of pain are you having?  Where is it?

8    A.   It's in my lower back.  It constantly radiates down my

9    left leg; constant numbness in my left foot.  It's kind of like

10   walking on Jell-O.

11       In my right foot, my first, second -- my little toe and

12   the second and third toe or down that side of the foot is numb.

13   Q.   Do you have problems every day with your pain?

14   A.   Yes.  There are no good days.  Some days are better than

15   others, but I'm normally -- it's just a daily battle with the

16   pain.

17   Q.   Mr. Evans, did you ever have any problems with your back

18   before this accident?

19   A.   No, sir, no problems with my back.

20   Q.   All right.  Did you ever have an accident at work at

21   Extreme Nissan where you slipped and fell?

22   A.   Yes.  I was getting some keys from the Used Car

23   Department, and it was raining very hard, and I walked out onto

24   the deck, and I was heading down to the steps, and when I went

25   to head down, my feet came out from under me and I fell on my

1  buttocks, and I had a bruise from that.  And the railing that

2  you hold onto there, my right foot had come up and I fractured

3  my little toe -- which there was really nothing --

4  Q.   Which toe, on what --

5  A.   On my right foot.

6  Q.   Did you miss any work after that?

7  A.   No, sir.  I went to the doctor about a week later, but

8  that was partially -- I had him look at it while I was there,

9  but, no, I never missed a day of work.

10 Q.   Okay.  What type of problems were you having when you went

11 to see Dr. Larcena?

12 A.   My left buttocks was bruised and it was sore, and my right

13 toe was giving me the main problems, and he referred me to have

14 X-rays, and he did some leg tests on me and stuff, and he

15 found, you know, nothing wrong in that area.

16 Q.   All right.  How long did it take to recover from that?

17 A.   For the bruise to heal, I don't know, but, I mean, it was

18 never a major problem.  I never missed a day of work; not even

19 an hour.

20 Q.   Were you having any problems with that on May 24th, 2001?

21 A.   No, sir.  That was a forgotten subject.

22 Q.   Dr. Larcena is going to testify by deposition.  What other

23 things did you go to Dr. Larcena for?

24 A.   Well, he was my internist.  I had high blood pressure.

25 I'm a borderline diabetic, and he was monitoring all that and

Evans - Direct                                     78

1    prescribing my medicines for me.  After the accident, I had to

2    go back to him because I had lost my house in the flood during

3    Isadore and Isabel, and with the accident and not being able to

4    work, I was under depression, and he prescribed some Celexa,

5    which helped me a little bit, and which I'm no longer on.  I'm

6    no longer on any medication.

7    Q.   Did you make any claim for that accident, when you slipped

8    at work?

9    A.   No, sir.  They called me in to the office and asked me if

10   I wanted to make a claim on Workmen's Compensation, and I said

11   no, and I signed a release to that effect.

12         MR. WRIGHT:  Your Honor, this has previously been

13   identified and marked as Exhibit Number 9 in the case.

14   BY MR. WRIGHT:

15   Q.   And, I'll go ahead and show you this.

16         MR. MAXWELL:  No objection, Judge.

17         MR. WRIGHT:  Okay.

18   BY MR. WRIGHT:

19   Q.   Is this the form that you filled out from the slip and

20   fall.

21   A.   Yes, sir, it is.  That's my handwriting.

22   Q.   Did you ever make a claim for that slip and fall?

23   A.   No, sir.

24   Q.   There's been some questions about falling down a flight of

25   steps.  Did you fall down a flight of steps, Mr. Evans?

Evans - Direct                                                    79

1  A.    No, sir.  I was going to the steps, when I went down --

2  and it was raining real hard, and everyone knows how slippery a

3  wet deck can get, and they didn't have the non-slip tabs.  But,

4  right as I approached the steps, I went to step down and my

5  feet came out from under me and all I did, I mean, I just,

6  boom, straight down.  And, you know, I landed on the deck on my

7  left side, on my buttocks.

8  Q.    And, what are the problems that you state in that report?

9  A.    As I mentioned previously right here, exactly what I said.

10 I was bringing keys out.  My right foot and my left hip and

11 leg, where I had slipped on the deck at that time.

12 Q.    And, this was before your accident when you got run over

13 by the Ford Explorer?

14 A.    Yes, sir.  About two weeks before.

15 Q.    And that's when you filled out this report, --

16 A.    Right.

17 Q.    -- two week before?

18 A.    Yes, sir.

19 Q.    And, did you ever complain about your back in that report?

20 A.    No, sir.  There never was a complaint about my back of any

21 kind.

22 Q.    All right.  And, when did you fill this out?

23 A.    On 5/15/01.

24 Q.    And, did any claim get actually made --

25 A.    No.

Evans - Direct                                              80

1    Q.   -- because of this slip?

2    A.   No, and they noted on there, and it's not noted on this in

3    any kind of way.  It was just an insignificant thing.  It was

4    an unfortunate little incident, but it wasn't anything.

5    Q.   And, what was the day that it's written that there was no

6    claim?

7    A.   On 5/16/01.

8    Q.   Did you pay for Dr. Larcena's visits for that?

9    A.   Yes.

10             MR. WRIGHT:  Your Honor, we'll publish this to the

11   jury when we give them everything.

12             THE COURT:  All right, that will be fine.

13   BY MR. WRIGHT:

14   Q.   In the last trial, did you talk about this claim, when we

15   were at the last trial?

16   A.   No --

17             MR. MAXWELL:  Judge, could we approach, please?

18             MR. WRIGHT:  Well, he's made --

19        **(At side bar)**

20             MR. WRIGHT:  He's made a reference that he didn't

21   tell anybody about it and I've got to clarify --

22             MR. MAXWELL:  I mean, we can't start talking about

23   what you did at the last trial and so on and so forth.  I can

24   tell you, I had to wrangle it out of him at the last trial.  He

25   denied this, that and the other, but I don't -- we can go into:

1    Were you truthful in the last trial?  Were you not truthful?

2           I mean, --

3           THE COURT:  Well, --

4           MR. WRIGHT:  He's going to cross-examine him.

5           THE COURT:  Yes, are you going to cross-examine him

6    on what he said at the last trial?

7           MR. WRIGHT:  I'll save it for redirect.

8           MR. MAXWELL:  No.  I mean, I'm going to cross-examine

9    him on what he said in his deposition.

10          THE COURT:  On the deposition?

11          MR. MAXWELL:  And what he said at the first trial

12   was:  I didn't have any other accidents.

13          And, I had to pull his deposition out and show him.

14          So, his initial testimony at the first trial was:

15   No, I had had no other accidents.

16          THE COURT:  Are you going to cross-examine him with

17   that, then?

18          MR. MAXWELL:  Yeah.

19          THE COURT:  You are?

20          MR. MAXWELL:  Yeah.

21          THE COURT:  Then he can get into it.

22          MR. MAXWELL:  Okay.

23          **(Side bar concluded)**

24   BY MR. WRIGHT:

25   Q.   Mr. Evans, at the other trial that we've already talked

1    about -- the jury knows about -- did you go through this report

2    at the last trial, about your right foot and your left hip?

3    A.   No, sir.  I was asked questions -- I had been asked if I

4    had had any other accidents, and because of the trial, I was

5    figuring they were talking about an automobile accident.  And,

6    no, we didn't really -- we didn't really cover that.

7    Q.   Okay.  You testified earlier about some of the things that

8    you had done before this accident in May of 2001.  Could you

9    tell the jury what type of activities?  You testified that you

10   played golf.  How often would you play golf?

11   A.   At least a couple -- every chance.  At least a couple of

12   times a week; boating, swimming, that type of thing.  Just

13   basically, you know, working out; racquet ball.  That's all

14   non-existent anymore; just basically an everyday guy.  No more

15   cutting grass and that type of stuff.

16   Q.   Well, what type of things do you do now, since this

17   accident?

18   A.   My wife has a small business, and basically I do -- I'm

19   unemployed.  I do nothing.  I'm not able to work.  I do run

20   some errands, like go to the bank for her or something like

21   that.

22   Q.   What kind of business does your wife have?

23   A.   She has a bar and grill.

24   Q.   And, tell the jury kind of basically what you do in a

25   daily basis?

Evans - Direct                                          83

1   A.   That's basically it.  If she needs me to go to the bank or

2   something, I'll, you know, do that.  A lot of days, I'm not

3   able to do anything.  I mean, there may be days at a time I

4   won't even come out of the house.  But, it's basically a

5   nonchalant day, not a lot of activity.

6   Q.   Have you played any golf since this accident?

7   A.   No, sir.

8   Q.   Have you tried at all?

9   A.   No, I have trouble tying my shoes, and I'm surely not

10  going to attempt to swing a golf club, no, sir.

11  Q.   What do you think would happen?

12  A.   I don't know.  I'm scared that I might, you know, -- I

13  don't know.  It could damage me more than it is, and I just

14  wouldn't want to live with that kind of pain.

15  Q.   Have you returned to any type of work since this accident?

16  A.   No.

17  Q.   Did you go back to Extreme Nissan to even attempt to work?

18  A.   No.  No.

19  Q.   What did Dr. Hontas, while he was treating you for those

20  two year periods, did he ever return you to work at all?

21  A.   No, sir.  On all of his reports they were "unable to

22  work."

23  Q.   When you were working for Extreme Nissan, do you know what

24  your average weekly wage was, at that time?

25  A.   My base salary, I think, was $560 to $600 a week.  That

1    was my base salary; plus, like I said, a car, fringe benefits,

2    medical.

3    Q.    What type of car would they give you?

4    A.    In the car business, the sales manager would always get a

5    new car.  That's part of the perks that comes with it.

6    Q.    And, you could take that car with you at home?

7    A.    Yes, that was my transportation.

8    Q.    And, what type of medical did you have?

9    A.    All my medicals, as far as, you know, my health insurance.

10              MR. WRIGHT:  That's all I have.  Thank you, Mark.

11              MR. MAXWELL:  Do you need something to drink,

12   Mr. Evans?

13              THE WITNESS:  No, I'm okay.

14              MR. MAXWELL:  All right.

15              MR. WRIGHT:  Judge, can we approach?

16              THE COURT:  Sure.

17       **(At side bar)**

18              MR. WRIGHT:  I have no idea what he's putting up on

19   the screen.

20              MR. MAXWELL:  I'm putting up your exhibits on the

21   screen.

22              MR. WRIGHT:  What?

23              MR. MAXWELL:  Your exhibits.

24              MR. WRIGHT:  Well, you've got to tell me before you

25   do it.

1          MR. MAXWELL:  I don't have to tell you anything.

2          MR. WRIGHT:  Sure you do.

3          MR. MAXWELL:  It's all out of your exhibit book that

4    you've introduced into evidence.

5          MR. WRIGHT:  Okay.

6          THE COURT:  Well, before you put it on the screen,

7    identify for him what you're getting ready to put up.

8          MR. MAXWELL:  Okay.  It's a bunch of the medical

9    records out of Exhibit Number 1.  Right out of your book.

10          And, one thing, Judge, I want to make sure I clear it

11   with you:  After we were up here, he did say, "I put it in

12   'Park,' and it jumped out of 'Park.'"

13          So, I'm going to ask him, "You didn't look down at

14   the transmission indicator."

15          MR. WRIGHT:  No.

16          THE COURT:  No.

17          MR. MAXWELL:  He just opened that door.

18          THE COURT:  Well, I think it was inadvertent and it

19   was very brief, and I don't want to get into that.  Let's stay

20   away from it.

21          MR. MAXWELL:  But, what if it happens again?  What

22   if --

23          THE COURT:  Well, I think what we're going to do is

24   we're going to -- we're going to make sure that during the next

25   break you instruct him -- or if you want to right now, you can

1   approach him and tell him no more discussion, no more

2   testimony.

3           MR. WRIGHT:  The facts of the accident don't need to

4   come out, that he got rolled over.

5           MR. MAXWELL:  He didn't have to talk about the gear

6   popping out of "Park."

7           THE COURT:  Yes, he didn't.  And, I want you to --

8   why don't you approach him, now, and instruct him that he's not

9   talk about the truck coming out of gear.

10          MR. MAXWELL:  I think if he instructs him with the

11  jury two feet away, it's going to emphasize it.

12          THE COURT:  All right.

13          MR. MAXWELL:  Maybe we could ask him to walk over

14  here, and I will --

15      **(To Open Court)**

16          THE COURT:  Mr. Evans, could you come over here, for

17  a minute, please.

18          THE WITNESS:  (Moves to the side bar)

19      **(Side bar continues)**

20          MR. MAXWELL:  I'm going to have to go into more of

21  the Charity records.

22          THE COURT:  Okay.

23          MR. WRIGHT:  If he asks you any questions about the

24  accident, don't tell him it popped out of gear.  Don't talk

25  about that.  Just talk about everything that happened from the

Evans - Cross                                      87

1   time it started moving, okay?

2              THE WITNESS:  So, I just would --

3              MR. WRIGHT:  Don't say anything about it popping out

4   of gear.

5              THE COURT:  Right.  None of the mechanics of what

6   happened.

7              THE WITNESS:  Yes, ma'am.  I'm trying.

8              THE COURT:  Okay.  Thank you.

9              MR. MAXWELL:  Thank you, Judge.

10             **(Side bar concluded)**

11                          *   *   *   *   *

12                          CROSS-EXAMINATION

13  BY MR. MAXWELL:

14  Q.   Good morning, Mr. Evans.

15  A.   Good morning.

16  Q.   How are you doing today?

17       I want to ask you just briefly a couple of things about

18  the accident back on May 24th of 2001.  You were actually

19  struck by the car door that you had left open?

20  A.   Yes.

21  Q.   It kind of hit you across the back?

22  A.   Yes, sir.

23  Q.   Knocked you to the ground?

24  A.   It pulled me to the ground, correct.

25  Q.   And, you said you didn't feel anything.  It kind of threw

1    you to the ground, knocked you silly a little bit?  You didn't

2    feel anything at that time?

3    A.   Yes, I was in a daze.  Yes.

4    Q.   Okay.  And, then they took you to the hospital?

5    A.   Yes, sir.  In the ambulance.

6    Q.   And, your complaints, now, Mr. Evans, are your lower back

7    and numbness in your left leg, correct?

8    A.   And my right leg.

9    Q.   Okay.  And, you and Mr. Wright have said that the car ran

10   over you on the date of the accident?

11   A.   Yes.

12            MR. WRIGHT:  Objection.  Mr. Wright didn't testify to

13   anything.

14            THE COURT:  Sustained.

15   BY MR. MAXWELL:

16   Q.   Is that what you're saying, Mr. Evans?

17   A.   That's exactly what I'm saying, yes.

18   Q.   Okay.  And, you were taken to Charity Hospital and

19   initially treated?

20   A.   Correct.

21   Q.   And, they examined you there?

22   A.   Yes.

23   Q.   And, then after that, one of your attorneys, Mr. Souhlas,

24   sent you to Dr. Hontas?

25   A.   Correct.

1    Q.    And then he, in turn, sent you to Dr. Butler?

2    A.    Right.  But, we're skipping Dr. Larcena in between, who --

3    Q.    I'll get to that.

4    A.    Okay.  Excuse me.

5    Q.    And, in addition to those two that you went at the behest

6    of your lawyer, you also saw Dr. Larcena.  He's your doctor?

7    A.    Correct.

8    Q.    You saw Dr. Nutik, did you not?

9    A.    Yes, I did.

10   Q.    And, you saw Dr. Fischer.  In fact, I think you mentioned

11   you --

12   A.    Yes, sir.

13   Q.    And you saw Dr. Fischer, as well, correct?

14   A.    Yes, sir.  He did the nerve conduction study.

15   Q.    Okay.  Now, let's look first at what the initial findings

16   were when you went to Charity, and I have some documents that

17   your attorneys introduced into evidence as Exhibit Number 1.

18         When you were at Charity, they kind of gave you a complete

19   go-over, from head to toe --

20   A.    Everything, yes.

21   Q.    -- am I correct?

22   A.    Yes, sir.

23   Q.    Can you see that, Mr. Evans?

24   A.    No, sir.

25   Q.    Well, let me read it to you.  First they checked your

1   upper spine, your cervical spine, and they said there was no

2   evidence of any fracture and there was no damage to the soft

3   tissues.  Is that consistent with what you were told?

4   A.   No, sir.  They said I had soft tissue damage.  They said I

5   had no broken bones.

6   Q.   Okay.  So, right here on the record, it says -- and this

7   isn't me speaking; this is your medical records -- "Soft

8   tissues are normal."  Do you see the bottom of my pen?

9        So, you would disagree with that being accurate?

10  A.   Yes, sir.  That's not what the orthopedic surgeon there at

11  Charity told me.

12  Q.   All right.  Well, let's look -- they looked at your chest,

13  as well, and the chest was the same thing.  They found that the

14  soft tissues and bony structures are normal and there was no

15  evidence of any trauma to your chest.

16       Would you agree with that conclusion?

17  A.   The truck didn't roll over my chest.

18  Q.   Okay.  So, that one you agree with.

19       All right.  Now, let's look at your pelvis.  It's all on

20  the same sheet, and the record indicates that the pelvis,

21  there's no evidence of fracture or dislocation, and no evidence

22  of a traumatic injury to your pelvis.

23       Would you agree with that assessment that's in your

24  medical records?

25  A.   No, sir.  I don't agree with that at all.

Evans - Cross                                                    91

1   Q.   All right.  That's wrong, too.  We'll keep track of what

2   you feel is wrong, Mr. Evans.

3        Now, continuing on, the orthopedic surgeon also examined

4   your left leg, the left tibia and fibula, and he found no

5   fracture or dislocation.

6        Are you starting to be able to see it, Mr. Evans?

7   A.   No.

8   Q.   Okay.  I'll just keep reading it, then.

9        "No fracture or dislocation of the left leg," and "soft

10  tissues" are down here -- "soft tissues are unremarkable."  And

11  you know what "unremarkable" means.  It means they didn't see

12  anything.

13       So, you would agree with that, that the examination of

14  your left leg found no fractures or no soft tissue damage?

15            MR. WRIGHT:  Your Honor, --

16            THE WITNESS:  No, I had severe lacerations.

17            MR. MAXWELL:  All right.

18            MR. WRIGHT:  -- let me object.  These are X-ray

19  reports.  This is not an orthopedic examination.

20            MR. MAXWELL:  Is that an objection, Judge?

21            THE COURT:  It is an objection.

22            MR. MAXWELL:  This is his exhibit.

23            THE COURT:  It is an objection.  He's trying to

24  clarify the record.  And, to that extent --

25            MR. WRIGHT:  It's a radiologist report.

1          THE COURT:  -- I'm going to sustain it.

2          Ladies and gentlemen, what they are reading are the

3    radiology reports, after having X-rayed various portions of

4    Mr. Evans' body, and these are the radiologist's report.

5    BY MR. MAXWELL:

6    Q.   And, again, you realize, Mr. Evans, these are your

7    lawyer's exhibits.  These aren't mine.

8    A.   I understand that.

9    Q.   Okay.  Let's go on to the left ankle.  Looked at your left

10   ankle, and the same finding, there's no fracture or dislocation

11   and the soft tissues are unremarkable, and the impression was

12   that there was no injury to your left ankle.

13        Do you agree with that?

14   A.   Yes, sir.  I've already agreed.

15   Q.   All right.  And, they also looked at your left knee and

16   basically had the same finding.  Looked at your left knee and

17   they found no abnormalities, no soft tissue injury and, in

18   fact, they say the soft tissues are normal.  Okay?

19   A.   I had no knee problem, right.

20   Q.   So, let me see if I have it correct, and I've looked

21   through the rest of these records -- and let me show you, since

22   that was the radiology report.  Let's take a look at the

23   physician records that are still part of Plaintiff's Number 1,

24   and these are the physical examination.  These are the notes

25   that the doctors and the nurses do.

1          And, I'd like to see if you agree with these, because this

2     is when they did the physical assessment.  So, this isn't the

3     radiologist.  These are the doctors and nurses, who are

4     actually looking at you, Mr. Evans.

5          And, they examined all of your extremities, and I've

6     highlighted just a portion of your record.

7          Do you remember them examining your extremities?

8     A.   Yes, sir, I do.

9     Q.   Okay.  And they examined the right upper extremity.

10    That's the top one.  So, that was normal.

11         The left upper extremity, that's the second one.  They

12    said that was normal.

13         The right lower extremity, meaning your right leg, they

14    said that's normal.

15         The left lower extremity, which is your left leg, they

16    said that was normal.

17         Do you agree with those assessments?

18    A.   Other than the lacerations and the trauma, which we're not

19    mentioning, yes.

20    Q.   Okay.  And then they also examined your back and they

21    checked that the back was not tender.  Do you agree or disagree

22    with that?

23    A.   I disagree completely.

24    Q.   All right.  And then they also do a review of all of the

25    radiological studies, and that's what we've already talked

1    about, and they were all normal.  We've gone through those,

2    right?

3    A.    Yes.

4    Q.    Okay.  So, essentially, -- let me see if I have this

5    correct, Mr. Evans -- at least the doctors and nurses and

6    radiologists at Charity, they found no broken bones, correct?

7    A.    Yes.

8    Q.    They found no soft tissue injuries, according to the

9    records?

10   A.    That's not what they told me.

11   Q.    Okay.

12   A.    According to your records.  That's not what they -- I was

13   told.

14   Q.    Mr. Evans, again, these aren't my records.  These are your

15   attorney's records that he provided.

16   A.    I don't --

17   Q.    So, according to these records, no soft tissue injuries --

18          MR. WRIGHT:  Your Honor, these are X-ray reports, and

19   if he's got a doctor that's going to come in and testify on

20   behalf of Ford to support his contention that soft tissue would

21   be found on an X-ray, I'd like to see it.

22          MR. MAXWELL:  Judge, I guess I have to ask that we

23   stop the little arguments and make objections.  And, again --

24          MR. WRIGHT:  I think it's unfair, Judge.

25          MR. MAXWELL:  We just went through this, Judge.

1    These are the doctor's and nurse's notes.  So, it's not

2    radiology.

3            THE COURT:  Okay.  I'm going to overrule the

4    objection.

5    BY MR. MAXWELL:

6    Q.   Now, Mr. Evans, then you went to see Dr. Hontas, and

7    you've described your treatment with Dr. Hontas.

8    A.   Yes.

9    Q.   And, he was who your attorney recommended you to go see.

10   He's over in Covington, am I correct?

11   A.   No, sir.  He's in -- well, he's got two offices.  He's at

12   Tulane; Slidell Memorial.

13   Q.   Okay.  So, you saw him at Slidell Memorial?

14   A.   Yes.

15   Q.   And, you discussed the MRI that he performed on you, am I

16   correct?

17   A.   Yes.

18   Q.   Okay.  And, the MRI, I want to take a look at this.  The

19   MRI was done at Delta Imaging?

20   A.   Right.

21   Q.   And, this is what -- Dr. Hontas sent you to Delta Imaging,

22   and the date is really hard to read.  It's July 9th of 2001.

23   Does that sound about right, Mr. Evans?

24   A.   That's close.

25   Q.   Okay.  And, he reviewed these findings with you, did he

1  not?

2  A.   I can't read that.  I'm sorry.

3  Q.   Okay.  Well, let me see if we can zoom in and get it a

4  little bit better for you.

5       Well, let me just start reading this for you, and I want

6  to see if this is what he described for you.  And that is, he

7  says that you have a slight bulging of the disc at the L5-S1

8  level.  And, that's right down at the base of your spine,

9  correct?

10  A.   Correct.

11  Q.   Is that the way he described it, that there was "slight

12  bulging"?

13  A.   He described it as "a bulging."

14  Q.   Okay.  And, at least on the report here it says "slight

15  bulging," so I assume he was reading the report with you, when

16  he discussed it, correct?

17  A.   No, sir.  He wasn't reading the report.

18  Q.   All right.  And, the report also indicates did he tell you

19  about the fact that there is degenerative disc changes

20  throughout your lumbar spine, from -- there's six different

21  vertebra and they found degenerative changes in all six of

22  them, from L1 all the way down to the bottom.

23       Did he discuss that with you?

24  A.   He said there was a slight problem; normal.

25  Q.   Normal, when you start pushing 50.  It happens to a lot of

1   us, right?

2   A.   I don't know.  It happens to a lot of people, --

3   Q.   Okay.

4   A.   -- but --

5   Q.   Did he explain to you that's part of the normal --

6   A.   Yes.

7   Q.   -- aging process?

8   A.   Yes.

9   Q.    A lot of people start getting lower back pains when they

10  get in their late 40s?

11  A.    No, he didn't --

12  Q.   Okay.

13  A.   -- discuss that.  No.

14  Q.   All right.  And, did he discuss with you -- he found, the

15  report found that there's degenerative disc disease all through

16  your lumbar spine, from L1 to L2, to L3 to L4, to L5, and then

17  from L5 to S1.

18      And, did he tell you that this report -- and this is the

19  thing I want to focus in on -- that there was no significant,

20  no significant spinal stenosis, which means narrowing of the

21  spinal canal, or disc herniations?

22          MR. WRIGHT:  Objection.  Your Honor, Mr. Maxwell is

23  testifying as to medical things.  He can't ask the witness

24  multiple questions.  He's not a medical doctor.

25          MR. MAXWELL:  Judge, he was asked --

1        THE COURT:  Ask whether the doctor explained that.

2        MR. MAXWELL:  Yeah.

3   BY MR. MAXWELL:

4   Q.   Did the doctor explain to you that the radiological

5   finding -- I'm sorry, the MRI that Mr. Wright had you describe

6   concluded that there was no significant disc herniations?

7   A.   No, --

8        MR. WRIGHT:  Objection.

9        THE WITNESS:  -- he said I did have a disc

10  herniation.

11       MR. MAXWELL:  All right.

12  BY MR. MAXWELL:

13  Q.   Did he show you the report, sir?

14  A.   No, sir.  I've never seen that report.

15  Q.   All right.

16       MR. MAXWELL:  Can I approach, Judge?

17       THE COURT:  Sure.

18  BY MR. MAXWELL:

19  Q.   It's right down there at the bottom. Can you see it?  Do

20  you need your glasses?

21  A.   That's what he told me, there was a disc protrusion at L5-

22  S1 level.

23  Q.   All right.  So, he told you there was a disc protrusion at

24  L5-S1?

25  A.   Right.  And, he said that wasn't causing my problem on my

1  left side.

2  Q.   All right.

3  A.   That should be on my right side.

4  Q.   And, you don't recall him telling you that there was no

5  significant disc herniations, according to the MRI report?

6  A.   No.

7  Q.   Okay.  Now, Dr. Hontas never told you that you were

8  totally disabled, am I correct?

9  A.   No, sir.  He never said that.  But he said he had already

10  done everything he could do for me, and surgery was the only --

11  Q.   And, you mentioned the myelogram that Dr. Hontas sent you

12  to.

13  A.   Yes, sir.

14  Q.   Correct?

15  A.   Correct.

16  Q.   And he discussed with you that the myelogram also showed

17  the degenerative disc disease and the -- I'm going to start

18  reading these -- "the small disc protrusion" down at the lower

19  part of your spine?

20  A.   That's where they found the problem with the nerve going

21  to my left side, yes.

22  Q.   Okay.  And then he sent you to see Dr. Butler?

23  A.   Yes, sir.

24  Q.   And, Dr. Butler, after he saw you, indicating that if

25  you're having this pain and you feel it's really affecting you,

1   that you should have surgery?

2   A.    That was one option, yes.

3   Q.    Okay.  That was certainly an option.

4         Another option was to do physical therapy --

5   A.    No, --

6   Q.    -- and other forms of treatment?

7   A.    -- Dr. Hontas had quit sending me to physical therapy.

8   There was no marked improvement from doing that.

9   Q.    Dr. Butler never recommended any physical therapy?

10  A.    Not physical therapy, no, sir.

11  Q.    Dr. Butler told you, did he not, that if your pain

12  complaints were such that you felt that you couldn't work, if

13  you had the surgery, more than likely you'd be able to return

14  to the same job --

15  A.    No, sir.

16  Q.    -- that you had before?

17  A.    He never said that.

18  Q.    He never said that?

19        Did you see his report, dated July 30th, 2002?

20  A.    I haven't seen Dr. Butler's -- I've just talked to

21  Dr. Butler.  I haven't seen any reports.

22  Q.    All right.  Well, let's take a look at the -- this is

23  Dr. Butler's report to Dr. Hontas, part of Plaintiff's Exhibit

24  Number 1, dated July 3rd, 2002.  Do you see this is Dr. Butler

25  writing to Dr. Hontas?

1          And, let's just read the highlighted area here.  This is

2    his conclusion.  "I would expect that it is realistic for

3    Mr. Evans to be able to return to his previous job position

4    with a reasonably successful outcome of surgery."

5    A.    That's the --

6    Q.    Is that what he told you?

7    A.    The "reasonably successful outcome," I agree with that 100

8    percent, yes.

9    Q.    And, the things that you told the jury earlier about the

10   chance of dying and the chance of paralysis, that's the general

11   information that any sort of surgical permission slip has.

12         Am I correct?

13   A.    Well, yes, sir.  If you're having surgery, I would think

14   you would want to know that.

15   Q.    Right.  If you have a little surgery and take some bad

16   mole off or a little bit of skin cancer, you get the same sort

17   of thing in your permission slip, do you not?

18   A.    I wouldn't know.  I've never had that problem.

19   Q.    He didn't tell you that you were at any heightened risk

20   that anybody in the entire population would be at?  I mean,

21   you're just the same as everyone else, as far as surgery is

22   concerned?

23   A.    He was just telling me the risk involved.

24   Q.    Right.  But, there was nothing special about the surgery

25   he was suggesting that put you at any heightened risk?

Evans - Cross                                                102

1   A.   I don't know what you would mean by the word "heightened"?

2   Q.   Well, he didn't say, "This is a risky surgery," or "This

3   is an experimental surgery," --

4   A.   No, sir.

5   Q.   -- or "This is some surgery that's different"?

6   A.   No, sir.  He didn't make that statement.

7   Q.   He was going to go in and fix the mild herniation on one

8   side of one of your discs, and said --

9   A.   And repair the nerve --

10  Q.   -- if you do that, in his opinion, you'd be able to return

11  to your previous job position?  Correct, sir?

12  A.   He didn't tell me I could return.  Like I said, I've never

13  seen that report, --

14  Q.   Would you like to see it?

15  A.   -- but all we went through is the --

16       No, sir, I have no need to see it.

17  Q.   Okay.

18  A.   All we went through is the risk, and the down time, and

19  the percentages of my back getting better.

20  Q.   Now, let's talk about the prior accident that you had on

21  the job, April 26th of 2001.  And, Mr. Wright brought that up

22  today, and I said I'm not going to make a big deal out of it,

23  that was his words.

24       But, let's talk about that accident, because you did have

25  this accident on the job about three weeks before the accident

Evans - Cross                                    103

1    that we're here today discussing, correct?

2    A.    Yes, sir.

3    Q.    And, you fell -- at least the report says you fell on

4    stairs.  You're saying you fell on the deck.

5    A.    Well, when I was going down to the steps, you know how you

6    come up -- it just had one step, and the deck is there.  And,

7    my feet came out from under me and I sat down, and I hit the

8    deck.

9    Q.    Okay.  Just the report said you slipped and fell on the

10   steps.  So, "deck," "steps," it was in the same area?

11   A.    I slipped on the step, but sat down on the deck.

12   Q.    Okay.  And, I deposed you before the trial started, the

13   first trial, am I correct?

14   A.    (Witness nods affirmatively)

15   Q.    You have to say yes or no, --

16   A.    Yes, yes.

17   Q.    -- so they get you, --

18   A.    Excuse me.  I understand.

19   Q.    -- Mr. Evans.  You sure you don't need a drink or

20   anything?

21   A.    No, not right now.

22   Q.    Okay.  And, during that deposition, you were sworn to tell

23   the truth, just like you are today, correct?

24   A.    Correct.

25   Q.    And I asked you if you had ever had any sort of accident

1    on the job and you denied that, did you not?

2    A.    When you were deposing me, that didn't even relate to me.

3    It was so insignificant.  I thought you had meant another

4    automobile accident, and that's why I said no.

5    Q.    Well, let me just show you what you did say and what I did

6    ask you, Mr. Evans.

7            MR. MAXWELL:  And, counsel, this is from Page 17 of

8    his deposition.

9    BY MR. MAXWELL:

10   Q.    I asked you the following questions, Mr. Evans.

11       And I'll get closer, so we can go over these.

12       I said:  "You've never been hurt on the job?"

13       You said:  "No."

14       "Never fell down a flight of steps?"

15       You said:  "No."

16       "Never had any sort of work related injury of any sort?"

17       "No."

18       So, I didn't say anything about a car accident, Mr. Evans.

19   I asked you for any sort of on-the-job accident, and you didn't

20   tell me you had had that, did you?

21   A.    No.

22   Q.    And, this isn't true, is it, sir?

23   A.    I didn't say -- no, I did not tell you that.

24   Q.    And, you actually went to see your doctor, Dr. Larcena,

25   after this fall at work, about three weeks before this

1    accident, correct?

2    A.    That was mainly for my Glucophage and Lotensin refills for

3    my high blood pressure.  And, while I was there, we discussed

4    it, correct.

5    Q.    And I think your testimony on direct was that this

6    accident was really nothing.  Is that what your testimony is?

7    A.    Yes, sir.

8    Q.    Now, the jury is going to hear this afternoon, when Ford

9    puts on our case, that we deposed Dr. Larcena.  Have you seen

10   his testimony, his deposition?

11   A.    Yes.

12   Q.    And, when you went to see Dr. Larcena, -- well, let me

13   just ask you about your May 10th of '02 visit.  That's two

14   weeks before this accident.  When you went to him, did you tell

15   him you were in severe pain, because of this accident, that you

16   didn't tell me about, initially?

17   A.    On my right toe, I didn't realize I had a fractured right

18   toe, and I did have a bruising on my buttocks.

19   Q.    Did you tell him you couldn't stand up or lie down?  Do

20   you remember telling him that?

21   A.    No, not that I couldn't stand up, no, sir.

22   Q.    Do you remember telling him that you had severe left leg

23   pain?  Not toe.  You had severe left leg pain?  The same thing

24   that you've told the jury --

25   A.    That's --

1  Q.    -- you have now?

2  A.    That's a different interpretation.

3  Q.    Okay.

4  A.    My left buttocks.

5  Q.    Well, if he testifies that you told him you had severe

6  left leg pain, the very thing that you're telling the jury is

7  related to your May 24th accident, then that would be a mistake

8  on Dr. Larcena's part?

9  A.    That's not what I said, no.

10 Q.    If Dr. Larcena has in his notes that you also complained

11 about back pain, would that also be a mistake?

12 A.    That would absolutely be a mistake, yes.

13 Q.    So, if he says anything about left leg pain, if he says

14 anything about back complaints, if he says anything about

15 you're in such severe pain that you couldn't even stand up or

16 lie down, that's a mistake in Dr. Larcena's notes and his

17 testimony --

18 A.    That's definitely wrong there.

19 Q.    Okay.  Fair enough.

20       Now, let's talk about the disability, just for a second.

21       No, I've got one more thing, one more thing I wanted to

22 ask you about.  I think at the very end of your testimony you

23 mentioned about that you have some nerve problems and

24 Dr. Fischer told you about nerve problems?

25 A.    Yes, sir.

1  Q.   Okay.  Have you seen Dr. Fischer's medical reports?

2  A.   No, sir.  Dr. Hontas had those.

3  Q.   If Dr. Fischer said that he sees no weakness in your nerve

4  territories or in your nerve root territories, is that

5  different than what you feel is the situation?

6  A.   Well, I don't know what you mean by "nerve territories."

7  Q.   Well, the nerves that he examined, he found no persistent

8  weakness in those nerves.  That's different than what your

9  understanding is --

10 A.   Yes, absolutely.

11 Q.   -- of his findings?

12 A.   Yes.

13 Q.   Okay.  So, if that's what Dr. Fischer said, that would be

14 incorrect, as well?

15 A.   Well, I don't know about "incorrect," but that's not what

16 I was told.

17 Q.   You disagree with it, though?

18 A.   Correct.

19 Q.   Okay.  Now, let's talk about the disability claim you're

20 making.  Your claim is, Mr. Evans, that you can't work, other

21 than run some errands for your wife?

22 A.   Yes, sir.

23 Q.   Okay.  And we've already established that Dr. Hontas

24 didn't tell you that, and Dr. -- well, I guess you didn't

25 discuss that with Dr. Fischer, did you?

1  A.   All of Dr. Hontas' reports says "unable to return to

2  work."

3  Q.   Sure, for the acute phase.

4  A.   No, sir, for --

5  Q.   But, did Dr. Hontas ever say you are totally disabled and

6  you can't work, Mr. Evans?

7  A.   He never said I was totally disabled.  He said I needed

8  surgery.

9  Q.   Okay.  And Dr. Butler didn't say you were totally

10 disabled, either, did he?

11 A.    No, sir.  He wanted to do surgery.

12 Q.   And he said if you had the surgery, more than likely

13 you're going to be able to return --

14 A.   He didn't never say "more than likely."

15 Q.   -- to the job you had?

16 A.   He said there's a good possibility.

17 Q.   Sure.  He said what he said in the July 30th, 2002 report,

18 that it would be realistic to assume that you would be able to

19 return to your prior job.

20 A.   Well, worded it a little different when we were talking

21 than the way he put it --

22 Q.   Okay, that's fine.

23 A.   -- in his report.

24 Q.   That's fine.  And, you saw Dr. Nutik, as well, am I

25 correct?  Gordon Nutik?

1   A.   Correct.

2   Q.   And Dr. Nutik performed --

3        MR. WRIGHT:  Are you going to call Dr. Nutik?  Let's

4   approach.

5        MR. MAXWELL:  Can we approach, Judge?

6        THE COURT:  Yes, come on up.

7     **(At side bar)**

8        MR. MAXWELL:  Now, I'm getting kinda ticked off --

9        MR. WRIGHT:  (Inaudible; speaking over Mr. Maxwell)

10       MR. MAXWELL:  Let me finish.  If you have an

11  objection, make an objection, not these little comments from

12  the peanut gallery, Judge.

13       THE COURT:  Okay, okay, keep your voice down.  Keep

14  your voice down.

15       MR. WRIGHT:  We talked about Dr. Nutik's report --

16       THE COURT:  Yes.

17       MR. WRIGHT:  -- and they sent us a letter that said

18  they're not going to use it.

19       THE COURT:  Yes.

20       MR. MAXWELL:  I'm going to ask him -- that doesn't

21  mean I can't ask him whether he saw the guy and what the --

22       THE COURT:  No, --

23       MR. WRIGHT:  No.

24       THE COURT:  No, I don't think we want to get into

25  Dr. Nutik.

1          MR. MAXWELL:  Well, Judge, I think he testified

2     earlier, just with me, that he saw all these doctors.  I can

3     certainly ask him what he did with Dr. Nutik.

4          MR. WRIGHT:  No.

5          THE COURT:  No.

6          MR. MAXWELL:  I only said I'm not going to put the

7     report into evidence.  It doesn't mean I can't ask if the man

8     went to see these doctors.

9          THE COURT:  Well, why don't you ask him --

10         MR. WRIGHT:  That's enough.

11         THE COURT:  Why don't you ask him if he saw

12    Dr. Nutik, and ask him what Dr. Nutik told him?

13         MR. MAXWELL:  Okay.

14         THE COURT:  But, I don't want you to get into

15    Dr. Nutik's opinion.

16         MR. MAXWELL:  All right.

17         MR. WRIGHT:  Your Honor, he's going to lead him into

18    something that's not true.

19         THE COURT:  I don't want you to get into Nutik's

20    opinion, unless he gives it to you.

21         MR. MAXWELL:  Yeah.  I'll ask him what you said, if

22    he saw Dr. Nutik and what did Dr. Nutik find.

23         THE COURT:  Okay.

24         MR. WRIGHT:  But, wait a minute.  Dr. Nutik's report

25    is not in, we're not going to use it.

```
 1              THE COURT:  No, no.

 2              MR. WRIGHT:  And then he's going to try to say

 3    something that my witness is not even prepared to talk about,

 4    because I haven't gone over Dr. Nutik with him.  You know, the

 5    way he's leading him into --

 6              MR. MAXWELL:  It's cross-examination.

 7              MR. WRIGHT:  I know, but --

 8              THE COURT:  Now, if he doesn't know what Dr. Nutik's

 9    opinion is, --

10              MR. MAXWELL:  Then I can't do anything.

11              THE COURT:  -- that's the end to it.

12              MR. MAXWELL:  Yes, ma'am.

13              THE COURT:  Okay.

14         (Side bar concluded)

15    BY MR. MAXWELL:

16    Q.   All right.  Mr. Evans, you remember seeing Dr. Gordon

17    Nutik?

18    A.   Yes, sir.

19    Q.   And, what did Dr. Nutik find?

20    A.   Dr. Nutik did not give me a report.

21    Q.   But, what did he do with you?

22    A.   He run me through some physical tests.

23    Q.   And, did he tell you what the findings were --

24    A.   No, sir.

25    Q.   -- after running you through those tests?
```

1  A.   No, sir.  That doctor was not at my request.

2  Q.   Okay.

3       Now, let's talk briefly about the wages that you're

4  claiming.  Your job at Extreme Nissan, you had been there about

5  four months?

6  A.   Three --

7  Q.   Three or four months?

8  A.   February, something to that degree.

9  Q.   And during those three to four months, you had the two on-

10 the-job accidents that we've talked about?

11 A.   I had the -- yes, if you want to call that an accident,

12 the first one.  Yes.

13 Q.   Okay.

14 A.   Yes.

15 Q.   And, since your second on-the-job accident, you haven't

16 worked anymore?

17 A.   No, sir.

18 Q.   And, before the job for three or four months at Extreme

19 Nissan, you were at Bryan Harris GMC for a few months, as well?

20 A.   Yes, sir.

21 Q.   Okay.  And, do I have it correct that the three years

22 before that -- so we're back to starting like early '99 -- then

23 you didn't work for three years?

24 A.   I bought and sold some cars and stuff on the side, and I

25 bought some cars for Hey, Jude, Incorporated and some other

1    people.

2    Q.    And, before that, you worked at Slidell Ford or Slidell

3    Lincoln/Mercury, was it?

4    A.    Slidell Ford/ --

5    Q.    Ford/Lincoln/Mercury?

6    A.    -- Lincoln/Mercury.

7    Q.    All right.  Now, going back to when you were working at

8    Slidell Ford, up to 2001, did you file tax returns every year?

9    A.    When I was at Slidell Ford and all that.  But, after, you

10   know, when I took off, no, I did not, not every year.  But, I

11   had a bunch -- which, like I said, I lost my house in the

12   flood, and we tried to recover my tax returns and we haven't

13   been able to, from the IRS.

14   Q.    All right.  So, as we sit here today, you don't have any

15   tax returns at all?

16   A.    No, sir.  They've been applied for.

17   Q.    Okay.  And, you've got three lawyers sitting here.  Did

18   they tell you there's just a form that you fill out and send in

19   to the IRS, and they send you copies of your tax returns back

20   to 1970, if you filed them?

21   A.    We did that, and we haven't had any response.

22   Q.    When did you do that?

23   A.    I don't know exactly when we did that, not the dates.

24   Q.    Are you aware that two and a half years ago I asked you

25   through discovery to provide me with your tax returns?

1    A.    That was before Isadore and Isabel came through, and I

2    wouldn't have had a problem then.  But, we lost our home.  We

3    lost all of our records in that.

4    Q.    And I'm certainly sympathetic, Mr. Evans, for that, but

5    did your lawyers tell you that way over two years ago we had

6    requested your tax returns?  And, did they make any efforts

7    over two and a half years, to get your tax returns?  I know

8    that the IRS is slow, but two and a half years slow?

9    A.    I'm telling you we don't have them, and they have been

10   applied for --

11   Q.    Do you know when they were applied for?

12   A.    -- more than once.

13   Q.    Uh-huh.

14   A.    They were applied for by me and by my attorneys.

15   Q.    Uh-huh.  And, just to make sure I've got the date correct,

16   Mr. Evans, the last time I asked was November of 2002, and were

17   told you don't have any tax records.

18   A.    No, sir.

19   Q.    And since July -- I'm sorry -- since November of 2002, you

20   just haven't been able to get anything?

21   A.    No, sir.

22   Q.    All right.  And, what you've brought to court is W-2s,

23   though, from your jobs.

24   A.    Sparsely, the ones that I had, correct.

25         I also signed a form for you to apply for those taxes,

1    too, I think.

2    Q.   Well, you've got three lawyers.  I can't do what your

3    lawyers can.  I don't represent you, Mr. Evans.

4    A.   Well, I understand.

5    Q.   All right.  But, you brought your W-2s for your job at

6    Extreme Nissan, correct?

7    A.   I brought the ones that I had, correct.

8    Q.   You brought your W-2 for the job at Bryan Harris GMC,

9    correct?

10   A.   I brought the ones that I had.  You know, salary and

11   commissions are different check stubs.

12   Q.   But here in a court of law, Mr. Evans, you understand

13   we've got to deal with what we're looking at.

14   A.   Yes.

15   Q.   We've got to touch it, feel it and see it.

16   A.   Well, yes, sir, that's why --

17   Q.   And so you brought everything that we can touch, feel or

18   see.

19   A.   I brought everything I had.

20   Q.   You brought everything you had, and that's what one of

21   Ford's exhibits are, and I think your own lawyer has it.

22   That's it.  There was nothing lurking in the shrubs that we

23   haven't looked at?

24   A.   Nothing that I have, no.

25   Q.   Okay.  Fair enough.

1          One final thing, Mr. Evans:  Even though your doctor has

2    told you that if you have surgery, probably you can return to

3    your job, you've decided not to have it?

4    A.    Yes, sir.  I have, because, you know, I'm just -- I'm not

5    willing to take that risk.  I've got too many friends that have

6    had back surgeries, and I've got friends that have -- they're

7    going for their seventh back surgery.  No, sir, I'm not willing

8    at this time.

9          I'm not saying I won't have to do it.

10   Q.    And, your friends that had the seven back surgeries, did

11   they have one mild herniation at one level --

12   A.    Sir, I'm not their doctor.  I don't know.

13   Q.    Are you planning on having surgery after this trial is

14   over?

15   A.    There could be a possibility of it, yes.

16   Q.    All right.  And, then if you have that, if your doctor is

17   right, you'll be able to go back to work, then?

18   A.    I can't answer that, sir.

19   Q.    But, if your doctor is right, will you be able to go back

20   to work, if you have surgery after the trial?

21   A.    I don't know that.

22   Q.    And, if you do that, --

23   A.    The doctor never told me I could go back to work.  He said

24   it would alleviate some of the nerve pain, itself; the

25   possibility of alleviating the nerve pain.  He never said I

1   could return to work, not to me, personally.

2   Q.   Okay, just his report says that?

3   A.   I don't know what the report says.

4   Q.   Do you want to see it --

5   A.   No, sir.  I don't want to see it.

6   Q.   That's fine.  But, we're clear:  You may have surgery

7   after the trial, and if your doctor is right, you'll be back

8   working.

9   A.   If it got to any -- the pain got any worse, I would

10  probably end up having to do the surgery.

11            MR. MAXWELL:  Judge, that's all I have.

12            Thank you, Mr. Evans.

13            THE COURT:  Thank you, Mr. Maxwell.

14            Hold on, Mr. Evans.  Your attorney gets another crack

15  at you.

16            THE WITNESS:  Oh, excuse me.  I'm sorry.

17                     *    *    *    *    *

18                     REDIRECT EXAMINATION

19  BY MR. WRIGHT:

20  Q.   Mr. Evans, we're going to go through some of your Charity

21  rererecords, and the jury is going to have an opportunity to have

22  this with them when they deliberate, but you were asked a lot

23  of details about your Charity records.

24       And, had you ever been to Charity before?

25  A.   Yes, sir.  That's where I was taken to, the trauma ward.

1    Q.    On the day of the accident?

2    A.    Correct.

3    Q.    And, how were you taken to Charity?

4    A.    By ambulance.

5    Q.    Ambulance.  And, in the Charity records -- I don't know if

6    you've seen this -- there's a record of the ambulance run.  Do

7    you remember the person who came to the Extreme Nissan

8    dealership to take you away in the ambulance?  Do you remember

9    them?

10   A.    I remember going in the ambulance, yes.

11   Q.    Okay.  Well, how did they do that?

12   A.    They had to put me on a board and put my neck in a

13   harness, because of the nature of the trauma.

14   Q.    The record here, in the Charity record, said that your

15   complaints were back and left leg pain.

16   A.    Correct.

17   Q.    Is that what you complained about?

18   A.    Yes, sir.

19   Q.    Did you lose conscientiousness?

20   A.    Yes, sir, briefly.  That's what I was told.  I never

21   realized it.  You know, it was just kind of a daze to me.

22   Q.    As records of Charity -- you had a lot of X-rays taken.

23   We talked about the X-rays.

24   A.    Yes.

25   Q.    Did the doctor ever tell you whether soft tissue injuries

1    can show up on X-rays?

2    A.    No, never.

3    Q.    What were they doing with the X-rays?

4    A.    Looking for broken bones.  That was --

5    Q.    Did you have broken bones?

6    A.    No.

7    Q.    Okay.  There's a record in the Charity -- and I don't

8    know, Mr. Maxwell said that there was no indication of

9    tenderness in your back area.  I'm going to show you a report

10   from Charity.  It says right here concerning sacral tenderness.

11   Do you know where your sacrum is?

12   A.    No.

13   Q.    The L5-S1, do you know that the S1 is the sacral part of

14   your lower spine?

15   A.    No, sir.  I do now.

16   Q.    Is that where you hurt, way back in the bottom of your

17   spine?

18   A.    Right.

19   Q.    And, is this an indication that you were tender in that

20   area?

21   A.    Yeah.  It's almost like, I guess, -- I guess you would

22   call it your tailbone.

23   Q.    Right.  And, when you were at Charity, was your low back

24   hurting you at Charity?

25   A.    Yes, absolutely.

1  Q.   And there's a lot of indications here -- your chief

2  complaint was left leg pain, car rolled over your left side and

3  your left leg.

4  A.   Correct.

5  Q.   Okay.  I'm reading the Charity records.  "Left lower back

6  pain.  Left leg pain.  Ran over by a truck.  Positive loss of

7  consciousness."  Is that what you recall --

8  A.   Yes, sir.

9  Q.   -- from Charity?

10  A.   Yes, sir.

11  Q.   That was mostly what you were complaining about is your

12  lower leg --

13  A.   My back and leg.

14  Q.   -- your left leg and your low back?

15  A.   And my left arm.

16  Q.   Okay.  You were asked some questions about your MRI

17  report.  Dr. Hontas, after you got your MRI back, talked to you

18  about his findings --

19  A.   Yes.

20  Q.   -- on the MRI?

21  A.   Yes.

22  Q.   And this is the Delta Imaging.  This is Exhibit Number 2.

23  We have all of the reports -- myelogram, CT scan, nerve

24  conduction study -- all the tests that were done.  Mr. Maxwell

25  was asking you about the disc finding, and said there was a

1  small bulge.

2      Could you read right here at "L5-S1 level," where it talks

3  about the finding?  Can you read that?  And, you need your

4  glasses, too.  We're about the same age.

5      Read that.

6  A.    "A disc protrusion and/or a focal disc herniation,

7  lateralizing toward the right side, at the L5-S1 level."

8  Q.    Okay.  And, down here it says the "Impression."

9  A.    "Finding suspicious for a disc protrusion and/or disc

10  herniation that lateralizes toward the right side of the L5 and

11  S1 level."

12  Q.    Okay.  So, this report that Mr. Maxwell was talking about,

13  does that coincide with what Dr. Hontas told you --

14  A.    That's exactly what --

15  Q.    -- you had a disc herniation?

16  A.    Yes, that's exactly --

17  Q.    But, on the right side?

18  A.    On the right side.

19  Q.    That's what the report says?

20  A.    Yes, sir.

21  Q.    All right.  And, the myelogram that was done later showed

22  something different, according to --

23  A.    Yes.

24  Q.    Correct?

25  A.    Yes.

1  Q.   And, what was the findings of the myelogram?

2  A.   "There is a subtle indentation of the left L5 nerve root,

3  due to the disc protrusion of the L4-5 disc."

4  Q.   Okay.  So, that's different.  The myelogram showed that

5  you had --

6  A.   Yes, totally different.

7  Q.   -- L4-5 disc herniation, correct?

8  A.   Yes.

9  Q.   And, that's consistent with what Dr. Hontas told you, you

10  had two disc herniations?

11  A.   Right; after I had the myelogram.  We didn't know that

12  before.

13  Q.   What did the doctor say about that L4-5 herniation?

14  A.   That was causing my left leg pain and my numbness, the

15  nerve that -- you know, the nerve damage.

16  Q.   The deposition that Mr. Maxwell talked about, when he

17  asked you a lot of questions about the accident and the

18  injuries and everything, --

19  A.   Yes.

20  Q.   -- do you remember when that was taken?

21  A.   Not the exact date, no.

22  Q.   Well, I'll show it to you.  It actually happened on May

23  24th, 2001, and this was taken on --

24  A.   November 19th, 2002.

25  Q.   So, that was over a year and a half after the accident?

Evans - Redirect                                    123

1   A.   Yes, sir.

2   Q.   Well, when he asked you questions about being hurt on the

3   job, you were thinking in terms of your whole job from when you

4   were 18 years old until you were 46?

5   A.   Yes, sir.

6   Q.   Did you think about slipping and hurting your butt?

7   A.   No, sir.

8   Q.   Did you think that had anything to do with this case?

9   A.   None.

10  Q.   Were you injured May 24th, 2001, when this Explorer rolled

11  over your back and your --

12  A.   Yes, sir.  I was severely injured.

13  Q.   Okay.  Were you injured, still hurting from that slip, at

14  that time?

15  A.   No, sir.

16  Q.   Did you miss any work?

17  A.   Never missed a day.

18  Q.   And, how many days have you worked since you got rolled

19  over by the Explorer?

20  A.   None.

21  Q.   Did you fall down a flight of steps?

22  A.   No, sir.

23  Q.   Okay.  So, when he asked you if you ever fell down a

24  flight a steps before this accident, were you telling the

25  truth?

1    A.    Before the accident?  I felt like I was telling the truth.

2    I hadn't fallen down a flight of steps, no, sir.  I was telling

3    the truth.

4    Q.    When you answered, "Have you had any back problems," were

5    you telling the truth then?

6    A.    Absolutely telling the truth.

7    Q.    Did you fill out forms for Mr. Maxwell to get IRS forms

8    from the IRS?

9    A.    Yes, I did.

10            MR. WRIGHT:  I don't have anything further.

11            Thank you, that's all I have.

12       (Witness is excused)

13            MR. MAXWELL:  Judge, since -- I thought we had

14    cleared up the deposition testimony.  Now, apparently, it's

15    changed.  I would move to admit Mr. Evans' deposition testimony

16    as Ford Exhibit Number 3.

17            THE COURT:  Are you moving to introduce the --

18            MR. MAXWELL:  Admit Page 17 out of his exhibit --

19            THE COURT:  Any objection.

20            MR. MAXWELL:  -- out of his deposition.

21            MR. WRIGHT:  I don't have any problem with that.

22            THE COURT:  Okay.  That will be admitted.

23            MR. MAXWELL:  I'll just put it on the big blow-up,

24    Judge, and I'll substitute a smaller copy during the break.

25            THE COURT:  Okay.  Ladies and gentlemen of the jury,

 1    I think this is probably a good time to take a lunch break.

 2    First of all, we'll be early for the cafeteria, which is in the

 3    basement, so we won't have long lines.  And, it's also a good

 4    time because we've finished one witness and we won't stop in

 5    the middle of another one.

 6              So, let's take a break until -- is 45 minutes

 7    sufficient for you?  Why don't we take a 45 minute break, and

 8    we'll come back at 12:15, okay?

 9              Thank you very much.

10         (Jury exits courtroom)

11                       *    *    *    *    *

12                        **(Luncheon Recess)**

13

14

15

16

17

18

19

20

21

22

23

24

25

1                **A F T E R N O O N   S E S S I O N**

2                        *   *   *   *   *

3                   (Jury enters courtroom)

4          THE COURT:  All right.  Are we ready to get started?

5          MR. WRIGHT:  Yes, Your Honor.  We're going to call

6   Herb Shoemake to the stand.

7                        *   *   *   *   *

8                **HERBERT SHOEMAKE, WITNESS, SWORN**

9                        *   *   *   *   *

10                    DIRECT EXAMINATION

11  BY MR. WRIGHT:

12  Q.   Mr. Shoemake, we've met before.  My name is Carter Wright.

13  I represent Mark Evans.

14       Could you tell us your date of birth?

15  A.   It's 9/23/45.

16  Q.   Are you working presently?

17  A.   No, sir, I had open heart surgery last year.

18  Q.   Briefly, tell us your educational background.

19  A.   I've got a Bachelor's Degree in Arts and Sciences from the

20  University of Arizona, in Tucson, Arizona.  I attended the

21  University of Southern Mississippi.

22  Q.   What types of jobs have you had over your career,

23  Mr. Shoemake?

24  A.   To be honest with you, mostly automobiles.

25  Q.   Okay, the last ten years?

Shoemake - Direct                               127

1   A.    Automobiles.

2   Q.    What type of work?

3   A.    Sales, manager.  I've had my own lots.  I have my own

4   wholesale cards and stuff, now.  I can buy and sell them for

5   other dealers.  They spot send me and I spot buy eight, ten

6   cars, and load up trucks the same way that we were unloading

7   these trucks that day.

8   Q.    Do you know Mark Evans?

9   A.    Oh, yeah.

10  Q.    How do you know Mark?

11  A.    When you're in the car business, you basically know just

12  about everybody.  But, I've known Mark on and off for probably

13  15, 16 years.

14  Q.    Have you worked with him before?

15  A.    Oh, yeah.

16  Q.    In what places?  Just name a few.

17  A.    Extreme Nissan, and we worked at the Ford store together.

18  Q.    Do you remember what Mark's position was?

19  A.    He was a used car sales manager.

20  Q.    At Ford/Lincoln/Mercury?

21  A.    Yes, he was.

22  Q.    Okay.  And, generally, what type of money would a used car

23  manager make during the years that you worked in that industry?

24  A.    Anywhere from $40,000 to $100,000, depending on where

25  you're at and what your pay program is, and how much the

 1  dealership decides to put a pack on, which -- that's just a

 2  hidden expense that nobody gets paid on.

 3  Q.   When did you start working at the Extreme Nissan

 4  dealership, do you remember?

 5  A.   I can't remember exactly.  I was employed there probably

 6  three to four months.

 7  Q.   Before the accident involving Mr. Evans?

 8  A.   Probably two months, two and a half, yes.

 9  Q.   What was your position at Extreme Nissan?

10  A.   I was his assistant and plus I was in sales, too.

11  Q.   Do you remember your job title?

12  A.   Yeah.  I helped Mr. Evans with -- every week, we would

13  have anywhere from three to four truck loads of automobiles

14  come in, and those cars would have to be put into stock and

15  into the computers with the equipment that are on them, what

16  kind they are.

17       And, they're taken off the truck and, naturally, that

18  gives you a surplus amount of room that you don't have.

19  Q.   Okay, I'm not going to go into all of that.

20  A.   Okay.

21  Q.   Do you remember your job title at Extreme Nissan?

22  A.   It was assistant used car manager.

23  Q.   And, did you work with Mr. Evans on a daily basis?

24  A.   Yes.

25  Q.   Before this accident of May 24th, 2001, -- and we're going

1   to talk about that.  Did you witness that accident?

2   A.    Yes.

3   Q.    Do you remember Mark having any kind of accident at

4   Extreme Nissan before that day?

5   A.    Not that I know of.

6   Q.    Did he ever complain to you about anything, about any kind

7   of medical problem before that?

8   A.    As far as I knew, he was a big, healthy man.

9   Q.    Did he ever miss any work, say, within a month before the

10  May 24th accident?

11  A.    Mark never missed work.

12  Q.    How about after May 24th, 2001?  Did he miss any work

13  after that?

14  A.    That's after the accident, right.  Yeah.

15  Q.    Did he ever come back to work?

16  A.    No, he didn't.

17  Q.    On May 24th, 2001, we don't want to go into what was going

18  on before the accident.  All I want you to do is tell the jury

19  what you saw.

20  A.    Okay.

21  Q.    Before you do that, how far away were you from the

22  accident scene?

23  A.    Thirty to 35 feet.

24  Q.    Okay.  Tell us what you saw.  Tell them what you saw.

25  A.    Mark and I both were checking automobiles in, to be put

Shoemake - Direct                                    130

1   into stock, and Mark --

2   Q.   Okay, guess what?

3   A.   What?

4   Q.   Don't tell us all that.

5   A.   Okay.

6   Q.   Tell us what you saw.

7   A.   All right.  I saw Mark standing by a Ford Explorer, which

8   had the big wheels on them.  It was a nice truck.  And I saw

9   the Ford jolt into gear, into "Reverse."  And, as it did, it

10  hit Mr. Evans in the back.

11       He reached, with his arm, to try to -- for some reason, I

12  guess he thought he could stop it, which is impossible.

13       But, it knocked him to the ground.

14       Well, when he went to the ground, I saw the front end of

15  this huge Ford go up in the air and come down.  I said, "Oh, my

16  God.  The truck has run over Mr. Evans."

17       I ran around to see, and I said, "Are you all right?"

18       And, he said, "No."

19       And, I looked, and there was the imprint of a tire print

20  where the truck had come across him.  The truck continued on

21  and crashed into three or four other cars, and did significant

22  damage to all those cars, and all those cars were taken away

23  and fixed.

24  Q.   What did you do after you saw --

25  A.   I went and called -- I immediately called the hospital

1    and, as soon as I got through there, I couldn't get hold of

2    Mark's wife, because I didn't know if he was going to make it

3    or not.  I mean, when a truck runs over the top of you with

4    tires that wide, -- and I tried to get hold of her.  I finally

5    got hold of her, and she came down.

6    Q.    Okay.  You said you called the hospital.  Did you call

7    9-1-1?

8    A.    Charity, yeah.

9    Q.    What was Mark's condition, when he was on the ground?

10   A.    He was sitting in, like, a prone position, and he said he

11   couldn't move.  He was kind of semi-sitting up, not laying

12   down.

13   Q.    Did he tell you what parts of his body were hurt?

14   A.    When I ran, the security guard and the other people ran to

15   him, and by the time I got back, everybody was around him, and

16   I never got a chance to talk to him.

17   Q.    Do you know whether he was taken away that day?

18   A.    He was taken away in an ambulance.

19   Q.    Have you seen Mark Evans since that accident?

20   A.    Oh, yeah.

21   Q.    Are you friends with Mr. Evans?

22   A.    Oh, yeah.

23   Q.    Do you know what his medical condition -- I don't want you

24   to say physically, but do you know whether or not he's having

25   problems, as far as what you've been able to --

1   A.   I know he goes to the doctor about as much as I do.  We go

2   to separate doctors, though.

3   Q.   How much longer did you work at Extreme Nissan after that?

4   A.   A couple of three weeks.  When I filed for my Social

5   Security from Extreme Nissan, along with some of the other

6   managers, we had found that the Social Security had not even

7   been filed, --

8   Q.   Okay, we don't need to go into that.

9   A.   Okay.  It concerned me, because it was income that was

10  going to be into my income, and it wasn't there.

11          MR. WRIGHT:  Okay, I think that's all I have.  Thank

12  you, Mr. Shoemake.

13                      *    *    *    *    *

14                      CROSS-EXAMINATION

15  BY MR. MAXWELL:

16  Q.   Mr. Shoemake, --

17  A.   How you doing?

18  Q.   -- how are you, sir?  It's good to see you again.

19  A.   I've seen you before.

20  Q.   And, who wasn't paying your Social Security?  It was a

21  Nissan dealer, right?  I want to make sure we're clear on that.

22  A.   Sure, sure.

23  Q.   Not a Ford dealer?  A Nissan dealer.

24  A.   But, I had heart surgery, which had nothing to do with

25  him.

Shoemake - Cross                                           133

1    Q.   I understand.

2         You and Mr. Evans live pretty close to each other?

3    A.   Fairly close, yes.

4    Q.   Okay.  Pretty good friends?

5    A.   Yes, sir.

6    Q.   And, you and he both worked at Extreme Nissan for a while

7    back --

8    A.   Yes, sir.

9    Q.   -- in 2001, I guess?

10   A.   Yes, sir.

11   Q.   How long had you been at Extreme Nissan?

12   A.   I told him, probably, say, three months, four months;

13   somewhere in that area.

14   Q.   Well, that's how long Mr. Evans had been there.  You had

15   come about the same length of time?

16   A.   I think I came after Mr. Evans did.

17   Q.   Okay.  So, you were there a few months, too, then?

18   A.   Yes.

19   Q.   Now, when you observed the accident, am I correct you were

20   behind the Ford, about 35, 40 feet?

21   A.   Yes, sir.

22   Q.   And you told me -- let me see if I have this correct; I'm

23   going back to what my notes indicate.  You said you kind of saw

24   a glimmer of the vehicle moving, out of the corner of your eye.

25   A.   Yes, sir.  That was what brought my attention to it, it

1  was the flickers of, like, chrome flickering on something.

2  Q.   Right.

3  A.   That's when I looked up, and that's when I saw the vehicle

4  strike Mr. Evans in the back.

5  Q.   So, you look up.  Mr. Evans is standing on the ground.

6  A.   Yes, sir.

7  Q.   He kind of had his arm out?

8  A.   Yes, sir.  Yes, sir.

9  Q.   And, the vehicle started to move?

10  A.   Yes, sir.

11  Q.   And I think you said it went about two, three, four miles

12  an hour, is about how fast --

13  A.   Yes, sir.  And, again, I told you at the time, I'm not

14  very good at guessing miles per hour.  A man walks, what, three

15  miles an hour?

16      The vehicle did not --

17  Q.   Some walk faster, some walk slower.  I'm slow.

18  A.   Well, I'm slow, so --

19      But, the vehicle that he was tangled up with in the front

20  did not stop with him.  It continued and did some severe damage

21  to three other vehicles behind it.

22  Q.   Because nobody was in it and the engine was running?

23  A.   That's right, sir.

24  Q.   Yeah.  Now, after you saw him get knocked down, -- I'm

25  going to make sure I'm clear, Mr. Shoemake.  You said about the

1   front end of the Explorer going up in the air.  Haven't you

2   described it before as you saw a bump?

3   A.   Yeah.

4   Q.   Okay.

5   A.   The same thing.

6   Q.   Is that pretty accurate to say you saw a bump?

7   A.   That's pretty accurate.  That's the same thing.

8   Q.   That's fine.

9        And your testimony about what a good used car salesman can

10  make, do you know what Mr. Evans actually did make?

11  A.   No, sir.

12  Q.   You don't have any information --

13  A.   No, sir.

14  Q.   -- about his income over the years?

15  A.   And could care less.

16            MR. MAXWELL:  Well, I sure hope you keep feeling

17  better.  You look good.

18            THE WITNESS:  Thank you.

19            MR. MAXWELL:  Thanks for coming.

20            That's all I have, Judge.

21            THE COURT:  Thank you very much, sir.  We appreciate

22  it.

23       (Witness is excused)

24            MR. WRIGHT:  We're going to read Dr. Larcena's

25  deposition.

1            THE COURT:  Okay.

2            MR. WRIGHT:  We've got three doctors' depositions, so

3    bear with us.

4            THE COURT:  Ladies and gentlemen of the jury, when we

5    talk about reading a deposition, the witnesses have been

6    deposed; that is that they've been sworn in previously to

7    testify, under oath, and their testimony, even though being

8    read to you, was under oath and should be treated the same as

9    though they were in court today and testifying, okay?

10           UNIDENTIFIED JUROR:  (Raises hand)

11           THE COURT:  Yes, sir.

12           UNIDENTIFIED JUROR:  If we have any questions

13   concerning some of the statements made, could we ask a

14   question?

15           THE COURT:  No, sir.  I'm sorry, but basically what

16   you have to do is listen to the evidence presented to you and

17   base your decision solely on the evidence, as presented.

18           This young lady is going to be testifying as

19   Dr. Larcena testified under oath.

20           Go ahead.

21

22

23

24

25

1                    *    *    *    *    *

2                      **(BY DEPOSITION)**

3            **DR. ALLAN Q. LARCENA, M.D., WITNESS, SWORN**

4                    *    *    *    *    *

5   EXAMINATION BY MR. SIMS:

6   "Q.  Good afternoon, Dr. Larcena.  I'm Darrell Sims.  I

7   represent Ford Motor Company.  I will have the other counsel

8   introduce themselves.

9          "MR. WRIGHT:  Carter Wright on behalf of Mark Evans."

10         "MR. SOUHLAS:  I'm here, too."

11  BY MR. SIMS:

12  "Q.  I represent Ford Motor Company and I'm the one that

13  Noticed this deposition.  I'm quite sure you've given your

14  deposition before numerous times, Dr. Larcena.

15  "A.  Yes, sir.

16  "Q.  You pretty much know the ground rules?

17  "A.  Yes, sir.

18  "Q.  Let's just jump right into it.

19      "Dr. Larcena, what is your specialty?

20  "A.  Internal medicine.

21  "Q.  Where did you go to school?

22  "A.  Philippines for the medical school, and then Colombia

23  University for residency.

24  "Q.  What is your specialty, again, Doctor?

25  "A.  Internal medicine.

1    "Q.  Have you ever testified in court before?

2    "A.  No.

3    "Q.  Have you ever been tendered as an expert witness, just to

4    give an opinion in any case?

5    "A.  Yes.

6    "Q.  How recently ago was that?

7    "A.  I think three years ago.

8    "Q.  Doctor, when did you first begin treating Mr. Mark Evans?

9    "A.  I first began treating Mr. Evans May 14th, 1998.

10   "Q.  At that time, Dr. Larcena, what were his complaints?

11   "A.  He was complaining of blurred vision and having no energy.

12   "Q.  After your examination, what were your findings?

13   "A.  He had some diagnostic blood tests done at that time.

14   "Q.  At that time, did you determine that he was suffering from

15   diabetes?

16   "A.  It was after the second visit when he made his follow-up

17   appointment.

18   "Q.  Doctor, what sort of medication did you recommend that he

19   take that you ordered for him?

20   "A.  He was put on diabetes medication.

21   "Q.  What type of diabetes medication?

22   "A.  Amaryl, two milligrams once a day; Glucophage, 500

23   milligrams two times a day.

24   "Q.  What type of diabetes did he have?  Was it Type I or

25   Type II?

Larcena - Deposition Testimony                    139

1  "A.  Type II.

2  "Q.  Now, Type II, they don't have to take the insulin shots?

3  "A.  Type II is non-insulin dependent.

4  "Q.  Doctor, when was the next visit that you treated

5  Mr. Evans?

6  "A.  After the second visit, to confirm the diabetes, I saw him

7  -- third visit was May 21st, 1998.

8  "Q.  What were his complaints then?

9  "A.  Follow-up on his diabetes and high blood pressure.

10  "Q.  What were your findings then and recommendations?

11  "A.  He was to continue his medications and I increased the

12  Glucophage to two in the morning and two in the evening.

13  "Q.  Did he have any other complaints of any back pain, any

14  neck pain, any pain in his foot or anything like that?

15  "A.  No other complaints.

16  "Q.  The next visit, Doctor?

17  "A.  Next visit was May 27th, 1998.

18  "Q.  What were his complaints then?

19  "A.  A follow-up on his diabetes.  His blood sugar was

20  90 percent better, now that his sugar was improved.

21  "Q.  Doctor, the next visit was on June 5[th], 1998, is that

22  correct?

23  "A.  I have a visit of June 9[th], 1998.

24  "Q.  What were the complaints and treatment for June 9[th], 1998?

25  "A.  This was a regular follow-up of his diabetes.  He was sent

Larcena - Deposition Testimony                    140

1   to the eye doctor, ophthalmologist.

2   "Q.  You were monitoring his blood sugar at that time?

3   "A.  Yes, sir.

4   "Q.  What was his blood sugar level?  Was it normal or

5   abnormal?

6   "A.  He reported his sugar at 184.  It's still mildly elevated,

7   but a lot improved.

8   "Q.  Doctor, let's go to the next visit.

9   "A.  Next visit was July 30th, 1998.

10  "Q.  Any complaints then, Doctor?

11  "A.  He was complaining of lacerations that was --

12  "Q.  Is it while moving a refrigerator?

13  "A.  While moving a refrigerator, yes.

14  "Q.  Where were the lacerations?

15  "A.  To the extremity.

16  "Q.  Did he require any sutures?

17  "A.  The sutures were already placed.  I removed.  He was here

18  for me to remove the sutures.

19  "Q.  Now, you said in the extremities.  What do you mean?

20  Where did he have the lacerations?

21  "A.  It should be in the emergency room report.  I don't know

22  if it's on the record.  It was Slidell Memorial Hospital

23  emergency room.

24  "Q.  Let's go to the next visit, Doctor, August 10th, 1998.

25   "A.  Yes, August 10th, 1998.

Larcena - Deposition Testimony                    141

1  "Q.  Were you seeing him for his diabetes or was there

2  something else that he made complaints of?

3  "A.  Fever, chills, and then also for diabetes.

4  "Q.  Did he have any other complaints, Doctor?

5  "A.  Other than the cold, fever, no other complaints.

6  "Q.  Did you tell him to continue on his regimen of Amaryl?

7  "A.  It's not stated here, but if we don't discontinue the

8  medicines, I show to continue the medication.

9  "Q.  When is the next time the patient came to see you?

10  "A.  He came for a blood test, I think, August 3rd, 1998.

11      "I have the emergency room report of that laceration.

12  It's on the right foot.

13  "Q.  I think that's dated 9/3/98.

14  "A.  The emergency room visit was 7/21/98.

15  "Q.  7/21/98?

16  "A.  Yes.  I saw him again on September 24th, 1998.

17  "Q.  What were his complaints then, Doctor?

18  "A.  He was out of his medications, so I restarted the

19  Glucophage again.  It was a routine visit.

20  "Q.  At this time, Doctor, do you know how he was paying his

21  medical bills?  Was he paying them out-of-pocket?

22  "A.  Out-of-pocket.

23  "Q.  He didn't have any health insurance that you were aware

24  of?

25  "A.  No insurance that I can recall.

Larcena - Deposition Testimony                          142

1   "Q.  Doctor, when is the next time that Mr. Evans came to see

2   you?

3   "A.  I have an entry here on January 14th, 1999.

4   "Q.  What were his complaints to you on that day?

5   "A.  He stated that he doesn't have any insurance, and he has

6   not taken his Amaryl.  So I gave him some samples of

7   medications.

8   "Q.  Sample medications for diabetes?

9   "A.  Yes.

10  "Q.  Let's go to the next visit, Doctor.

11  "A.  April 12th, 1999.

12  "Q.  What are his complaints then?  I don't see too much on the

13  progress notes.

14  "A.  This is a follow-up on the diabetes and the high blood

15  pressure.

16  "Q.  The next visit, Doctor?  Is it April 12th, 1999?

17  "A.  August 3rd, 1999.

18       "That's to refill the medications.

19  "Q.  Do you  have anything on April 12th, 1999?

20  "A.  Yes.  That's the one I just did.  It was a routine

21  appointment.

22  "Q.  Next visit?

23  "A.  August 3rd, 1999.  After the August 3rd, is September 9th,

24  1999.

25  "Q.  Let's go back.  I thought you said August 3rd, 1999.  I

Larcena - Deposition Testimony                    143

1    have an April 12th, 1999 progress note here.  You may not have

2    it, Doctor.

3              "MR. WRIGHT:  Counsel, we already discussed that.

4              "THE WITNESS:  April 12th.  After April 12th,

5    August 3rd, then we're on September 9th, 1999."

6    BY MR. SIMS:

7    "Q.  Do you have a visit on 6/21/99?

8    "A.  This is just a telephone conversation.

9    "Q.  What is he requesting?

10   "A.  Refill of the Lotensin, his blood pressure medicine, and

11   we put an 'okay' here.

12   "Q.  The next visit, I guess, is --

13   "A.  September 9th.

14   "Q.  1999?

15   "A.  Yes.  Apparently, he was admitted at Long Beach,

16   Mississippi for pneumonia on August 25th.  And, he came back to

17   see me that day, September 9th, for follow-up of his pneumonia.

18   "Q.  What sort of medications did you prescribe?

19   "A.  I gave him samples of Cipro, an antibiotic.

20   "Q.  Did he express that he didn't have any health insurance?

21   "A.  Yes.  All this time, he has no health insurance.

22   "Q.  Next visit, Doctor?

23   "A.  September 16th, 1999.  It was for follow-up of his

24   diabetes and hypertension; gave him some samples of the blood

25   pressure medication.

Larcena - Deposition Testimony                              144

1   "Q.   For blood pressure?

2   "A.   Yes.

3   "Q.   Elevated blood pressure?

4   "A.   Yes, elevated blood pressure.  And, I gave him Cozar.

5   "Q.   That's in addition to the diabetes?

6   "A.   Yes, that's in addition.  He's got diabetes and

7   hypertension.

8   "Q.   Doctor, at that visit when you saw Mr. Evans, what did you

9   tell him about his hypertension?  What did you recommend that

10  he do?  Did he have to change his diet?

11  "A.   Yes.  That's part of general advice -- diet, exercise,

12  lifestyle modification.

13  "Q.   Did you place him on any work restrictions at that time?

14  "A.   It's not in my notes.

15  "Q.   Next visit?

16  "A.   February 8th, 2000.  He was complaining of cough and

17  congestion for one month.  And, it's showed in my report:  No

18  insurance, can't afford labs.

19     "I gave him a prescription for antibiotic and Allegra for

20  his sinuses.  I advised him to stop smoking.

21  "Q.   Next visit, Doctor?

22  "A.   September 13th, 2000.

23  "Q.   What was this visit for?

24  "A.   He's got some pain on his left flank area, while he was

25  putting a roof on his house.

1   "Q.  What does it say, it hurts when he stands up or lays down?

2   Is that what it says, Doctor?

3   "A.  Yes, sir.

4   "Q.  It says left side hurting?

5   "A.  Yes, sir.

6   "Q.  What was the course of treatment that you performed?

7   "A.  I recommended anti-inflammatory medication, Celebrex.  I

8   gave him samples.  I also gave him samples of his diabetes

9   medicines and blood pressure medicine.

10  "Q.  Doctor, when you say you gave him samples, did you give

11  him enough to maybe cover the next visit or did you give him

12  enough that the law allows?

13  "A.  I have him 12 samples of Celebrex.

14  "Q.  What about his hypertension?  Did you examine him for

15  that?

16  "A.  Yes.  His blood pressure was 160/98.

17  "Q.  What about the diabetes, Doctor, at that time?

18  "A.  The diabetes, he was given samples of Glucophage.

19  "Q.  Let's go to the next visit, Doctor.

20  "A.  Next visit was May 7th, 2001.

21  "Q.  Let's go back, Doctor, to the prior visit.  You said he

22  had -- did he have complaints of any back pain?

23  "A.  No complaints of back pain.

24  "Q.  Let's go back to the May 7, 2001.

25  "A.  He fell at work, slipped and fell at work.  He landed on

Larcena - Deposition Testimony                146

1  his buttocks, left side.

2  "Q.  is that the history that he gave you, Doctor, that he had

3  a slip and fall at work?

4  "A.  Yes.  That's what I gathered from him.

5  "Q.  It says 'HPI.'  It says, 'Fell three weeks ago.'  That

6  means prior to the date that you saw him on May 7th, 2001?

7  "A.  That's the medical assistant's entry.  My entry was two

8  weeks, two weeks ago.

9  "Q.  It says in here, 'Pains in back and leg.'  I can't read

10  the next word.

11  "A.  'Can't lie down, stand up.'

12  "Q.  Were there any other complaints, Doctor?

13  "A.  Left leg pain.

14  "Q.  Doctor, why don't you just go through your whole report

15  and read everything to decipher it, because I cannot read it.

16  "A.  Okay.  'Fell at work.  Slippery.'  Apparently, it was

17  slippery at work.  It was two weeks prior to this visit, 'and

18  hurt his right foot.  Landed on his buttocks, having pain for

19  one week to the left buttocks.  It radiates to the left leg.'

20  And, that one is off Glucophage; there's a follow-up on the

21  diabetes.

22  "Q.  Now, I see in here your plan.  What was your plan, Doctor?

23  "A.  The plan was I gave him a prescription for pain medicine,

24  Lortab-5, 500 milligrams every six hours, 30 tablets; checked

25  labs, HBA1C, CBC, CMP, lipids.

Larcena - Deposition Testimony                     147

1        "I recommended X-ray of the lumbosacral spine, pelvis,

2   X-ray of the right foot; referred to orthopedist, and I

3   discussed the side effects on the prescription for Lortab, such

4   as drowsiness.

5   "Q.  Doctor, it says here under 'extremities,' does that say

6   'swelling'?

7   "A.  'Swollen right toes.'

8   "Q.  'Swollen right toes'?

9   "A.  Yes, sir.

10  "Q.  Did you notice any marks on his body when you examined

11  him, Doctor?

12  "A.  There were no bruises seen, as I mentioned in the report,

13  and negative SLR -- straight leg raising test.

14  "Q.  Doctor, how did he pay you for this visit?

15  "A.  I don't remember, but my recollection, he doesn't have any

16  insurance, so I think he pays me whatever he can afford.

17  "Q.  I see, Doctor, that you wrote the prescription.  Is this

18  your handwriting?

19  "A.  Yes, sir, that's my handwriting.

20  "Q.  You recommended that he go see an orthopedist, correct?

21  "A.  Yes, sir.

22  "Q.  Did you ever get an opportunity, Dr. Larcena, to get the

23  film of his X-rays of his lumbar spine and of his foot?

24  "A.  No, sir.  I don't read X-rays.  I just get the report from

25  the radiologist.

Larcena - Deposition Testimony                    148

1   "Q.  Did you ever get Dr. Bishop's report?  Does that name ring

2   a bell to you?

3   "A.  Dr. Bishop, I know, is a radiologist at Northshore

4   Regional Medical Center.

5   "Q.  Did you ever see her report regarding her findings?

6   "A.  I may have seen it at that time.  I don't remember it

7   right now.

8   "Q.  Do your records indicate that you had an opportunity to

9   talk with Mark Evans about the findings?  Is there anything in

10  your record?

11  "A.  I don't see it in my records.

12  "Q.  Doctor, take a look at this right here.  Is that what you

13  used to order the X-ray?

14  "A.  Yes, sir.

15  "Q.  This outpatient request form has got Mark Evans' name on

16  it.  Is that 'SP'?

17  "A.  A SP, status post-form.

18  "Q.  You're telling her here, you circled on the radiology

19  X-ray, 'L spine,' lumbar spine?

20  "A.  And, 'right foot.'

21  "Q.  And that's your signature?

22  "A.  That's my signature.

23  "Q.  Doctor, when is the next time you treated Mr. Evans?

24  "A.  He came back to see me May 10th, 2001.

25  "Q.  And what were his complaints then?

1  "A.  He was complaining of severe pain.  He stated he lost his

2  prescription for Lortab.  And, he reported that he has not seen

3  the orthopedic specialist.

4      "Then I looked at his X-ray report that showed mild

5  degenerative changes.

6  "Q.  Now, is that in the lumbar spine?  Is that what you are

7  referring to?

8  "A.  The X-ray of the lumbar spine.  That's what I'm referring

9  to, correct.

10  "Q.  Now, he's complaining of severe pain, but in what areas of

11  his body?

12  "A.  Through where he fell, like the buttocks and left leg.  On

13  examination, it showed that he was tender on his left buttocks.

14  "Q.  Would you read the rest of your report for me, just kind

15  of going down to decipher this for me?

16  "A.  Yes, sir.  'In severe pain.  Patient states he lost his Rx

17  for Lortab.  Blood sugar 118.  Has not seen ortho.  X-ray, mild

18  degenerative changes.  Not taking his blood pressure meds for

19  one week.  Pain radiates through left leg.

20      "'Physical examination:  Tender left buttocks.  Negative

21  straight leg raising test.'

22      "The assessment:  'Contusion of the buttocks, diabetes

23  mellitus, hypertension uncontrolled.'

24      "The plan:  To make appointment with orthopedics.  We call

25  in the Rx for the Lortab to his pharmacy.  Advise him to do

Larcena - Deposition Testimony                          150

1   labs for the diabetes, and advise him to take the Lotensin for

2   the blood pressure.

3   "Q.  Doctor, when was the next time that he came to you?

4   "A.  He came to see me again May 29th, 2001.

5   "Q.  What were his complaints now, Doctor?

6   "A.  He came for follow-up on motor vehicular accident.

7   Hematoma, pain to the lower extremities.

8       "And, on my entry, again, before -- he was complaining of

9   having problems with Tylenol-3, which was the prescription

10  prescribed from Charity Hospital.  And, the complaint was

11  nausea and vomiting to Tylenol-3.

12      "My entry:  'Happened on 5/24/2001, at work at the car

13  dealership.  Got run over by Ford Explorer.  He was sent to

14  Charity Hospital, where he had CT scan and X-rays.'

15      "And, next I have:  'Could not tolerate Tylenol-3.  Was

16  able to tolerate Lortab.'

17      "Then physical examination:  'Ambulatory, not in distress.

18  In severe pain.'  Lungs and heart examination were normal.

19  Abdomen is soft.  Above that is masses in the left arm.  That's

20  from the hematoma.  Abrasion on the left leg.  Hematoma on the

21  right medial thigh.  Hematoma on the left medial arm.  And,

22  five over five, the motor power and muscle strength.

23      "The assessment is:  'SP, status post-motor vehicular

24  accident with multiple soft tissue injuries.  Rule out DVT,'

25  deep vein thrombosis, 'of the left arm.  Diabetes mellitus,

Larcena - Deposition Testimony                    151

1  hypertension,' which are chronic medical problems.

2       "The plan was to obtain records from Charity.  I gave a

3  prescription for Lortab-5, 500 every six hours, dispense 30.

4       "I put an order for orthopedics referral as soon as

5  possible, and cold compresses, and I ordered left arm venous

6  Doppler ultrasound to rule out deep vein thrombosis.

7  "Q.  Did you ever get an opportunity to review the X-rays from

8  Charity Hospital, Doctor?

9  "A.  No, sir.

10  "Q.  Did you request them, Doctor?

11  "A.  I requested records from Charity, but usually it takes

12  forever to get those records.

13  "Q.  Doctor, I see an outpatient request form, too.  Could you

14  explain this one to me?

15  "A.  This is an outpatient requisition form for a left arm

16  venous Doppler ultrasound for Northshore Medical Center.

17  "Q.  I have a patient consult form right here.

18  "A.  This is a consult form for the orthopedic doctor for the

19  injuries.

20  "Q.  Now, I see on here it say, 'Workers' Compensation.'  Why

21  would that be written on here?

22  "A.  Because the office in the orthopedics, they usually ask

23  for insurance information.

24  "Q.  So, the billing records are maintained by your office

25  staff here?

Larcena - Deposition Testimony                            152

1    "A.   Yes, sir.

2    "Q.   When is the next time you saw Mr. Evans?

3    "A.   I saw Mr. Evans again August 16th, 2002.

4    "Q.   What were the complaints then?

5    "A.   This was for follow-up on the diabetes, blood pressure.

6    He was out of medicines -- and I put a note here that he has

7    not followed with me for about a year -- and feeling depressed,

8    chronic pain lower back and legs, secondary to motor vehicular

9    accident.

10        "And I put there, 'Has not checked blood sugars.'

11   "Q.   Why did he or did he give you an explanation why it took

12   him a year to come back to see you, Doctor?  Did you ask him?

13   "A.   I don't remember right now, but he might be seeing other

14   doctors, meaning orthopedics.

15   "Q.   Doctor, could you go through the rest of this report for

16   me?

17   "A.   Going to the physical examination:  'Alerted and oriented

18   times three.  Lungs clear, heart regular.  Abdomen obese, non-

19   tender.  Extremities no cyanosis, clubbing edema.'

20        "Assessment:  'Hypertension, diabetes mellitus.  Status

21   post-MVA.  Care of Dr. Hontas.'  Next is 'depression.'

22        "On the plan, I ordered blood tests, hemoglobin A1C, CBC,

23   CMP, lipids.  I checked his blood sugar which was 82.  I gave

24   him samples of Benicar, 20 milligrams once a day; an anti-

25   depressant, Celexa, 20 milligrams once a day.  Advised him to

1  discontinue smoking.

2  "Q.  When was the next visit, Doctor?

3  "A.  Next visit is August 27th, 2002, follow-up on hypertension

4  and lab results.  At the time, he's been off the Benicar,

5  secondary to vomiting.  He was started on Diovan, 80 milligrams

6  yesterday.  It was 8/26/2002.

7      "And then I put down the results of his blood test.

8  'Cholesterol, 197; LDL cholesterol, 131.'  He reported that the

9  Celexa for the depression worked good.  I put down the results

10  of the rest, 'SGOT, 47; SGPT, 56; MCV 99.'

11      "For the cholesterol, discussed Pravachol, but liver

12  function test is high.  So, I discussed other alternatives,

13  such as Welchol for his cholesterol.

14  "Q.  By the time of this visit, Doctor, had you had the

15  opportunity to review the X-rays from Charity Hospital?

16  "A.  I don't remember.

17  "Q.  Let's go to the next visit, Doctor.

18  "A.  Next visit, November 14th, 2002.

19      "'Depression, on Celexa.  Discussed lab results.'  He was

20  feeling depressed.  'He lost his house in the flood; motor

21  vehicular accident two years ago at work.'

22      "He has anhedonia, a sleep disturbance, and was out of the

23  Diovan.  His back pain from trauma, and by that I put 'C/O' --

24  care of -- 'orthopedist.'

25      "And physical examination was unremarkable.

Larcena - Deposition Testimony                    154

1        "Assessment:  'Elevated liver function test, diabetes

2    mellitus, depression, hypertension, back pain.'

3        "And, the plan:  Lexapro is an anti-depressant.  Gave him

4    35 samples.  'Check liver function test.  Advised to

5    discontinue alcohol and check hemoglobin A1C, lipids, and

6    advised low fat diet.  Gave him samples of Diovan, 80

7    milligrams once a day.'  This is a blood pressure pill.

8    "Q.  Doctor, when is the next visit?

9    "A.  I don't have a visit here in the chart anymore.  I think

10   that was the last visit, 2002, November 14th."

11   "Q.  Doctor, I have a progress note here dated 6/13/03.  You

12   have that anywhere?  There's nothing on it.

13   "A.  Yes.  It's an empty -- patient did not show up.

14        "MR. SIMS:  I pass the witness."

15   EXAMINATION BY MR. WRIGHT:

16   "Q.  Doctor, as Mark Evans' internist, the depression that

17   Mr. Evans has brought to your attention, do you relate that to

18   the motor vehicle accident and his chronic back pain?

19   "A.  Well, I cannot pinpoint it directly.  He is under

20   stressors.  He's got diabetes, hypertension, chronic pain,

21   chronic back pain, financial problems.  So, it's a combination

22   of all these stressors in his life.

23   "Q.  Doctor, on the two visits that Mr. Evans saw you on

24   May 7th and May 10th, 2001, you said that there were negative

25   straight leg raising tests.  Explain to the jury what a

1  straight leg raising test is.

2  "A.  A straight leg raising test is a test where you usually

3  are going to see if there is nerve involvement, such as sciatic

4  nerve involvement.

5       "We usually do a maneuver of raising the leg, and that

6  would stretch the major nerve, such as sciatic nerve.  And,

7  when we are able to elicit pain, then we can hypothesize that

8  there is nerve involvement.

9  "Q.  The fact that there was a negative straight leg raising

10 test, what would the significance of that be?

11 "A.  The significance is that the injury did not necessarily

12 involve the major nerves in the back, such as the sciatic

13 nerve.

14 "Q.  In your notes of May 7th and May 10th, Doctor, we've gone

15 over them in detail.  He didn't actually complain of low back

16 pain, did he, in your history?

17 "A.  He was complaining of buttocks pain from where he landed

18 from the fall.

19      "MR. WRIGHT:  Thank you, Doctor.  That's all I have."

20    **(Completion of deposition testimony of Dr. Larcena)**

21      MR. WRIGHT:  That's it for Dr. Larcena.

22      THE COURT:  Okay.  Who's quick?

23      MR. WRIGHT:  Dr. Hontas.  Do you have your records?

24      THE COURT:  I do.

25      Okay, we're getting ready then to hear the deposition

1   of Dr. Hontas under the same circumstances.  At the time of his

2   deposition Dr. Hontas was sworn in to testify under oath.

3       **(The deposition of Dr. Mark Hontas was read into the**

4   **record; not transcribed.  See Exhibit P-3.)**

5       (Reading of deposition interrupted)

6       **(At side bar)**

7           MR. MAXWELL:  The portions Carter --

8           MR. WRIGHT:  We've already been through this.

9           MR. MAXWELL:  Well, here's "Slipped out of gear

10  twice."

11          MR. WRIGHT:  All right, take "Slipped out of gear"

12  out.

13          MR. MAXWELL:  This question here, there's no personal

14  information about the vehicle slipped out of gear, you know --

15          THE COURT:  Yeah.

16          MR. MAXWELL:  -- that should not be in there.

17          MR. WRIGHT:  Take the "Slipped out of gear" out.

18          MR. MAXWELL:  Well, this whole line of questions.

19          MR. WRIGHT:  Not being run over, you need to keep

20  that in.

21          THE COURT:  He's already given that history.  He's

22  already testified a couple of pages ago that he came in

23  following a motor vehicle -- following being run over at the

24  Extreme Nissan.

25          MR. MAXWELL:  So, go to Page 8, Line 7, start there.

1  That gets rid of the, "Slipped out of gear," because that is

2  all asking -- we don't know about that, that what he told,

3  yeah.

4          THE COURT:  Yeah, I think that's right.  Carter, back

5  up and see if I'm right.

6          MR. MAXWELL:  Go to Page 8, Line 7.

7          THE COURT:  No, he's backing up to see if I'm right

8  on the history.

9          MR. WRIGHT:  Okay, start right here?

10          MR. MAXWELL:  Page 8, Line 7.

11          MR. WRIGHT:  Okay.

12          THE COURT:  Okay.  Give her the page that you start

13  it on.

14      **(Side bar concluded)**

15      (Continued reading of the deposition of Dr. Hontas)

16      **(Completion of deposition testimony of Dr. Hontas)**

17          THE COURT:  Why don't we, ladies and gentlemen of the

18  jury, take a quick, a little bit more than ten minute break and

19  come back about two o'clock, okay?

20          Great, thank you very much.

21      (Jury exits courtroom)

22      **(Recess from 1:45 p.m., until 2:00 p.m.)**

23      (Jury enters courtroom)

24          THE COURT:  All right, ladies and gentlemen, I think

25  we have one more doctor and then we will have two live

 1  witnesses.

 2          Anything else after that, gentlemen?

 3          MR. WRIGHT:  No, Your Honor.

 4          THE COURT:  So, we're heading on the home stretch.

 5  Bear with us.

 6          Okay, who are we calling next?

 7          MR. WRIGHT:  Dr. Butler.

 8          THE COURT:  Again, Dr. Butler was sworn in to testify

 9  at the time of his deposition and his testimony is given just

10  as though he were here in court.

11          MR. WRIGHT:  Ready, Judge?

12          THE COURT:  Yes.

13      **(The deposition of Dr. James Butler was read into the**

14  **record; not transcribed.  See Exhibit P-4.)**

15          MR. SOUHLAS:  May it please the Court, Your Honor,

16  the Plaintiff calls Shael Wolfson.

17                  *   *   *   *   *

18          **SHAEL WOLFSON, PLAINTIFF'S WITNESS, SWORN**

19                  *   *   *   *   *

20                  VOIR DIRE EXAMINATION

21  BY MR. SOUHLAS:

22  Q.  Mr. Wolfson, sir, would you please state your occupation?

23  A.  Currently I'm a forensic economist as well as a graduate

24  student at the University of New Orleans.

25  Q.  Tell the jury about your education?

1   A.    Sure.   I have a Bachelor's Degree in Economics and Finance

2   from the Stern School of Business at New York University in

3   1997.   In August of 2000, I received a Master's Degree in

4   Economics from Florida State University.   Currently, I'm

5   working on a PhD in Financial Economics at the University of

6   New Orleans.

7   Q.    Thank you, sir.

8         Mr. Wolfson, what does a forensic economist do?

9   A.    Commonly we're called upon to help determine economic

10  damages in litigation matters applying our expertise in

11  discount rates and growth rates.   We help triers of fact

12  determine present value of any damages.

13  Q.    Thank you.

14        Have you ever been qualified in a court of law as an

15  expert in the field of forensic economics, and if so where?

16  A.    In multiple state courts around Louisiana, as well as the

17  Eastern District here.

18  Q.    The Eastern District, this federal court?

19  A.    Yes, sir.

20            MR. SOUHLAS:   Your Honor, I tender him as an expert

21  witness in the field of forensic economics.

22            MR. MAXWELL:   No objection, Judge.

23            THE COURT:   Okay, ladies and gentlemen, this Witness

24  is going to be deemed to be an expert in the area of forensic

25  economics.

1                    *    *    *    *    *

2                         DIRECT EXAMINATION

3    BY MR. SOUHLAS:

4    Q.    Mr. Wolfson, were you retained to render an opinion on the

5    economic loss of the Plaintiff in this case, Mr. Mark Evans?

6    A.    Yes.

7    Q.    And were you provided with any documents to assist you in

8    your calculations of Mr. Evans' economic loss?

9    A.    Yes.

10   Q.    And do those documents include some W-2 forms?

11   A.    Yes.

12   Q.    Did some of these documents ask you to assume an average

13   weekly wage?

14   A.    Yes, they did.

15   Q.    And were you given any income tax returns of Mr. Evans?

16   A.    No, I was not.

17   Q.    And do you know why?

18   A.    I was told that they had been lost in a flood and they

19   were being requested from the IRS.

20   Q.    To your knowledge, Mr. Wolfson, does your file reflect

21   that Mr. Evans' requested copies of his tax returns from the

22   IRS as late as January 7th of this year?

23   A.    I was forwarded a letter of the request for tax returns

24   dated January 7th.

25   Q.    And did I tell you as of this date that they have not been

 1    received?

 2    A.    Yes.

 3    Q.    Were you provided with Mr. Evans' deposition taken by

 4    Ford?

 5    A.    Yes.

 6    Q.    And did you read his deposition?

 7    A.    Yes, I did.

 8    Q.    According to that was Mr. Evans out of the labor force --

 9    was he out of the labor force from approximately May of '97 to

10    May 2000?

11    A.    Apparently so, yes.

12    Q.    Okay.  And did that deposition indicate to you why he was

13    out of the labor force in that period of time?

14    A.    Apparently, he stated he went on vacation after he sold a

15    business that he owned, a restaurant/bar.

16    Q.    All right.  Did that deposition reflect whether or not he

17    worked for Bryan Harris GMC for several months prior to his

18    employment with Extreme Nissan Ford where this accident

19    allegedly happened?

20    A.    Yes.

21            MR. SOUHLAS:  May I approach the Witness, Your Honor?

22            THE COURT:  Yes.

23    BY MR. SOUHLAS:

24    Q.    Mr. Wolfson, I'm going to show you what's already

25    introduced into evidence as Plaintiff's Exhibit Number 5.  Does

Wolfson - Direct                                    162

1   that represent a W-2 from Extreme Nissan Ford?

2   A.   Yes, it does.

3   Q.   For the year 2001?

4   A.   Yes.

5   Q.   According to his deposition, Mr. Wolfson, did he work for

6   Extreme Nissan Ford from approximately February 8th, '01 to the

7   date of his accident in May of 2001?

8   A.   I believe so, yes.

9   Q.   Okay.  The calculations that you have prepared for us of

10  his economic loss do they include in any way any fringe

11  benefits?

12  A.   No, sir.

13  Q.   Do they include a car -- use of a car or gasoline?

14  A.   No.

15  Q.   Any medical benefits?

16  A.   No.

17  Q.   Did we ask you to calculate his past lost wages from the

18  date of incident through today?

19  A.   Yes.

20  Q.   And did we also ask you to calculate his future lost wages

21  based on two separate assumptions?

22  A.   Yes.

23  Q.   One, should he return to the minimum wage labor market

24  and, two, if he don't go to work at all for the rest of his

25  life.

1    A.    Correct.

2    Q.    Okay.  Now, would you tell the jury your calculations for

3    past and future at this time?

4    A.    Sure.

5          I was asked to assume a weekly wage of $690 a week.  If we

6    were to annualize that, that comes out to be $35,880 a year.

7    So, that was our starting point.

8          In order to calculate loss from accident to trial, I

9    simply multiplied the period of time since the accident by that

10   $35,880.  If we do that, we come up with a past lost to trial

11   of $100,169.

12         Additionally, I was asked to estimate future loss of

13   earning capacity.  In order to do that the first thing we have

14   to do is settle upon a duration of time with which we assume

15   that losses would continue from trial.  In this instance using

16   the labor force participation rate published by the

17   United States Department of Labor, as well as his life

18   expectancy, as well as an unemployment rate, again published by

19   the United States Department of Labor, I've estimated a work

20   life equivalent of 12.57 years from trial.  Basically, we've

21   reduced his life expectancy by the probability he would be in

22   the labor force and the probability that he would be employed.

23   Doing that yields us a duration of 12.57 years.

24         The next thing we have to do is determine if we should

25   apply any growth rate to his earnings.  In this case we've

1   applied a three percent annual growth rate to earnings.  That's

2   again based on United States Department of Labor information

3   for sales occupations.  Going back 15 and 20 years, the average

4   rate of change fluctuates around 2½ to 3 to 3½ percent.  We've

5   settled upon a midpoint range of 3 percent here.

6       The last thing we must do is determine a discount rate.

7   And the discount rate places things in present value terms.

8   And the idea of a discount rate is this:  If there was a lump

9   sum awarded today, that lump sum could be invested over time

10  and earn a certain interest rate.  So, in order to account for

11  the fact that any award would be given in a lump sum and there

12  could be interest earned upon that sum, we have to take that

13  into consideration.

14      And here we've used a five percent discount rate.  It's

15  loosely based on the ten year U.S. Treasury rate.  It's

16  actually higher than the ten year U.S. Treasury rate.  I

17  haven't looked at it today, but typically it's been around four

18  percent lately, so it's a full percentage point higher.  So,

19  the higher your discount rate, the lower your present value.

20      Taking all these things into consideration and assuming an

21  earning capacity base of $35,880, future loss from trial

22  without return to work is $397,589.  If we then assume under

23  the same growth and discount assumptions for the same duration

24  that as of the trial date Mr. Evans would return to work at

25  minimum wage, the loss then would be $278,888.

1    Q.   Thank you, sir.

2         Now, for the moment let's set aside that assumption of an

3    average weekly wage, although there's been testimony here today

4    that the average worker in his field earned somewhere between

5    $40,000 and $100,000 per year, if you take that W-2 Form in

6    front of you from Extreme Nissan, Mr. Wolfson, and again

7    assuming he worked there between February and May of 2001,

8    would you say that between February and May of any year that

9    that's a slow sales period after the holidays?  Is that --

10        MR. MAXWELL:  Your Honor, unless he's an expert now

11   in slow times in car sales, I object to that question.  It's

12   outside his field of expertise.

13        THE COURT:  I'm going to sustain that.

14   BY MR. SOUHLAS:

15   Q.   Mr. Wolfson, can you annualize that W-2 Form for the year?

16   A.   Sure.

17   Q.   Project it out.

18   A.   If we estimate, it's roughly three and a half months over

19   that time period and the W-2 reflects roughly $7,669.  If we

20   were to annualize that on a monthly basis over the year, we

21   would come out with a base of approximately $26,293.

22   Q.   Can you project that over his work life?

23   A.   Sure.  Loss from trial assuming a base of $26,293 without

24   return to work would be $291,354.  After credit for minimum

25   wage, the loss would then be $172,653.  Loss to trial would be

1    $73,357.

2    Q.   Thank you, sir.

3         MR. SOUHLAS:   I tender the Witness.

4                        *    *    *    *    *

5                        CROSS-EXAMINATION

6    BY MR. MAXWELL:

7    Q.   Mr. Wolfson, how are you?  It's the first time I've had a

8    chance to meet you.  I knew your dad for 20 years.

9         Now, you're in the PhD Program at UNO?

10   A.   Yes, sir.

11   Q.   And did you start the PhD Program there or did you start

12   it over at Florida State?

13   A.   I got my Masters from Florida State.

14   Q.   Okay.  Is this the first PhD Program you've been in?

15   A.   I was at LSU before UNO.  My father passed away and

16   then --

17   Q.   We all miss your dad.  He was a good man.

18   A.   Thank you.

19        And so then I inherited his business and was commuting

20   back and forth from Baton Rouge, and that just became too much.

21   Q.   And your dad's business is basically to provide consulting

22   services for primarily plaintiff lawyers in civil lawsuits --

23   A.   He was a --

24   Q.   -- fair enough?

25   A.   He was a lawyer and he went to law school with a lot of

1    lawyers and also had a PhD in Economics, so that's just how it

2    turned out, yeah.

3    Q.    And that's how it turned out and that's what he did for

4    what, 30 plus years?

5    A.    Approximately.

6    Q.    Okay.  Now, Mr. Wolfson, you've made -- let me see if I

7    have this correct.  You've made two basic assumptions in giving

8    the figures that you just gave to Plaintiff's Counsel.  First

9    you made an assumption about disability, either a total

10   disability or some sort of partial disability, correct?

11   A.    Correct.

12   Q.    And second you've made an assumption of a base annual

13   salary of $35,880, am I correct?

14   A.    Correct.

15   Q.    Okay, well let's go through these one at a time.  Now,

16   first as far as the disability, someone not being able to work,

17   that's really the basis for any sort of wage calculation.  If a

18   person can work, it's really not appropriate to make any sort

19   of wage calculation, am I correct?

20   A.    I don't know if it's appropriate or not, it depends on the

21   situation.  I'm not a vocational rehab person.

22   Q.    All right.

23   A.    I don't do testing of that nature.

24   Q.    All right.  Were you given information about whether

25   Mr. Evans was disabled or not, either partially or totally?

1  A.   I was just asked to assume total disability as well as

2  partial at minimum wage.

3  Q.   Okay.  So, you were asked by Counsel for Mr. Evans, not

4  you didn't through any of the doctors' depositions or get any

5  of their reports?

6  A.   Correct.  And even then I'm not a doctor, so I wouldn't --

7  Q.   I understand that.  But that's essentially what you were

8  asked to assume.

9  A.   Yes.

10  Q.   Okay.  And your figure about the $400,000 in future lost

11  wages, that's based on the assumption that Mr. Evans will never

12  earn a dime the rest of his life?

13  A.   Correct.

14  Q.   Now, if Mr. Evans is in fact not disabled, then there

15  really isn't a future wage loss, if you make that assumption.

16  A.   If he's not totally and permanently disabled.

17  Q.   If I asked you to assume he's not totally and permanently

18  disabled, then there really shouldn't be any future lost wage,

19  correct?

20  A.   Correct.

21  Q.   Or if he's voluntarily choosing not to work in the future

22  like he did for the three years back in the late '90s, again,

23  no future wage loss would be appropriate, correct?

24  A.   Correct.

25  Q.   And if one of his doctors has already testified, I think

1   when you were here in the courtroom or right before, that if

2   he'd have surgery he could return to work, again, that would be

3   inappropriate really to assign a future wage loss, wouldn't it?

4   A.    If you're asking me to assume a surgery and then a full

5   recovery --

6   Q.    Yes.

7   A.    -- yeah, absolutely.

8   Q.    Okay.  All right, so if he's choosing not to work, or if

9   he's not disabled, or if the doctor says "Have the surgery, you

10  can return to work," under any of those three scenarios the

11  future wage loss is really nothing?

12  A.    Depending on the time period if he had the surgery and was

13  out for a couple of years --

14  Q.    Okay --

15  A.    -- maybe there would be some loss, but --

16  Q.    Other than that, there would be no loss?

17  A.    Correct.  Under the assumption that his earnings going

18  forward could be the same as they were in the past, then, yes.

19  Q.    Sure.  So, I'd be correct on that, huh?

20  A.    Yes.

21  Q.    Okay.  Now, let me ask you this, let's go on to the salary

22  that you have assumed the $35,880.  What do you base that

23  assumption on?

24  A.    That was based upon a document which was provided to me

25  which indicated that Mr. Evans' weekly wage was $690 -- from

Wolfson - Cross                                    170

1    Mr. Souhlas.

2    Q.   And Mr. Souhlas gave you a document that indicated that

3    and that was the end of your investigation on that point?

4    A.   Well, then we asked about tax returns and that nature and

5    the discussion followed and --

6    Q.   Well, we'll talk about that in a minute.  But that

7    assumption is not based on tax returns, or W-2s, or anything

8    other than something Mr. Souhlas gave you and said, "Assume

9    this"?

10   A.   Correct.

11   Q.   And you've taken what Mr. Souhlas told you to do and then

12   made the calculations that you've testified to today?

13   A.   Yes, sir.

14   Q.   And I've noticed, Mr. Wolfson, that your calculations are

15   for both past lost wages and the future lost wages are all

16   based on gross pay.  For example, the past lost wages you just

17   took the $35,880 and multiplied it times approximately three

18   years?

19   A.   Correct.

20   Q.   Okay, you've made no deduction for Uncle Sam.

21   A.   Correct.

22   Q.   Somebody always comes knocking on my door I know.  You've

23   made no deduction at all on taxes.  This is gross salary.

24   A.   It was my understanding that taxes weren't to be taken

25   into consideration.

1  Q.   And essentially you did almost the same thing for your

2  future lost wages, did you not?  I took the $35,800 and

3  multiplied it time 12 years, isn't that what you did?  And I

4  came within $20,000 of the figure that you presented, the

5  $397,000.  Essentially, isn't that what you did for the --

6  A.   Twenty thousand higher, I presume.

7  Q.   Yeah.

8  A.   That's because of the discounting and the growth that we

9  talked about.

10  Q.   Okay.  So, that's over 12 years, there's only a $20,000

11  reduction over the whole 12 years.  You essentially took the

12  $35,880 and multiplied it times 12 years and your other

13  testimony about the reduction, the long and the short of it is

14  it wound up being about $20,000 off of the top?

15  A.   Well, the calculation is done as if it's grown at three

16  percent a year and then discounted back at five percent, so not

17  necessarily multiplying by 12 or making an adjustment.

18  Q.   But the end result was it was about $20,000 off the top?

19  A.   Due to present value, the effect (inaudible, speaking at

20  the same time)

21  Q.   And again this was a figure based on gross income, right?

22  You're not paying taxes or anything?

23  A.   Yes.

24  Q.   Now, let's talk about what you did review.  Now, the tax

25  records that you didn't review, Mr. Souhlas asked you about the

1   request that was in your file, and did I hear you correct that

2   it was requested on January 7th, of 2004?

3   A.   I believe that's the date that's on the letter.

4   Q.   All right, about two months ago.  Did Mr. Souhlas give you

5   any documents where this was requested two years ago?

6   A.   No.

7   Q.   Okay.  And you can get tax records from the Government in

8   less than two years, can you not?

9   A.   I've never had to do it.

10  Q.   You never did?

11  A.   I would assume people could.

12  Q.   Yeah.  Probably two months you may be pushing your luck,

13  but two years?

14  A.   Maybe.  Personally, I don't know.

15  Q.   Okay.  Now, the W-2s that you reviewed, when did you get

16  those?

17  A.   Those were sent to me recently, I believe last week.

18  Q.   Last week.  So, actually they were sent to you after you

19  wrote your report?

20  A.   Correct.

21  Q.   So, you wrote your report about these wages losses and

22  then Mr. Souhlas after the fact sent you some W-2s to look.

23  So, these really didn't play any part whatsoever in the

24  calculations?

25  A.   In the initial report, no.

1   Q.    Okay.  And I've blown up some of these, because really

2   these documents here, these W-2s and the wage records, that's

3   really the only thing that you have, the only hard piece of

4   evidence you have, correct?  I mean you've got Mr. Souhlas

5   telling you things and telling you to make assumptions, but

6   really when it comes down to it these documents you got over

7   this last week, which was a month or so after you wrote your

8   report, that's really the only hard bit of evidence that you

9   have to work on.

10  A.    Well, it's the only earnings documentation that we have --

11  Q.    Correct.

12  A.    -- that are of the W-2 or tax.

13  Q.    And I'm sure when you were in school the importance of

14  dealing with certainties in the economic field is something

15  your professors probably hammered into your head, did they not?

16  A.    I'm not sure of your specific question.

17  Q.    Well, when you were in school didn't your professors tell

18  you it's kind of important when you're talking about figures

19  and making calculations that you really deal in what's certain

20  rather than kind of what someone tells you to assume?  Wouldn't

21  you find this is much more reliable than what maybe a plaintiff

22  lawyer tells you to assume?

23  A.    Well, what I've done is I've taken what's been given to me

24  and a second estimate we did use the tax returns, but all of

25  this needs to be, you know, framed within the context of what

1   it is, and I have W-2s here for apparently three months in

2   2001.

3   Q.   And no one's suggesting, Mr. Wolfson, that you're not

4   doing the best you can with what was given to you.  Let me just

5   show you what was given to you a week ago after you'd already

6   written your report.  Now, this is your W-2 forms.  Okay, now

7   here's the W-2 Forms you got -- and this is going to be tough

8   for everybody to see, let me move it over here.  Here's one

9   thing that Mr. Souhlas sent you last week.  This shows the

10  wages that Mr. Evans earned in 2001, am I correct?

11  A.   From Extreme Nissan and Crescent City Nissan.

12  Q.   Correct.  And this is something that would have been

13  provided to the government and it shows that from Extreme

14  Nissan he earned $4,200.

15  A.   Correct.

16  Q.   Correct, and that was over what, a three to four month

17  period?

18  A.   Roughly.

19  Q.   Okay.  So, if you multiply that times four, that gives you

20  about $16,000, does it not?

21  A.   If you multiply it by four?

22  Q.   Yeah.  But you're adding to that the prior number the

23  $3,469, that's how you got your --

24  A.   Right, right, right, right.

25  Q.   Okay.

1   A.    I did it on a monthly basis and then --

2   Q.    Sure.

3   A.    -- and then multiplied it by 12, but right.

4   Q.    So, that's what we had in 2001, we had $7,669, am I

5   correct?

6   A.    Right.

7   Q.    Now, here is the other ones that Mr. Souhlas sent you from

8   earlier years.  Here's the year 2000 and for the whole year of

9   2000 what did Mr. Evans earn at Bryan Harris Pontiac, Buick,

10  GMC in Slidell?

11  A.    Seven thousand one hundred and eighty-eight dollars and

12  fifty-five cents.

13  Q.    Okay, so while this is a snapshot for less than a year,

14  here is his whole year; am I correct, for the year 2000?

15  That's what he made the whole year there at that dealership,

16  $7,100?

17  A.    I believe so, if there wasn't any other W-2s.

18  Q.    And assuming there are none.

19  A.    I don't know if there are or if there aren't.

20  Q.    I just got what you got a week ago.

21       Now, in 1999 for a different company, Hey Jude,

22  Incorporated, he made $9,624.

23  A.    Right, and I believe that was for a couple of months.

24  Q.    Okay, well whatever it was for, this is the only documents

25  we have for 2001, 2000 and for 1999.

1    A.    Correct.  Those are the only documents that we have.

2    Q.    All right.  Did you get some similar documents for the

3    years 1995 and 1996?  Some pay stubs?

4    A.    I believe so.

5    Q.    Okay.  Just take a look at those and see if you got -- see

6    if you got something for '95 and '96, it wasn't a W-2, but was

7    some pay records.

8    A.    Okay.

9    Q.    And I want to see if these numbers all look right here.

10   Now, we know we've got $7,100 -- we know we've got $7,469.20 in

11   2001.  Let's just go down the list, and we agree on this,

12   right?

13   A.    Correct.

14   Q.    Okay, and we know in 2000 we have $7,188.55, correct?

15   A.    That is correct.

16   Q.    Okay.  And we know in '99 we had $9,624.81, correct?

17   A.    Correct.

18   Q.    And am I correct that there was nothing for '98 and '97

19   and you indicated Mr. Souhlas had you refer to the deposition I

20   took that Mr. Evans didn't work at all those years?

21   A.    Correct.

22   Q.    That's after he was taking a vacation I believe he said.

23   And see if I added it up right what you have for '96, see if

24   that's $5,561, and if it's $8,180 for '95?

25   A.    I'm not sure if we're looking at the same documents.

1    Q.   Sure, we are.  We are unless my math is bad.  Yeah, 85 --

2    A.   Eighty-six.

3    Q.   Okay, so maybe I'm off.

4    A.   Eighty-six fifty-three.

5    Q.   You know what I did here?  I took that number there

6    (indicating).  Let's correct that, because I took the net pay,

7    not the gross pay.  So, since we're dealing with gross not net,

8    this is net.  What's the gross pay?

9    A.   Eight thousand six hundred and fifty-three dollars and

10   sixty-eight cents.

11   Q.   And that's gross.  All right, now let's take a look at

12   '95.

13          MR. MAXWELL:  And I should have asked permission to

14   approach, Judge.  I apologize.

15          THE COURT:  Not a problem.

16   BY MR. MAXWELL:

17   Q.   Now, I think, Mr. Wolfson, if you'll look at these, these

18   are consecutive weeks.

19   A.   Right.

20   Q.   And there's April, May, and there's the latest one in May

21   and it has $8,180.05?

22   A.   Right, right, right.

23   Q.   That's the gross per year.  So, I'm right on this one?

24   A.   The year-to-date.

25   Q.   Yes, the year-to-date.  That's the last thing we have is

1    $8,180.05.

2    A.   Eight thousand one hundred eighty dollars and five

3    cents --

4    Q.   Okay.

5    A.   -- apparently through 5/26/95.

6    Q.   Yes, sir.  So, how about, Mr. Wolfson, why don't you add

7    up what Mr. Evans has produced as proof of income for one, two,

8    three, four, five, six -- seven years?  How about adding these

9    seven years up and take the gross figure for '96, not the net

10   figure, add those up for me and let's put a total.

11        Can you see it okay?

12   A.   Yeah, it's just that my eyes are bad.

13   Q.   You're too young to have bad eyes.

14   A.   Forty-one three sixteen.

15   Q.   Okay, so for seven years we have a verified gross income,

16   not net after tax but gross income of $41,316 for seven years

17   from 1995 through 2001.  But Mr. Souhlas had you assume an

18   annual income of $35,000.  So, he's having you assume for one

19   year what it took Mr. Evans based on what we've got here almost

20   seven years to earn.  Do you feel kind of iffy about that?

21   A.   Well, it's my understanding that most of these are for

22   partial years.

23   Q.   But in forensic economics, your doctorial field, you

24   certainly accept the principal that the best evidence is

25   documents that you touch, that you can look at and you can

1  verify and that are filed with the federal government.  If you

2  had to choose, if you're defending your dissertation and you're

3  asked to choose what's the best evidence, is it forms that you

4  actually have that were sent to the federal government, or is

5  it a phone call or a letter from a plaintiff lawyer; which

6  would you feel is the most reliable and the most accurate way

7  to estimate wage losses?

8  A.   Well, first of all I never said my doctorate field is

9  forensic economics.

10  Q.   Oh, I'm sorry.

11  A.   I don't --

12  Q.   What is it?

13  A.   I don't believe you could find one in the country.

14  Q.   Okay.  Is it just in economics?

15  A.   It's a degree in financial economics.  It's a

16  finance/economics program.

17      What I would say though is that as a forensic economist we

18  are implored to sort of frame all this in the context of the

19  law and what -- sort of what constitutes earning capacity.  And

20  while I will grant to you that the documentation here does not

21  seem to tell the full story if it is as Mr. Souhlas has

22  represented it to me.

23  Q.   And then that's all we have, what Mr. Souhlas told you.

24  That's all you had, but in reality what you got last week says

25  that $41,000 over the last seven years is what this man is able

1  to show he made.

2  A.    Well, I would argue that's probably over five years as

3  well, because he sold a business and chose not to work.

4  Q.    Well, if you choose not to work, it doesn't mean anything

5  other than you have a zero income that year, does it?

6  A.    Well, if a pregnant woman decides to leave the labor force

7  and doesn't return to work, is the value of her earning

8  capacity zero is the question you're asking, and I don't

9  believe so.

10  Q.    Well, this is a grown man, not a pregnant woman.

11  A.    Well, if he's --

12  Q.    If he choose not --

13  A.    If he's making a choice, then I would say that plays into

14  earning capacity, absolutely.

15  Q.    And did you see in the deposition that Mr. Souhlas was

16  referring you to that he say, yeah, he just made a choice, he

17  just took a vacation?

18  A.    Absolutely, because he sold his bar.

19  Q.    I believe that's all I have.  Nice meeting you,

20  Mr. Wolfson.

21          MR. MAXWELL:  That's all I have, Your Honor.

22

23

24

1                    *    *    *    *    *

2                    REDIRECT EXAMINATION

3    BY MR. SOUHLAS:

4    Q.   Mr. Wolfson, the W-2 forms that Mr. Maxwell was showing

5    you, do they indicate partial employment for this period of

6    time?

7    A.   On top of most of them I believe someone has indicated

8    each one is for a couple of months worked.

9             MR. MAXWELL:   I object, Your Honor.   Counsel has

10   written on top of these things, so --

11            MR. SOUHLAS:   I object that you say I wrote on top of

12   them.

13            MR. MAXWELL:   Well, I object then, Judge.   The

14   document speaks for itself then.

15            THE COURT:   Okay.

16            MR. SOUHLAS:   Well, that's what I'm asking what it

17   says.

18   BY MR. SOUHLAS:

19   Q.   The last calculations you gave us, Mr. Wolfson, were based

20   on your projection of the W-2 Form from Extreme Nissan, is that

21   correct, for the three month period?

22   A.   Three and a half months for 2001.

23   Q.   And that's a document that came from the federal -- went

24   to the federal government, is that correct?

25   A.   Correct.

1   Q.   And what was your projected figures from that document?

2   A.   That was $291,354 from trial, $172,653 after return at

3   minimum wage, and $73,357 from accident to trial.

4   Q.   Thank you, sir.

5           MR. MAXWELL:  Judge, I'd ask for leave to ask one

6   more question.

7           THE COURT:  Okay.

8                        *   *   *   *   *

9                      RECROSS-EXAMINATION

10  BY MR. MAXWELL:

11  Q.   What's written on top of that document is not part of the

12  document; it's just some handwritten notation, correct?

13  A.   Correct.  It's handwritten.  I don't know who wrote it.

14          MR. MAXWELL:  All right, thank you.

15          THE COURT:  Okay.

16          MR. WRIGHT:  Your Honor, we have no other witnesses.

17  We rest.

18          THE COURT:  Okay, thank you, Mr. Wolfson.  I

19  appreciate it.

20      (Witness is excused)

21          MR. WRIGHT:  Judge, may we approach?

22          THE COURT:  Yes.

23      **(At side bar)**

24          MR. WRIGHT:  I think I might want to put Mark back on

25  to clarify the wage information on redirect.

1          MR. MAXWELL:  You can't do that.  What's the basis

2  for that?

3          MR. WRIGHT:  For rebuttal.

4          MR. MAXWELL:  That's not rebuttal.

5          MR. WRIGHT:  For rebuttal after you put on --

6          MR. MAXWELL:  I guess you can put him on after we put

7  on ours.

8          THE COURT:  Yeah, I don't think that's proper.

9          MR. MAXWELL:  Judge, I think procedurally I have to

10  bring a motion now and I think we have to do it now.  I've seen

11  cases saying you can't reserve that right.

12          THE COURT:  I agree.

13          MR. MAXWELL:  Do you want to take a little break?

14          THE COURT:  Yeah.

15    **(Side bar concluded)**

16          THE COURT:  Okay, ladies and gentlemen, we need to

17  take a brief stop at this point.  Plaintiff has rested his case

18  and we need to hear a couple of motions.  So, why don't we take

19  about a ten minute break, which means that at quarter after

20  three you all will come back, we'll have one more witness and

21  then we'll go right into closing arguments.  Thank you very

22  much.

23    (Jury exits courtroom)

24          THE COURT:  All right, Mr. Maxwell.

25          MR. MAXWELL:  Judge, briefly we move for a judgment

1    as a matter of law on the future wage loss claim.  I don't

2    think there's been sufficient evidence in the record; in fact,

3    the evidence has been to the negative that Mr. Evans is totally

4    and permanently disabled.  Dr. Hontas said he never said that.

5    His other doctor said he never said that.  The only evidence

6    has been that the disability is essentially one that would be

7    cured by a surgery, which Mr. Evans has voluntarily chosen to

8    not take.  With that I think there's an insufficient nexus

9    between the claimed future wage loss and the information that

10   the jury has heard at this point and I move for a dismissal of

11   the future wage claim.

12           MR. WRIGHT:  Your Honor, we've heard testimony from

13   Dr. Hontas and Dr. Butler that Mr. Evans has sustained very

14   serious injuries to his lumbar spine and left leg which they

15   relate to this accident.  They have also said that Dr. Hontas

16   in his records says "Can't work," "Can't work," "Can't work."

17   He's never been discharged to return back to work.

18           There is some opinions in the record by both

19   Dr. Hontas and Dr. Butler that state he has a chance with

20   surgery of going back to work, nothing definitive, because

21   there's some very good risks involved in the surgery and they

22   both testified that it's his choice to go back to work.  And

23   that's why we put on the evidence that he's got -- from the

24   economist that if he doesn't return to work, we're giving the

25   figures to the jury for that.  If he goes back part-time,

1  they've got an opportunity to give him some -- a lesser award

2  in that respect.  The law allows us not only to put on evidence

3  of a loss wage claim, but also a loss of earning capacity.  And

4  of course the jury can render a decision on either way.

5          There's abundant evidence in the record on the

6  medical causation issue and his inability to do things.  Mark's

7  own testimony about his inability to work, so I think there's

8  plenty enough evidence to go to the jury on future lost wage.

9          THE COURT:  Yeah, I agree.

10         Mr. Maxwell, I'm going to deny your motion.  I think

11 that issue is peculiarly suited for the jury to make a factual

12 determination.

13         Any other motions?

14         MR. MAXWELL:  No, ma'am.

15         THE COURT:  All right.  You're going to set up your

16 Elmo?

17         MR. MAXWELL:  We're going to set that up, Judge, and

18 we'd thought we'd do it during this break so we can just roll.

19         THE COURT:  Yeah, and everybody take your bathroom

20 breaks, because as soon as we finish with --

21         MR. MAXWELL:  We're going to roll with closing.  We

22 have ten minutes again?

23         THE COURT:  Ten minutes again.

24         MR. MAXWELL:  Okay.

25      **(Recess from 3:10 p.m., until 3:15 p.m.)**

1        (Jury enters courtroom)

2            THE COURT:  All right, Mr. Kelly.

3            MR. MAXWELL:  Judge, since we've already read

4    Dr. Larcena, we just have one witness.

5            THE COURT:  One witness.

6            MR. MAXWELL:  Yes, ma'am.

7            THE COURT:  All right.

8            MR. KELLY:  Defense calls Dr. Kenneth Boudreaux.

9                   *   *   *   *   *

10           **KENNETH J. BOUDREAUX, DEFENSE WITNESS, SWORN**

11                  *   *   *   *   *

12                  VOIR DIRE EXAMINATION

13   BY MR. KELLY:

14   Q.   Thank you, Dr. Boudreaux, thank you for coming here.

15   You're our last witness today -- first and last.

16       Could I get you to introduce yourself to the jury, please?

17   A.   My name is Kenneth J. Boudreaux.

18   Q.   And could you tell us a little bit about your background?

19   A.   Yeah.  I'm a Professor of Economics and Finance at --

20           MR. SOUHLAS:  Your Honor, we accept him as an expert

21   in the field of economics.

22   BY MR. KELLY:

23   Q.   Just briefly tell the jury where you're employed.

24   A.   I'm on the faculty at Tulane University.  I'm Professor of

25   Economics and Finance.  I've been at Tulane since 1970.

1    I teach courses in the Graduate School, essentially a full

2   professor.  I also do economic consulting, which is what I'm

3   doing today.

4   Q.   Okay, given that you've been accepted as an expert

5   witness, I'll move on.

6                         *    *    *    *    *

7                      DIRECT EXAMINATION

8   BY MR. KELLY:

9   Q.   Did I ask you to perform an economic evaluation in this

10  case?

11  A.   You did.

12  Q.   Could you tell us generally what does an economist do in a

13  case like this?  Tell the jury.

14  A.   Well, as you just heard Mr. Wolfson talking about we do

15  calculations of economic loss.  Essentially in this particular

16  kind of thing, we do calculations of the difference between the

17  amount of money that a person is able to make versus what they

18  actually made given that an accident, an event has supposedly

19  caused them not to be able to make as much money.  That's

20  basically what we do.

21  Q.   In a general sense in performing this are there two main

22  calculations that are made, those lost wages, wages lost

23  because of an accident and future losses that may be suffered

24  because of an accident?

25  A.   Right.  There's a period of time between the accident and

Boudreaux - Direct                                    188

1   the trial and you do a calculation of how much the person would

2   have made over that period of time versus if they have made any

3   money since then.   That's a past loss.   And then there's a

4   future loss, which under the assumption that a person is not

5   going to be able to make as much money in the future as they

6   would have been, we do a calculation which you heard described.

7   It's essentially how much money you would have to put in a safe

8   investment so the investment would make up the difference in

9   your earnings.

10  Q.   And let's start with the past loss wages.   In a general

11  sense again, in making this type of evaluation what kind of

12  information is important to you?   I think you already said the

13  date of the injury, the date of trial.

14  A.   Right.   We need to know the time period involved, but at

15  least as important as that is what I would call an income base

16  and an earning capacity, that is, how much money it's

17  reasonable to think the person would have made if this hadn't

18  happened, in other words, how much per year as an annual income

19  base.

20  Q.   And as an income base or past earnings, what kind of data

21  do you like to see for that?

22  A.   Typically, economists like to see three to five years

23  worth of tax returns or Social Security records, which are the

24  best information as to what a person has actually produced in

25  terms of earnings over a significant period of time.   Now, the

1    reason I say three to five years is because depending on the

2    type of occupation a person has the income may go up and down

3    depending on a number of different factors.

4    Q.    Now, you have been in the courtroom today listening to

5    Mr. Wolfson's testimony, correct?

6    A.    I was, yes.

7    Q.    And you saw that in part of his calculations he was basing

8    an income base for Mr. Evans based on a three-month period.  Is

9    that something that you would attempt to do?

10   A.    Not if there's better information than that.  In other

11   words, again, in my view somewhere around three to five years

12   worth of earning records are what I first ask for.  If that's

13   unavailable, then you start scaling back what you would like to

14   see.  Well, first of all, not what you'd like to see, but what

15   you're willing to look at.  I think that's on the record as to

16   what information is available here and what period of time it

17   covers.

18        Generally, if you have less than a year's worth of

19   earnings it requires more assumptions about what would have

20   happened during the period that you don't have information for,

21   then if you have a whole year's worth of earnings, or if you

22   have several years worth of earnings.

23   Q.    Okay.  But as a minimum you're looking for some sort of

24   written documentation?

25   A.    Absolutely.  And I should say just to be clear, an

Boudreaux - Direct                                              190

1    economist can't make up an earnings base.  In other words,

2    we're not trained to look at a person and say they could have

3    done that, they could have done this, and so on and so forth.

4    We have to have actual documentation to go by if you want our

5    opinion about what a person's earning capacity is.

6         Now, we can also do any kind of calculations you tell us

7    to do, but that's not our opinion.  Those are two different

8    things.

9    Q.   I think I understand.  So, if an economist prepared an

10   evaluation based on, well, he told me he made this number of

11   dollars, or this lawyer told me this, that would not really be

12   an accurate representation of a lost earnings?

13   A.   It wouldn't be the economist's opinion.  In other words,

14   if you tell me to assume that a person would have been able to

15   make $30,000 or $40,000 a year, I can do the calculations based

16   on that assumption, but I can't tell you whether that

17   assumption is any good or not, unless there's some sort of

18   documentation that backs it up.

19   Q.   Now, you have had a chance to read Mr. Wolfson's report

20   that he prepared in this case?

21   A.   I did.

22   Q.   And you were here for his testimony?

23   A.   I was.

24   Q.   Do you have any comments on how his economic analysis was

25   in this case?

Boudreaux - Direct                    191

1    A.   Well, actually, the basic elements of the calculations

2    that he used were all okay with one exception in my view,

3    namely the annual income base, the earning capacity.  The work

4    life expectancy he used I think is within a few months of the

5    figure that I have.  The discounting process, the increase rate

6    and the interest rate you can earn on investments is

7    reasonable.  That leaves a question of how much money per year

8    it's reasonable to think that Mr. Evans would have made if this

9    event hadn't happened.  And Mr. Wolfson did some calculations

10   based on a 35,000 and some odd dollar figure and then another

11   figure I think he said was in the mid-20s thousands per year

12   based on the annualized few months worth of records from the

13   Nissan Company.

14       I would, at least in my view, if you asked me my opinion

15   about what the documents would validate as an income earning

16   capacity, I would say neither of those figures are consistent

17   with what I think would be correct.

18   Q.   And just let me briefly show you so the jury can remember

19   that we talked about this with Mr. Wolfson.

20           MR. KELLY:  May I approach, Your Honor?

21           THE COURT:  Yes, sure.

22   BY MR. KELLY:

23   Q.   Are these the documents that you've been shown as far as

24   Mr. Evans' work history, his W-2s?

25   A.   Those are the W-2s, yes.

1  Q.   And were you also provided some additional written data --

2  A.   Right.

3  Q.   -- regarding his earnings?

4  A.   Yeah.  There were some records, from 1995 and '96 that I

5  had also.

6  Q.   I think we have here something that was used during

7  Mr. Wolfson's testimony.

8          MR. KELLY:  Again, I'm going to approach, Your Honor,

9  to pull this up.

10 BY MR. KELLY:

11 Q.   This was I think the corrected information regarding

12 Mr. Evans' past earnings?

13 A.   Yeah, '95, $8,100; '96, $8,600; no records for '97, '98;

14 1999, $9,600; the year 2000, $7,188; the year 2001 through the

15 late May accident date, $7,669.

16 Q.   Now, as you went through these records, you saw how

17 Mr. Wolfson that he took a three-month period and tried to

18 extrapolate out and say, "Well, this means he could have

19 earned, you know, 'X' number of dollars over the next 12

20 years."  Did you find when you went through this analysis a

21 better way to look at how much we could actually say accurately

22 Mr. Evans made?

23 A.   Well, let me begin by saying with these kinds of records

24 we can never really be sure what the total of the earnings

25 were, because we -- typically Social Security earnings records

Boudreaux - Direct                                    193

1    or tax returns are the things that you look for.  These are

2    some kind of backup documents that would go into those things

3    but are not necessarily the same as what you would find with

4    those.

5         Having said that, I think there's been testimony that

6    Mr. Evans went back to work after having not worked -- I think

7    it was said he went back to work in May of 2000.  If that's

8    true and if this accident was in late May of 2001, we have a

9    whole year's worth, 12 months worth of earnings here.  In other

10   words from May of 2000 to May 2001, the available documents

11   indicate that he made $14,858 about.

12        The only other contiguous time period where there's

13   testimony that he was working would be 1995 and '96, where we

14   have records of about $8,000 a year, $8,500 a year.  If we take

15   the position that that's so long ago you don't want to pay as

16   much attention to it, then I think the most -- somewhere

17   between reasonable and generous estimate that you could make

18   would be an annual income of about $14,800 a year.

19   Q.   Somewhere between $14,000 and $16,000?

20   A.   Well, no, now this is $8,000 per year --

21   Q.   Right.

22   A.   -- so this is $16,000 over a two-year period, not a one-

23   year period.

24   Q.   You're right, you're right.  So, it would be somewhere

25   between $8,000 and $14,000 would be about the yearly?

Boudreaux - Direct                                          194

1   A.    Yeah, $8,000 to $14,500 a year.  You can look at those

2   documents and just forgetting all about the period of time

3   where I'm not sure what was happening between '97 and '99.

4   Q.    Well, let me ask you quickly, you said something about tax

5   documents.  Have you ever had occasion to go through the IRS or

6   have an attorney go through the IRS to get tax documents for

7   any kind of an evaluation that you've ever made?

8   A.    Very, very often.

9   Q.    About how long has it been your experience that it takes

10  to get these documents?

11  A.    Somewhere between six weeks and three months, depending on

12  the responsiveness in the Internal Revenue Service.

13  Q.    It takes less than two years though, correct?

14  A.    Yes.

15  Q.    Now, as far as past lost wages, could you give the jury

16  your calculation of any past lost wages in this case?

17  A.    Well, I did a calculation based on the $14,858 a year that

18  ran from the accident date through another date that you asked

19  me to use.

20  Q.    And what other date was that?

21  A.    That was October 23rd, 2001.

22  Q.    And why is that date significant?

23  A.    There was evidently a report written by Dr. Nutik that

24  indicated that --

25            MR. WRIGHT:  Objection, Your Honor.

1          THE COURT:  Why don't you all approach?

2          MR. WRIGHT:  If they wanted Dr. Nutik they should

3   have called him.

4          THE COURT:  Come on up.  Come on up.

5      **(At side bar)**

6          MR. KELLY:  We're not asking to introduce that,

7   Your Honor, it's medical records that he reviewed --

8          MR. WRIGHT:  Come on --

9          THE COURT:  No, no.  You all said you weren't going

10  to introduce Dr. Nutik's report and so I don't want him basing

11  anything on that.

12         MR. KELLY:  It was in the stuff you sent to him,

13  yeah.

14         MR. WRIGHT:  I sent him everything we had.

15         THE COURT:  Okay.

16         MR. KELLY:  Okay, let's move on.

17     **(Side bar concluded)**

18  BY MR. KELLY:

19  Q.  Let's move on to another date.  Why don't you tell us the

20  amount of lost wages you calculated from the time of the

21  accident until the date of trial?

22  A.  Okay.  That period of time is 2.8 years, and using the

23  $14,858 a year -- give me just a minute --

24  Q.  You're better than me to do calculations on the fly.  I

25  know I would mess that up.

Boudreaux - Direct                                    196

1   A.    Well, this is mostly arithmetic.

2            MR. SOUHLAS:   Fourteen thousand what?

3            THE WITNESS:   Fourteen eight fifty-seven times 2.8 is

4   $41,599.  That essentially assumes that Mr. Evans would have

5   been making -- earning at the rate that he actually did, at

6   least from the documents in 2000 and 2001 and has been unable

7   to work at all since the accident date.

8   BY MR. KELLY:

9   Q.    So, $41,599.

10  A.    Correct.

11  Q.    Now, the second -- going back to when we started off what

12  economist do, the second big calculation is calculating the

13  future wage loss.

14  A.    Correct.

15  Q.    And what is your definition of future wage loss?

16  A.    Well, it's the difference between what a person would have

17  been able to make if this hadn't happened compared to what he

18  is actually going to be able to make in the future given that

19  the accident did happen.  It's the difference between those two

20  things.  And again as Mr. Wolfson described, what we do is

21  estimate a work life expectancy, you know, how long, how many

22  years a person on the average using some statistical tables

23  would continue to work.  And then we do a calculation that

24  says, okay, given this annual difference and with reasonable

25  increases in that, how much money would be necessary to invest

Boudreaux - Direct                              197

1   in a safe investment -- I'll use U.S. Treasury Bonds -- so that

2   the interest and the principal you get from the investment

3   would make up the difference, would bring your total earnings

4   back up to where they would have been if this hadn't happened.

5   That's basically what we do.

6   Q.   Okay.  And did you calculate any future lost wages in this

7   case?

8   A.   I did in the following sense:  Given the information that

9   I had, I did a calculation of what an economist would call a

10  present value factor that is the remaining work life expectancy

11  was a little over 12 years for Mr. Evans.  For each dollar of

12  annual income loss that he has, he would need to invest about

13  $11.50 today to make up that difference.  For instance, if he's

14  going to make a thousand dollars a year less each year for the

15  rest of his work life, he'd need $11,500 to put in a safe

16  investment today.

17      If it's $2,000 a year less, if his loss is $2,000 a year,

18  then he'd need $23,000 to put in a safe investment to produce

19  $2,000 a year increasing gradually over the period of time and

20  so forth.  What I'm saying is that I don't know if Mr. Evans

21  has a future loss of earnings or if he does, how much money

22  that is per year, but if the jury feels it's a certain number

23  of dollars per year, they can almost in your head do a

24  calculation.  You would multiply that figure by 11½, whatever

25  the annual loss is, you multiply it by 11½ and that's its

1   present value.

2   Q.    Let me ask you this to make sure we're clear for the jury,

3   in a case where somebody can go back to work for the same

4   amount or more, is there any future lost wage?

5   A.    No.  If a person can go back to work doing essentially the

6   same job making the same money as they did before, there

7   wouldn't be any loss of earnings from that point forward.

8   Q.    As an economist you don't evaluate Mr. Evans and say, you

9   can or cannot go back to work?

10  A.    No.  I'm not trained to look at Mr. Evans and know whether

11  he can go back to work or not.  That's not my field.

12  Q.    And for that you would rely on the medical testimony, the

13  doctors, the medical reports, the medical records?

14  A.    Yeah, whoever is the expert looking at people and deciding

15  if they can go back to work or not, but it's not me.

16  Q.    And that's what the jury is going to have to do when they

17  go back and look at the evidence?

18  A.    Right.

19  Q.    So, you said that you did perform some sort of future loss

20  wage.  If Mr. Evans can go back to his job, we've said that

21  he's not really going to have a lost wage.

22  A.    If he can go back to work with a capability of earning

23  essentially what he was earning before, there wouldn't be any

24  loss from that point on.

25  Q.    But what if he could go back to work but couldn't make --

Boudreaux - Direct                                    199

1  could make only the minimum wage?

2  A.   Well, minimum wage as we sit here today if $5.15 an hour.

3  If you work full-time over a year you make a little less than

4  $11,000 a years, it's $10,700.  If you compare that to what the

5  record that I mentioned that indicate earnings over a 12-month

6  period were say $14,900, you would get a difference between the

7  $14,900 and the $10,700 a year of about $4,200 a year.  If you

8  multiply that times 11.5 -- well, let's see, you get $48,300.

9       In other words, just to be clear what I'm saying here, if

10  Mr. Evans would have been able to make $14,900 a year and now

11  can only make $10,700 a year, which is the minimum wage, then

12  the difference is $4,200 a year.  If you multiply that times

13  11½ as I said before, he would need to put $48,300 into a safe

14  investment and that would make up the difference between

15  earning the minimum wage and what his actual earnings were from

16  the records we have in 2000 and 2001.

17  Q.   Okay, so just to make sure, I'm going to kind of restate

18  what I think your testimony is.  If the jury goes back and

19  decides that Mr. Evans -- well, let me just say, as far as past

20  lost wages, your calculations show that he's lost $41,599.

21  A.   Under the assumption that I made, yes, --

22  Q.   Right.

23  A.   -- that he couldn't have worked between the accident and

24  the trial.

25  Q.   Correct.  And as far as adequately compensating him for

Boudreaux - Cross                                    200

1   any future lost earnings, if the jury decides that he can go

2   back to work, there's no future lost wages, if he can only go

3   back at a minimum wage, then the loss would be $48,300.

4   A.   Correct.

5            MR. KELLY:   That's it.

6            Thank you, Your Honor.

7                         *   *   *   *   *

8                      CROSS-EXAMINATION

9   BY MR. SOUHLAS:

10  Q.   Mr. Boudreaux, when you were retained by Ford what did you

11  understand your job was to be?

12  A.   To do a calculation of economic loss based on an event in

13  late May of 2001 that is the subject of this litigation.

14  Q.   Now, you've already testified that you can't project his

15  future lost wages whether there are any because you're not a

16  medical doctor, is that correct?

17  A.   Yeah.  I'm not capable of saying whether Mr. Evans can go

18  back to work or not, or what he can do if he can go back to

19  work.  That's not my field.

20  Q.   Correct.  And from the information you were given you

21  assumed that his past lost to date is $41,599, is that correct?

22  A.   Yeah, I didn't write the figure down, but whatever it was

23  I said.

24  Q.   Okay.  If you take that figure, I want you to assume he

25  can't go back to work, what is his future loss at that figure?

1  A.   You would -- if he's totally disabled --

2  Q.   Is your factor 11.27?

3  A.   Right.  Well, depending on what education you assume.  I'm

4  using 11½, which is a little higher --

5  Q.   Okay.

6  A.   -- than that.

7  Q.   Eleven point five.

8  A.   If he's totally disabled, it would be $170,855.

9  Q.   Okay, with your figure 11.27.

10  A.   Eleven point five, yeah.

11  Q.   Is that 11.5 figure based on for every 1,000 hours lost

12  per year you multiply it by 11.5?

13  A.   Exactly.

14  Q.   Is that how you do it?

15  A.   Yeah.

16  Q.   Okay.  If you took the yearly wage of $35,880 times 11.5

17  what is your number?

18  A.   If I assume that --

19  Q.   At TNP, total and permanent.

20  A.   Right.  If I assume $35,880 and total disability, it would

21  be $413,000.

22  Q.   Four hundred and what?

23  A.   Thirteen.

24  Q.   Okay.  Now, assume minimum wage, what would it be?

25  A.   If I assume that Mr. Evans would have been making $35,880

1  a year but now can only make the minimum wage, the figure is

2  $289,400.

3  Q.   Okay.  You were here in court when Mr. Wolfson testified,

4  is that correct?

5  A.   I was.

6  Q.   You were not present when Mr. Shoemake testified, were

7  you?

8  A.   No.

9  Q.   I want you to assume he testified that in Mr. Evans' job

10 position the basic salary is between $40,000 to $100,000 a

11 year.  Would you have any reason to disagree with that?

12 A.   I don't -- couldn't comment on it one way or the other.

13 Q.   Okay.  You haven't done an analysis of the job market as

14 far as what these certain jobs pay, is that correct?

15 A.   No.

16 Q.   Okay.  And your factor 11.5 times $35,880 was four hundred

17 and what?

18 A.   Four twelve six twenty.

19 Q.   Thank you, sir.  Thanks for coming.

20      MR. KELLY:  Nothing else, Judge.

21      THE COURT:  Thank you, Doctor, I appreciate it.

22      (Witness is excused)

23      MR. MAXWELL:  We rest, Your Honor.

24      THE COURT:  All right.

25      MR. WRIGHT:  Would you like us to close now?

1          THE COURT:  I would like you to close now.

2          MR. WRIGHT:  Can we take a break?  I'd like to

3    consult with my Counsel.

4          THE COURT:  Sure.

5          MR. WRIGHT:  Just five minutes.

6          THE COURT:  You want to just take a quick break where

7    the jury remains here and you all go out in the hall?

8          MR. WRIGHT:  Whatever they want to do.

9          THE COURT:  I think that's probably faster.  You all

10   go out in the hall if you all need to consult and you do

11   likewise.

12      **(Short break)**

13                    *    *    *    *    *

14                    **CLOSING ARGUMENT**

15                    *    *    *    *    *

16         MR. WRIGHT:  Ladies and gentlemen of the jury, I want

17   to thank you again for spending the day with us.  Can you

18   imagine being here for a month trial, or a two month trial?  No

19   thank you.

20         We really appreciate on behalf of Mark Evans, Ernie

21   Souhlas and Gene Taggart, we appreciate your day here with us.

22   We thank you for serving your jury duty and your civic duty.

23   It's very important to this country the way our judicial system

24   works.  It works well and we thank you for your time.

25         We started this case with a statement of the case

1    that the Judge read you.  You know that you're only trying one

2    piece of the case, the damage portion of the case, but just to

3    start that foundation over again, the matter before you

4    involves an accident that occurred on May 24th, 2001, that

5    involved Plaintiff, Mark Evans, and a vehicle manufactured by

6    Ford Motor Company.  At a prior trial a jury reached a finding

7    of liability against Ford for this accident and determined that

8    the injuries sustained by Mark Evans were caused by this

9    accident.  The trial is solely about the amount and the extent

10   of damages due to Plaintiff as a result of the accident of

11   May 24th, 2001.

12          The Judge is going to give you a jury interrogatory

13   and it's not going to ask you who you think is at fault; it's

14   just going to ask you how much damages were sustained by Mark

15   as a result of this accident and it's going to have different

16   categories.  The past medical expense is already given.  The

17   future medical expense, past lost earnings, which means from

18   the date of the accident until today, which is about three

19   years, and the economists talked about that loss; and then

20   future earning capacity and you heard two different versions of

21   the future earning capacity.

22          Then you're going to get into "E," which is past and

23   future general damages including physical and mental pain and

24   suffering, disability, disfigurement, and loss of capacity for

25   enjoyment of life.  And so those are the different elements

1    that you're going to make a decision on today.

2          Just to go over the facts again, on May 24th, 2001,

3    Mark was working at the Extreme Nissan Dealership.  There's a

4    W-2 Form that shows you two -- it breaks down the W-2 Forms

5    into two Nissan Dealerships.  It's actually the same one, same

6    address, so don't get confused by that.  For that three month

7    period he made $7,800 for those -- that three years, so that's

8    the basis that W-2 is.

9          But on that day, May 24th, you heard Mr. Shoemake

10   testify as to what he saw, you heard Mr. Evans' testimony that

11   he got knocked down by this vehicle and run over.  It went up

12   his -- as he got knocked down by the door, he went underneath

13   and the left front tire rolled up his back, his leg and his

14   back, and he had to be taken by an ambulance.  He was laying

15   out on the cement.  His friend had to go get some help and call

16   911, and he was taken to Charity Hospital.

17         We're going to give you some books to take back with

18   you in the jury.  There's a lot of medical records.  There's an

19   ambulance report in there that states exactly what his

20   complaint was.  The bystanders said that he had lost

21   consciousness for awhile and his complaints right then and

22   there were low back and left leg pain.

23         He was taken to the emergency room and spent about

24   nine hours, and he was x-rayed almost every part of his body,

25   his leg, his low back was x-rayed.

1        Soft tissue injuries do not show up on x-rays;

2   they're looking for broken bones.  But we know he had bruises.

3   We know he had abrasions and he had the marks on him.  Both

4   Dr. Larcena talked about them, Dr. Hontas talked about them,

5   and there was plenty of evidence that he had been run over.

6   Mr. Shoemake actually saw the imprint from the vehicle that had

7   gone up his back, saw the vehicle go over him.

8        And there's no evidence that Mr. Evans had low back

9   problems before this accident.  I asked Dr. Larcena

10  specifically in his deposition, "Did he complain to you of his

11  back?"  And he said, "No," in that incident where he slipped

12  and hit his buttocks, not his back, it was his buttocks that

13  went into his hip in that area, and his toe was hurting him.

14  And his foot was swollen on the right foot because when he

15  slipped he hit his toe.

16       And he went in also for his diabetes.  The doctor

17  talked about that, because that's what Larcena was treating him

18  for his diabetes and hypertension.

19       Mr. Shoemake said he didn't even know about the slip

20  and fall.  They worked together every day, didn't even know

21  that he had fallen.  He had not missed any work.  And we have

22  set a foundation in this case and we're here today to determine

23  damages and we've already got a statement that the prior jury

24  found that this accident caused his injuries, and that's what

25  we're here about today.

1            And what are those injuries?  We bored you with three

2     doctors testifying, but what they had to say in their

3     depositions was very pertinent.  We've got in Tab 2, if you

4     want to go through them again, we've got all of the those

5     tests.  It took a whole year to find exactly what was going on

6     with Mark Evans.  Dr. Hontas, when he first saw him, did that

7     straight-leg raising test and found it positive.  His sciatic

8     nerve was being affected in that leg.  Larcena, being a good

9     doctor like he did with that butt bruise, he did a straight-leg

10    raising test; he was fine, Mark was fine and never had any

11    problems after that.

12           So, the straight-leg raising test was one of the

13    things.  The MRI, positive, herniated disc, but showing it on

14    the right side, so Dr. Hontas is a little confused about that.

15    He's got a herniation which is showing up.  He should be having

16    -- it could be that he's got pain in the left leg, but he's

17    still wondering about that, because he's got a herniation on

18    the right side and he does have a little bit on the right, but

19    his left leg is what is causing him most of the problems.

20           "Let's do an epidural steroid injection" -- a big

21    needle in the epidural.  It didn't do any good.  Did another

22    one in his back, didn't do any good.

23           "Let's do a nerve conduction study and see what's

24    going on in that leg."  They did a nerve conduction study.

25    Trauma caused him to have nerve damage into his leg.  That's

1  from the car rolling over him.

2       Then they do a myelogram.  That's not a very nice

3  test either.  A myelogram they inject dye into you and the dye

4  goes into your spine and the doctor can really look to see what

5  kind of blockage is up there, and sure enough, the L4-5 disc is

6  blocked.  The dye is showing it and the doctor says, "We found

7  it.  This is what's causing you sciatic nerve pain, numbness

8  and pain all the way to your foot," every day of his life.

9       So, Dr. Butler sends him -- I'm sorry, Dr. Hontas

10  sends him to Dr. Butler, because Dr. Hontas doesn't do back

11  surgeries.  There's not a lot of orthopedics that do back

12  surgeries and neck surgeries.  It's a very delicate operation.

13  There's a lot of risks involved.  I'm sure a lot of you know

14  people who have back and neck operations and are in bad shape

15  because of them.

16       Mark has a real tough decision to make.  This is now

17  over a year after the accident, hadn't been to work, he's

18  disabled.  Dr. Hontas -- read each one of Dr. Hontas' records

19  if you'd like, "No work," "No work," "No work."  He never does

20  tell him he can go back to work in his reports.

21       He says, "You really have to think about this

22  surgery," but Mark has made an election not to have the

23  surgery.  He's afraid of it, because he can be worse off than

24  he is today.  And one thing that was real important with both

25  Dr. Hontas and Dr. Butler, Dr. Butler said, "You know what?  If

1    I do surgery on his back and remove that disc that's impinging

2    on that nerve, this has been going on for a year now."  That

3    nerve has been impinged for a year, because it took so long

4    with all these tests.  Each one was a progression in the

5    process of trying to find out what's wrong with him.  "He's got

6    an impingement for a year now.  I could take out that disc and

7    it might not do any good.  I could take out the disc and the

8    nerve damage from the vehicle running over his leg may not even

9    relieve his pain."

10             So, Mark says, you know, "Why should I take the risk

11   of going through this surgery if it may not even do any good?"

12             There's no doubt that this accident caused his

13   problems.

14             Now, the economists, I'll be the first one to say

15   that that's a confusing part.  That's why I let Mr. Souhlas do

16   it for me.  He doesn't appreciate it.  Mr. Evans had a flood.

17   He lost everything in his house.  He had to go get all those

18   records the best he could.

19             Now, the IRS records, I wish I had those.  We asked

20   for them, and their own expert says sometimes it takes three

21   months.  Well, we all know the IRS.  We tried to get those

22   records.  Maybe we should have tried a long time ago, but we

23   had other records that -- and we had testimony.  Mr. Shoemake

24   testified this is what -- the kind of money we make in this

25   industry.  You know, Mark wasn't working, you know, at Ford

1    Lincoln Mercury making $16,000 a year, you can bet that.

2           He did take three years off.  He was going through a

3    divorce.  He got some money out of the sale of his restaurant,

4    because his wife kept the restaurant and bar and he got a

5    sizable community property settlement.  He took some time off

6    from work.  And then, guess what?  He gets married again and

7    he's got to go back to work.  We know how that is.

8           And so he started back.  These records, and they're

9    here, I want you to look at them.  They're at Tab 6 -- I'm

10   sorry, Tab 5.  Some of them went into in detail, some of them

11   not.  We've got W-2s from Extreme Nissan and Crescent City

12   Nissan.  It's the same address, this is the same place where he

13   worked in 2001.  We've got his Bryan Harris Pontiac record

14   where he made $7,000, but that was for three months where he

15   worked at that dealership.

16          He worked at Hey Jude wholesaling cars for a two-

17   month period.  He made $9,600 for that.  He found a pay stub

18   from the All Star Toyota Slidell, and this was just a period of

19   time until August -- going back to '96 when it shows he made

20   $8,653 just for that period of time and he only worked two and

21   a half months there.

22          This is not a W-2, but this shows some of his salary

23   that he was making at Slidell Ford Lincoln Mercury in '95.  So,

24   this shows you what his weekly wage was back then, and then

25   this next record shows his salary of $450 per week plus his

1   bonuses and different things that you can get in your

2   employment.  And this is back in '95.  This just happens to be

3   his used car sales, he was the director at Slidell Ford Lincoln

4   Mercury back then and that's his card when he worked back then.

5           I wish we did have more records for you with the IRS.

6   But guess what?  Ford could have gotten these records.  The

7   Judge could have -- you know, a judge -- if you're looking for

8   those kind of records, you come to court and you can get them.

9   You get Mr. Evans to sign a record, you give it to them, they

10  get the records.  And Mr. Evans testified he gave them a form

11  to get the records.

12          So, shame on us, shame on them if they don't have all

13  the records.  This case has been going on for over -- for

14  around two years.

15          What did the economists testify?  Mr. Wolfson

16  testified that he used $35,000 a year.  That's a good figure.

17  That's not an unreasonable figure.  Mark certainly made more

18  than that in many years of employment.  With $35,000, he's got

19  $100,000 past loss wage.  We know he hadn't worked.  We know

20  the doctors say he couldn't work, so we've got a $100,000 that

21  he's already lost and they projected at $35,000, which is a

22  reasonable figure, that he would lose $397,000 for the future.

23          Now, if you think he can go back and work selling

24  tickets in a movie theatre or something, he'd have a hard time

25  doing that because of his back pain, but minimum wage he would

 1    still lose $287,000 from now until he's 65 years old.

 2              So, we think those figures are reasonable and we've

 3    given you the best we can.  So, look at those records when you

 4    deliberate.

 5              Consider what Herb Shoemake testified when he said,

 6    you know, these are the kind of numbers that we make in those

 7    -- in that industry.

 8              I'm going to suggest to you, ladies and gentlemen, if

 9    you -- the past medical expenses we have.  The future medical

10    expenses, we know if Mark has that surgery that Dr. Butler said

11    it was going to cost around $25,000 for the future surgery.  We

12    know he's going to have some medical expense to go in.  He's

13    not taking narcotics now, but we know he's going to have some

14    future medical expense and you be reasonable in deciding what

15    you think that is.

16              Past lost earnings, we talked about that, $100,000.

17    Future lost earnings, either the $278,000 or the $397,000 if

18    you think that he'll never be able to go back to work.

19              The tough one is the last one and that's really, you

20    know, something that you're going to have to think about; what

21    is a herniated disc causing some problems on the right side,

22    constant low back pain, a herniated disc on the left side that

23    we know -- at least we have a doctor saying needs surgery,

24    nerve damage to the left leg, and having to deal with this for

25    the rest of his life.  He can't come back later and ask for

1  more.  This is his only day in court.  So, we think somewhere

2  in the neighborhood of $300,000 to $500,000 for pain and

3  suffering that he's already been through, that he's

4  experiencing now and for the rest of his life would be a

5  reasonable figure.

6          I'm going to be able to get back up and conclude, but

7  I'm going to pass to Mr. Maxwell right now and I'll have a few

8  words to conclude when I have my turn again.  Thank you, ladies

9  and gentlemen.

10          THE COURT:  Okay, Mr. Maxwell, you can have as much

11  time as he took.

12          MR. MAXWELL:  Thank you, Judge.

13                  *    *    *    *    *

14                  **CLOSING ARGUMENT**

15                  *    *    *    *    *

16          MR. MAXWELL:  Well, I join Mr. Wright in thanking you

17  for what has now turned into a long day.  I know you all have

18  better things you'd rather be doing, so thanks very much.  I

19  appreciate you coming.  The people at Ford Motor Company

20  certainly appreciate you coming.

21          I've got just a couple of things to speed things

22  along, if I could show you visually rather than just talk about

23  it.

24          I said this morning that the only thing we're here

25  today is to determine what is fair and reasonable to compensate

1   Mr. Evans for what -- the injuries that occurred on May 24th,

2   2001.  Mr. Wright suggested basically that he should be

3   compensated for everything that's wrong with him, but that's

4   not what the law is and that's not what you'll be charged on.

5   Only the injuries you conclude were related to the accident on

6   May 24th, 2001 should form the basis of the compensation.

7           Now, just to start with these injuries, I heard

8   Mr. Wright say in opening that there were two herniated discs

9   in his back, and I think he just said something to that same

10  effect.  So, let's talk exactly about what the injuries were

11  and I guess we can start off with the herniated discs.  I'll

12  invite you to look through the medical records, the MRI

13  reports, and see where it says anything other than one mild

14  herniation.  There's not two, and the reports actually say that

15  there's no significant herniations of any sort.  There's one

16  mild herniation.

17          But, let's go way back to the beginning, what

18  injuries were caused due to this accident of 5/24?  Well, I

19  showed you the Charity medical records.  Here they all are.

20  They're in Exhibit Number 1.  They did x-ray him and examine

21  him from head to toe.  There were no broken bones, no bony

22  injuries at all.  And then also this is right in with the

23  Charity records, they examined him, and this was a doctor

24  examining him, found no tenderness on the back.  This wasn't an

25  x-ray, this was an actual examination from the doctor.  All the

1    findings were normal.  So, look at the Charity records.  I

2    invite you to do that.

3         But, let's look at what happened after Charity.

4    Let's start looking at what the doctor did that Plaintiff's

5    Counsel sent Mr. Evans to see.  I have no problem with that;

6    that's a very common thing.  A plaintiff's lawyer will send a

7    person to see a doctor that he uses.  There's nothing wrong

8    with that.  But then you have to live with what that doctor

9    finds and concluded.

10        Now, Dr. Hontas, who sent Mr. Evans to the Delta

11   Imaging to get the MRI done, this is his report and the report

12   is dated July 9th, of 2001.  And that report says very

13   important things.  Look on that report for the two disc

14   herniations that you keep getting told about by Mr. Wright.

15   It's not there.  In fact, all this report says is that there

16   are some slight disc bulges.  There is degenerative disc

17   disease throughout his lumbar spine from all "L" to the S1

18   layers, and there is no significant disc herniations.  So, I'm

19   not saying this -- I don't want you to really pay much

20   attention to what I'm saying, because it's not evidence; I'm

21   just telling you to look at what the doctor that the Plaintiffs

22   hired concluded and the reports he generated after this man had

23   the appropriate tests done.  It says, "No significant disc

24   herniations," a mild herniation at one level and degenerative

25   disc changes at all of his back.

1           So, what I have up on my little chart here, this

2    comes right off of the Plaintiff's doctor's report.  I didn't

3    send Mr. Evans to a doctor.  This is all what Mr. Wright's

4    doctors have concluded, that there is a mild disc protrusion,

5    there is degenerative disc disease throughout his entire back,

6    no significant disc herniation.  In fact, you may remember

7    Dr. Hontas, when he testified today and I wrote it down, he

8    said that, "He had a bad lumbar spine throughout the entire

9    lumbar spine."  Now, that's kind of repeating myself.  So,

10   there are no problems with that.  It's a mild disc herniation.

11   Okay, if you determine that happened at this accident, then

12   that's your conclusion and I'll respect that, but certainly the

13   back problems relating to the degenerative disc disease, that

14   has nothing to do with the accident on May 24th.

15           And in the accident on April 26th that I've been kind

16   of criticized about bringing up, I think that's significant too

17   for a couple of reasons.  First significance is whether it was

18   serious or not.  And you can see how defensive Mr. Wright has

19   been about whether this was a serious accident or not.  And

20   Dr. Larcena, the doctor who's deposition we took, I just

21   highlighted some of his testimony.

22           His testimony, and I'll put it up here so I'm not

23   holding it, he treated Mr. Evans on May 10th of 2001.  He came

24   in, he was complaining of severe pain.  Now, Mr. Evans told you

25   today it wasn't nothing, but in reality the doctor testified he

1    was complaining of severe pain.  In fact, it was so bad he

2    couldn't stand up or lie down.  Again, these aren't my words,

3    these are Dr. Larcena's words.  And one of the questions is, it

4    says here, "Pains in the back and leg," and the next word is,

5    "Well, can't lie down and stand up."  So, this was a very

6    serious injury that he seemed to have that seemed to be

7    bothering him, at least what he was reporting to Dr. Larcena.

8             And then Mr. Wright went through quite a few

9    questions about whether this was just so inconsequential that

10   he shouldn't have ever remembered it and he shouldn't have told

11   me about it, because when you're in a case you take these

12   depositions for a simple reason.  Everybody wants to know

13   what's going on.  It's the fair thing to do and you ask people

14   questions and you expect them to be truthful, just like they

15   are there in the stand.  You're sworn to tell the truth, and to

16   tell the truth in your deposition.  And when Mr. Evans was

17   deposed by me here's what he said.

18             "You've never been hurt on the job?"

19             "No."

20             "Never fell down a flight of stairs?"

21             Now, Mr. Wright is trying to quibble, well, maybe it

22   wasn't a flight of stairs, it was just a stair or wet deck.

23   And you can look in the last exhibit in that book it says,

24   "Fell on steps," so steps, stairs, whatever.

25             "Never had any sort of work related injury?"

1          "No."

2          "Never had any back problem?  Never had any leg

3    problem?"

4          He told Dr. Larcena he had a leg problem, he had

5    pains in his back and he had pain in his leg to the effect he

6    couldn't stand up or lie down.  So, if this was so unimportant,

7    if this was so insignificant, just pay this no never mind, it

8    would have been real easy just to tell me about it and I

9    wouldn't have had to go digging through this stuff and find it

10   like I did.  So, I think this is significant.

11         I think it's significant when you evaluate whether

12   all these complaints were caused by the accident or not, and I

13   think it's significant when you talk about Mr. Evans'

14   credibility.  The Judge told you during her initial

15   instructions that when you listen to a witness one of the

16   things you get to judge is their credibility.  And if they are

17   less than truthful about all the issues, you can use that in

18   your fact finding mission when you go into the back room.

19         So, I think this is significant, ladies and

20   gentlemen, and I will invite you to not only look at the

21   medical records, but look at all of the information that came

22   in because it supports what I told you in opening that

23   Mr. Evans has a lot of health problems going on.  He's got

24   degenerative disc disease.  He has diabetes.  He's got high

25   blood pressure.  He had a prior accident on the job.  And it's

1    very convenient now to blame everything on the one single

2    accident when he got knocked down by the Ford vehicle.  And I'm

3    asking you to consider all of the evidence, not just those

4    little portions that have been cherry-picked out by Mr. Wright.

5              Now, secondly, let's talk about the disability,

6    because for Mr. Evans to have a legitimate lost wage claim he

7    has to prove that he's been disabled.  He has to prove he's

8    been disabled not by the degenerative disc disease, not by the

9    accident in April of 2001, but by the accident on May 24th, of

10   2001.

11             Now, you heard the three doctors.  Did you hear any

12   of them say, "Mr. Evans is totally disabled, he can't work"?

13   No.  In fact, Dr. Hontas said, "No, I never said he is totally

14   disabled."  And Dr. Butler said, "Well, his subjective

15   complaints if he feels he can't work with his complaints of

16   pain, that's why I recommended surgery.  And if he has the

17   surgery, he can return to his prior employment."  And again, I

18   don't want you to listen to what I'm saying, I want you to look

19   in the medical records at Dr. Butler's report dated July 30th,

20   of 2002.  The conclusion of his report, and I'll read it here,

21   "I would expect that it's realistic for him to be able to

22   return to his previous job position with a successful outcome

23   of surgery."

24             Now, I think there's been a suggestion made that

25   somehow this surgery is some high risk surgery.  There's been

1    no testimony of that.  It's just a normal back surgery.  I'm

2    not minimizing it, but there's nothing special about going in

3    and fixing a mild one level disc herniation.  It's done every

4    day by orthopedic surgeons.  It's not that big of a deal.

5           What is the success rate?  I think you were just told

6    it's kind of a crap shoot what the success rate would be.  I

7    hope you listened to Dr. Butler's testimony when he said there

8    is -- I wrote it down -- if your memory is different than me,

9    well, that's fine, but I wrote it down.  He said, "There is an

10   80 percent chance to cure Mr. Evans' symptoms with this

11   surgery."  And 80 percent chance to cure his symptoms.

12          Your job is to decide what's more likely than not.

13   Eighty percent is getting pretty close to -- it's not a

14   certainty, but it certainly is more likely than not that if

15   Mr. Evans would have this surgery he would not only get

16   improvement, but be able to have his symptoms cured and return

17   to work.

18          Now, the whole return to work business, I think

19   that's another issue and the fact that Mr. Evans hasn't had

20   surgery is another issue that I think you people will be able

21   to consider.  When Mr. Evans was on the stand the last thing or

22   the next to last thing I asked him is, "Well, are you thinking

23   about having the surgery after this trial is over?"  And he

24   candidly admitted, yeah, he's thinking about having it after

25   the trial is over.  But, see, if you have it before the trial

1    is over and you're in the 80 percent and it's cured your

2    symptoms and you can go back to work, guess what?  You can't

3    bring Mr. Wolfson in and say, well, give him a half a million

4    dollars for lost wages.  I'm going to suggest to you that's a

5    litigation tactic that also has been involved here that I would

6    ask you to consider.

7          So, let's talk about what the losses are, and what

8    are the losses?  This is real simple.  Mr. Wolfson said, "Well,

9    about a half a million dollars," I think it was four hundred

10   and some thousand dollars.

11         Now, I said there was no documents to support the

12   claim.  Here are the only documents, ladies and gentlemen, in

13   the record.  These are the only documents there are.  And in a

14   court of law when jurors deliberate, they are supposed to use

15   the evidence that's presented at trial.  Mr. Wright somehow

16   blamed me that he didn't get the tax returns, because,

17   goodness, it would take two to three months.  I asked him for

18   them two years ago.  What did Mr. Wolfson say?  Oh, well, he

19   sent off for them on January 7th of this year.  So, two years

20   pass by.  If there were documents that were different or

21   contradicted these, you wouldn't think it would take you two

22   years.  I know when I'm trying to get a tax return or a tax

23   refund, it doesn't take me two years to get any sort of

24   evidence that's going to support my claim.

25         This is the only evidence there is in the record and

1    it says for seven years if you total that up Mr. Evans made

2    $41,000.  So, what did they do to contradict that?  Well, blame

3    me because I somehow not being Mr. Evans' lawyer was supposed

4    to get the tax returns.

5            And then they brought Mr. Shoemake in who said --

6    Mr. Evans' friend, oh, yeah, these guys can make $100,000 a

7    year.  That's all just guess work.  That's all just

8    speculation, but what you have in the record is right here,

9    $41,000 for seven years is what he made.

10           So, ladies and gentlemen, I think that -- that brings

11   me to my final point which is what's the law require of people

12   when they're injured?  The law requires that they take

13   reasonable steps to make themselves better and to return to

14   gainful employment.  You have to decide whether Mr. Evans in

15   refusing surgery before today, as long as the trial is going

16   on, whether that's reasonable, and whether he could return to

17   work as his doctors have said he can.  In fact, there's an

18   80 percent chance that he could not only return to work but

19   have his symptoms pretty much eliminated or certainly

20   tremendously improved.  That's something called mitigation of

21   damages and you'll have to determine whether Mr. Evans has done

22   his homework and has mitigated his damages as the law requires.

23   And I'm going to suggest to you that he has not.

24           And when it comes to awarding whatever damages are

25   due, there is one thing that's not disputed, and that's the

223

1    fact that there's $16,000 of lost -- I'm sorry, $16,000 of

2    medical expenses that Mr. Evans incurred.  So, we're not

3    debating that and certainly that's the sum total of all the

4    medical expenses he has is for $16,000.

5            As far as any future medical expenses, I guess you

6    have to determine what Mr. Evans' motivations are.  Mr. Wright

7    asked you for money for future medicals and the only future

8    medical can be having the surgery that he's refused to get.

9    So, award him the future medicals, because he probably is going

10   to have the surgery.  His doctors have suggested that.  But if

11   he does that, then what happens?  Then there's not going to be

12   the lost wages.  So, that's as my grandma used to say, "Having

13   your cake and eating it, too."  You can't have both the lost

14   wages and the future medicals.  So, I'm going to suggest in

15   addition to the $16,000 for the past medicals, you award him

16   whatever you think is appropriate for the future medicals for

17   him to have his surgery.

18           As far as the past wages are concerned, I'm not going

19   to suggest figures.  You decide what's appropriate.  If you

20   want to give him what he earned over the last seven years, it

21   would be $41,000.  They haven't been asked for anything

22   reasonable; they're asking for $200,000, $300,000, $400,000,

23   $500,000 depending upon when Mr. Wolfson is saying what he's

24   saying.  But this is what we know he earned over the past seven

25   years.

1        So, ladies and gentlemen, I think the final figure

2   you got was another half million on top of it.  You know, I

3   think we started off with something in the $500,000 range and

4   then he threw another half million on top of that.  So, we're

5   talking about a million dollars for an accident that caused at

6   best a mild disc herniation in a lumbar spine that has

7   degenerative disc disease throughout it and disabled Mr. Evans.

8   But his doctors say he doesn't have to be disabled, it's

9   basically his choice.  So, I'll leave that totally to you,

10  ladies and gentlemen.  You decide what's appropriate.  I think

11  what's been asked for is grossly excessive.  I think it's been

12  done litigation purposes and I think the whole case has been

13  generated that way.

14       And with that, my part is done.  I don't get to come

15  back up and say anything else.  You know, like most lawyers my

16  wife always says, "You've got to stop talking."  So, that's

17  what I'm going to do now.  And thank you very much for your

18  time today.

19       THE COURT:  Okay, Mr. Wright, I'm going to give you

20  three minutes.

21       MR. WRIGHT:  Three minutes?  I need more than three

22  minutes.

23       THE COURT:  Three minutes.  You used a lot more than

24  ten the first time.

25                    *    *    *    *    *

1                    **REBUTTAL ARGUMENT**

2                    *    *    *    *    *

3          MR. WRIGHT: Ladies and gentlemen of the jury, the

4    preponderance of the evidence is the standard here, more than

5    50 percent, not like a criminal standard.  The testimony from

6    the doctors have all been, Dr. Hontas and Dr. Butler, that this

7    accident caused these injuries.  They didn't have another

8    doctor come in here.  They had one witness, an economist.  They

9    didn't have another doctor, Dr. Nutik, whoever he is, come in

10   here and say this accident wasn't caused by -- these injuries

11   weren't caused by this accident.  There's no doubt that the

12   evidence that was presented to you through these depositions

13   through these doctors was that this accident caused all of

14   these injuries.

15         I'm going to give you the MRI reports.  All these,

16   they're very simple, they all say he's got two herniated discs.

17   He's got them on two levels.  The one that's causing him the

18   most problems is at L4-5 and that's the one that the doctors

19   think they want to do the surgery on.  The other one is the

20   nerve conduction study that shows he's got nerve damage.  Look

21   through these five different records, they're undisputed.

22         Now, as far as Mr. Evans testifying, he's testified

23   in a deposition, his long deposition.  He's testified at the

24   other trial.  And they put one page up here, one page and to

25   call him not telling the truth.  He had a slip in another

1    instance that wasn't that big of a deal.  Dr. Larcena, I asked

2    him in his deposition, "Did he complain to you of his back when

3    he slipped?"

4            He said, "No, he had a buttocks problem.  He had a

5    swollen right foot.  He did have a little leg pain, but that

6    was it."

7            The Charity records, we have those in the file for

8    you to look at.  He had the abrasions on his leg.  He had

9    abrasions on his arm.  He had all the evidence of soft tissue

10   injuries that the x-rays don't pick up.  So, all that evidence

11   is in the record.

12           Dr. Hontas and Dr. Butler both relate these injuries

13   to the accident.  They both talk about how complicated it is

14   and why surgery may not help this man.

15           So, with that, ladies and gentlemen, we ask for a

16   reasonable award.  This will affect him the rest of his life

17   and what you decide today is something that he'll have to take

18   with him to his grave.  And we hope that you consider that and

19   thank you again for all your time and your patience.

20           THE COURT:  All right, Mr. Wright.

21           All right, members of the jury, you have heard the

22   evidence in this case.  I will now instruct you on the law that

23   you must apply.  You are not to single out one instruction

24   alone as stating the law, but you must consider the

25   instructions as a whole.  It is your duty to follow the law as

1    I give it to you.

2              On the other hand, you the jury are the judges of the

3    facts.  Do not consider any statement that I have made in the

4    course of the trial or make in these instructions as an

5    indication that I have any opinion about the facts in this

6    case.

7              You have heard the closing arguments of the

8    attorneys.  Statements and arguments of the attorneys are not

9    evidence and are not instructions on the law.  They are

10   intended only to assist the jury in understanding the evidence

11   and the parties' contentions.

12             Your verdict must be based only on the evidence in

13   the case.  You cannot be governed by sympathy or prejudice or

14   any motive whatsoever except a fair and impartial consideration

15   of the evidence, and you must not allow any sympathy that you

16   may have for any party to influence you in any degree in

17   arriving at your verdict.

18             This case should be considered and decided by you as

19   an action between person of equal standing in the community and

20   holding the same or similar situations in life.  A corporation

21   and all other persons are equal before the law and must be

22   treated as equals in a court of justice.

23             In determining the weight to give to the testimony of

24   a witness, you should ask yourself whether there was evidence

25   tending to prove that the witness testified falsely concerning

1    some important fact or whether there was evidence that at some

2    other time the witness said, or did something, or failed to do

3    something that was different from the testimony the witness

4    gave before you during the trial.

5           You should keep in mind, of course, that a simple

6    mistake by a witness does not necessarily mean that the witness

7    was not telling the truth as he or she remembers it, because

8    people may forget some things or remember other things

9    inaccurately.  So, if a witness has made a misstatement, you

10   need to consider whether that misstatement was an intentional

11   falsehood or simply an innocent lapse of memory.  And the

12   significance of that may depend on whether it has to do with an

13   important fact or with only an unimportant detail.

14          While you should consider only the evidence in this

15   case, you are permitted to draw such reasonable inferences from

16   the testimony and exhibits as you feel are justified in the

17   light of common experience.  In other words, you may make

18   deductions and reach conclusions that reason and common sense

19   lead you to draw from the facts that have been established by

20   the testimony and the evidence in the case.

21          The testimony of a single witness may be sufficient

22   to prove any fact, even if a greater number of witnesses may

23   have testified to the contrary if after considering all of the

24   other evidence you believe that single witness.

25          A witness may be discredited or impeached by

1    contradictory evidence or by evidence that at other times the

2    witness has made statements which are inconsistent with the

3    witness' present testimony.  If you believe any witness has

4    been impeached and thus discredited, you have the right to give

5    the testimony of that witness such credibility, such

6    believability as you may think it deserves.

7         In addition, although a witness does not deliberately

8    testify falsely, sometimes his memory may be unreliable.  You

9    may have a right to distrust or at least to limit the weight

10   you give to such testimony.

11        Where witnesses disagree as to certain events, you

12   may of course take into consideration the relative opportunity

13   which each witness had to observe the events at issue when they

14   occurred.

15        Certain testimony was presented to you through

16   depositions.  A deposition is the sworn recorded answers to

17   questions asked a witness in advance of the trial.  Under some

18   circumstances if a witness cannot be present to testify from

19   the witness stand, that witness' testimony may be presented

20   under oath in the form of a deposition.

21        Some time before this trial the attorneys

22   representing the parties in this case questioned the witnesses

23   under oath.  A court reporter was present and recorded the

24   testimony.  The questions and answers were read or shown to you

25   today.  The deposition testimony is entitled to the same

1    consideration and is to be judged by you as to the credibility

2    and weighed and otherwise considered by you insofar as possible

3    in the same way as if the witness had been present and had

4    testified from the witness stand in court.

5         Now, in this case you were told that the Plaintiff

6    and Defendant agreed or stipulated to certain facts.  This

7    simply means that they accept those facts.  There is no

8    disagreement in that case, so there is no need for evidence by

9    either side as to those facts.  You must accept these

10   stipulations as proven fact.

11        In this case, correct me if I'm wrong, Counsel, the

12   only stipulation was with regard to the past medical expenses.

13        MR. WRIGHT:  Yes, Your Honor.

14        THE COURT:  Okay.  During the course of the trial you

15   heard objections to evidence.  Sometimes these are argued out

16   of the hearing of the jury as we did today.  It is the duty of

17   the attorney on each side of a case to object when the other

18   side offers testimony or other evidence the attorney believes

19   is not properly admissible.  You should not draw any inference

20   or show any prejudice against a lawyer or his client because of

21   the making of an objection.

22        Upon allowing testimony or other evidence to be

23   introduced over the objection of an attorney, I do not, unless

24   expressly stated, indicate any opinion as to the weight or the

25   effect of such evidence.  As stated before, you are the sole

1  judges of the credibility of all witnesses and the weight and

2  the effect of all evidence.

3          When the Court has sustained an objection to a

4  question addressed to a witness, the jury must disregard the

5  question entirely and may draw no inference from the wording of

6  it or speculate as what the witness would have said if

7  permitted to answer the question.

8          When knowledge of a technical subject matter may be

9  helpful to the jury a person who has special training or

10 experience in that technical field, called an expert witness,

11 is permitted to state his opinion on those technical matters.

12 However, you are not required to accept that opinion; as with

13 any other witness it is up you to decide whether or rely on it

14 or not.

15         In deciding whether to accept or rely upon the

16 opinion of an expert witness, you may consider any bias of the

17 witness, including any bias you may infer from evidence that

18 the expert witness has been or will be paid for reviewing the

19 case and testifying, or from evidence that he testifies

20 regularly as an expert witness and his income from such

21 testimony represents a significant portion of his income.

22         The burden of proof is on the plaintiff in a civil

23 action, such as this one, to prove every essential element of

24 his claim against the Defendant by a preponderance of the

25 evidence.  If the proof should fail to establish any essential

1  element of the Plaintiff's claim against the Defendant by a

2  preponderance of the evidence, then you should find for the

3  Defendant.

4       A preponderance of the evidence means the greater

5  weight and degree of credible evidence before you; in other

6  words a preponderance of the evidence just means the amount of

7  evidence that persuades you that a claim is more likely so than

8  not so.

9       In determining whether any fact has been proved by a

10  preponderance of the evidence in the case, you may, unless

11  other instructed, consider the testimony of all witnesses

12  regardless of who may have called them and all exhibits

13  received in evidence regardless of who may have produced them.

14       A plaintiff need only prove his claim by a

15  preponderance of the evidence.  The plaintiff need not produce

16  every possible witness and he need not prove his case beyond a

17  reasonable doubt, as is necessary in a criminal prosecution.

18  But speculation or merely possibility and even unsupported

19  probability is not sufficient to support a judgment in

20  Plaintiff's favor.

21       As we discussed earlier, there are two types of

22  evidence that you may consider in properly finding the truth as

23  the facts in this case.  One is direct evidence such as

24  testimony of an eye witness; the other is indirect or

25  circumstantial evidence.  The proof of a chain of circumstances

that the existence or non-existence of certain other facts.

As a general rule the law makes no distinction between the indirect and circumstantial evidence, but simply requires that you find the facts from a preponderance of all of the evidence both direct and circumstantial.

The Plaintiff, Mark Evans, alleges that actions of Ford Motor Company caused him damages.  The Defendant, Ford Motor Company and Ford Motor Credit Company contest the extent of Plaintiff's damages.

You must determine an amount that is fair compensation for all of the Plaintiff's damages.  These damages are called compensatory damages.  The purpose of compensatory damages is to make the Plaintiff whole; that is to compensate the Plaintiff for the damage that the Plaintiff has suffered. Compensatory damages are not limited to expenses that the Plaintiff may have incurred because of his injury.  They can include damages for the physical injury, pain and suffering, mental anguish, shock and discomfort that he has suffered because of the Defendant's conduct.

You may award compensatory damages only for injuries that the Plaintiff proves were proximately caused by the accident.  The damages that you award must be fair compensation for all of the Plaintiff's damages, no more and no less.

Damages are not allowed as punishment and cannot be imposed or increased to penalize the Defendant.  You should not

1  award compensatory damages for speculative injuries, but only

2  for those injuries which the Plaintiff has actually suffered or

3  that the Plaintiff is reasonably likely to suffer in the

4  future.

5        If you decide to award compensatory damages, you

6  should be guided by dispassionate common sense.  Computing

7  damages may be difficult, but you must not let that difficulty

8  lead you to engage in arbitrary guess work.

9        On the other hand, the law does not require that the

10  Plaintiff prove the amount of his loss with mathematical

11  precision, but only with as much definiteness and accuracy as

12  circumstances permit.  You must use sound discretion in fixing

13  an award of damages drawing reasonable inferences where you

14  find them appropriate from the facts and circumstances in

15  evidence.

16        You should consider the following elements of damages

17  to the extent you find them proved by a preponderance of the

18  evidence:  The reasonable expense of hospitalization and

19  medical care and treatment that the Plaintiff will require in

20  the future because of his injuries which were caused by the

21  accident, the parties have stipulated that Plaintiff's past

22  medical expenses were $16,371.07; any earnings loss, any loss

23  of ability to earn money sustained in the past and any such

24  loss in the future; in addition, any bodily injury that the

25  Plaintiff sustained and any pain and suffering, disability,

1    disfigurement, mental anguish, and loss of capacity for

2    enjoyment of life that the Plaintiff experienced in the past or

3    will experience in the future as a result of the bodily injury.

4         No evidence of the value of intangible things such as

5    mental or physical pain or suffering has been or needs to be

6    introduced.  You are not trying to determine value, but an

7    amount that will fairly compensate the Plaintiff for the

8    damages he has suffered.  There is no exact standard for fixing

9    the compensation to be awarded for these elements of damage.

10   Any award that you make should be fair in light of the

11   evidence.

12        The Plaintiff is entitled to recover an amount that

13   will fairly compensate him for any damages he has suffered to

14   date.  If you find that the Plaintiff is reasonably certain to

15   suffer damages in the future from his injuries, then you should

16   award him the amount you believe would fairly compensate him

17   for such future damages.

18        An award of future damages necessarily requires

19   payment be made now for a loss that Plaintiff will not actually

20   suffer until some future date.  If you should find that the

21   Plaintiff is entitled to future damages including future

22   earnings, then you must determine the present worth in dollars

23   of such future damages.

24        If you award damages for loss of future earnings you

25   must consider two particular factors.  You should reduce any

1  award by the amount of expenses that the Plaintiff would have

2  incurred in making those earnings.  If you make an award for

3  future loss of earnings, you must reduce it to present value by

4  considering the interest that the Plaintiff could earn on the

5  amount of the award if he made a relatively risk-free

6  investment.  The reason you must make this reduction is because

7  an award of an amount representing future loss of earnings is

8  more valuable to the Plaintiff if he receives it today than if

9  he received it in the future when he would otherwise have

10  earned it.  It is more valuable because the Plaintiff can earn

11  interest on it for the period of time between the date of the

12  award and the date he would have earned the money.  Thus, you

13  should adjust the amount of any award for future loss of

14  earnings by the amount of interest that the Plaintiff can earn

15  on that amount in the future.

16      If you make any award for future medical expenses,

17  you should adjust or discount the award to present value in the

18  same manner as with loss of future earnings.  However, you must

19  not make any adjustment to present value for any damages that

20  you may award for future pain and suffering or future mental

21  anguish.

22      A person who claims damages resulting from the

23  wrongful act of another has a duty under the law to use

24  reasonable diligence to mitigate, to avoid, or to minimize

25  those damages.  If you find the Plaintiff has suffered damages,

1    the Plaintiff may not recover for any item of damage which he

2    could have avoided through reasonable effort.

3         If you find by a preponderance of the evidence that

4    the Plaintiff unreasonably failed to take advantage of an

5    opportunity to lessen his damage, you should deny him recovery

6    for those damages which he would have avoided had he taken

7    advantage of the opportunity.

8         You are the sole judge of whether the Plaintiff acted

9    reasonably in avoiding or minimizing his damages.  An injured

10   plaintiff may not sit idly by when presented with an

11   opportunity to reduce his damages.  However, he is not required

12   to exercise unreasonable efforts or incur unreasonable expenses

13   in mitigating the damages.

14        The Defendant has the burden of proving the damages

15   which the Plaintiff could have mitigated.  In deciding whether

16   to reduce the Plaintiff's damages because of his failure to

17   mitigate, you must weigh all of the evidence in light of the

18   particular circumstances of the case using sound discretion in

19   deciding whether the Defendant has satisfied its burden of

20   proving that the Plaintiff's conduct was not reasonable.

21        Your verdict must represent the considered judgment

22   of each juror.  In order to reach a verdict it is necessary

23   that each juror agree.  Your verdict must be unanimous as to

24   each question on the verdict form.  It is your duty as jurors

25   to consult with one another and to deliberate with a view to

1    reaching an agreement if you can do so without violence to

2    individual judgment.  You must decide the case for yourself,

3    but only after an impartial consideration of the evidence in

4    the case with your fellow jurors.

5            In the course of your deliberations do not hesitate

6    to reexamine your own views and change your opinion if

7    convinced it is erroneous, but do not surrender your honest

8    conviction as to the weight of the evidence or the effect of

9    the evidence solely because of the opinion of your fellow

10    jurors, or for the mere purpose of returning a verdict.

11            Remember, at all times you are not partisans, you are

12    judges, judges of the facts.  Your sole interest is to seek the

13    truth from the evidence in this case.

14            When you retire to the jury room to deliberate on

15    your verdict, you may take the exhibits which the Court has

16    admitted into evidence.  You will also select a jury foreperson

17    who will preside over your deliberations and speak for you in

18    court.

19            A special verdict form has been prepared for your

20    convenience.  You will take that into the jury room with you.

21    It reads as follows:

22            "What amount of compensatory damages, if any, do you

23    find from a preponderance of the evidence would fairly and

24    adequately compensate Mark Evans for the wrongful conduct of

25    the Defendant?"

1          First, "Past medical expenses," and that's been

2     stipulated to.

3          Second, "Future medical expenses."

4          Third, "Past lost earnings."

5          Fourth, "Future lost earnings and earning capacity."

6          Fifth, "Past and future general damages including

7     physical and mental pain and suffering, disability,

8     disfigurement, and loss of capacity for enjoyment of life."

9          At the end you'll sign and date the form and return

10    to the courtroom.

11         You will note that the form contains interrogatories

12    or questions.  You must follow the directions and answer each

13    question by unanimous answer of the jury.  After you have

14    reached unanimous verdict, your foreperson is to fill in the

15    answers on the form.

16         Do no reveal your answers until such time as you are

17    discharged unless otherwise directed by me.  You may not

18    disclose to anyone, not even to me, your numerical division on

19    any question until you are discharged.  At the conclusion of

20    the deliberations, the foreperson will date and sign the

21    special verdict form.

22         If you recess during your deliberations, follow all

23    of the instructions that I gave you earlier about your conduct

24    during the course of the trial.  If it becomes necessary to

25    communicate with me during your deliberations, the foreperson

1    should give a written message or question to the court security

2    officer, who will then bring it to me.  I will either reply in

3    writing or bring you back into the courtroom to answer your

4    message orally.  Under either circumstance, I will relate your

5    message or questions and my response to Counsel before I reply

6    to you.

7              At this point you may now retire to the jury room to

8    deliberate and only after selecting your foreperson.

9              We're going to send in with you the jury verdict

10   form, one for each of you to look at and view, along with the

11   evidence that has been admitted for you to consider during your

12   deliberations.

13             Thanks.

14        (Jury exists courtroom)

15             THE COURT:  Now, Carter, you've got the jury books?

16             MR. WRIGHT:  Right.

17             THE COURT:  You've got just the exhibits that we've

18   introduced into evidence in those books?

19             MR. WRIGHT:  All right, what I have, Judge, is

20   Number 1, the medical records and Number 2, which is the

21   medical tests.  And then we have the W-2 Forms.

22             THE COURT:  Right.  And those are marked as what,

23   Exhibit 3?

24             MR. WRIGHT:  And then I put the workman's comp thing

25   in there.

1       THE COURT:  Okay, what exhibit is that, three?

2       MR. WRIGHT:  I can't remember.

3       THE COURT:  Okay, that's what we have, okay.

4       Okay, if you'll give those to Cecil.

5       And, Cecil, you've got the jury interrogatory form?

6       THE CLERK:  Did you take out Number 6 and 7?

7       THE COURT:  Yes.

8       MR. WRIGHT:  Right.

9       THE COURT:  I think you did, didn't you, Carter?

10      MR. WRIGHT:  All right, I need to add one more.

11      MR. MAXWELL:  And we had the deposition page -- we

12  had three, Judge, one, two and three.

13      MR. WRIGHT:  You don't put those with the jury.

14      THE COURT:  No, the deposition page is like

15  testimony.  You can't mark it one deposition page to give

16  them --

17      MR. MAXWELL:  Judge, it was entered without objection

18  because there was a dispute as to what he said and didn't say

19  and what his prior testimony was.

20      THE COURT:  I know.

21      MR. MAXWELL:  That's as much an exhibit --

22      MR. WRIGHT:  That doesn't go to the jury, Your Honor.

23      MR. MAXWELL:  Baloney, that's as much an exhibit as

24  anything, Judge.  That was introduced because he was

25  disagreeing with --

1          MR. WRIGHT:  He wasn't disagreeing.

2          MR. MAXWELL:  Oh, well --

3          THE COURT:  Okay, I'm not going to let that in.  They

4   heard the testimony three or four times during the course of a

5   very long one-day trial.  They've got it.

6          Okay, Cecil, you want to get that --

7          What else are you adding to it, Carter?

8          MR. WRIGHT:  I was going to try to get two, but it

9   looks like I only have one complete with all of them in.

10          THE COURT:  Okay.

11          THE CLERK:  Exhibit Number 6, I believe, Page 1, 2,

12   3, 4, 5, 6 --

13          THE COURT:  Yeah, he's got that in there.

14          THE CLERK:  -- is admitted but the rest of it is not.

15          THE COURT:  That's right, and he's got those.

16          THE CLERK:  And then Exhibit 7 is not admitted.

17          MR. WRIGHT:  Right.

18          THE COURT:  All right, so that's the juror book.

19   And, Cecil, you've got the jury interrogatories?

20          THE CLERK:  I have the jury interrogs and how about

21   the Intervenor's exhibit?

22          THE COURT:  No, that's been stipulated to.

23          THE CLERK:  That's not going in?

24          THE COURT:  That's not going in.  That's just going

25   into the record.

1          MR. MAXWELL:  Judge, there's one more thing that I

2     think since we're picking a few nits --

3          THE COURT:  Well, let's pick quickly.

4          MR. MAXWELL:  Real quickly.  On Exhibit 3, which is

5     the wage records, somebody wrote in on hand "Wholesale cars for

6     two months."  And the economist said, "I don't know who did

7     that."  There's been no testimony as to who did that.  That

8     needs to be crossed out.

9          THE COURT:  Okay.  Well, then somebody quickly take a

10    pen and cross them out.

11         THE CLERK:  Can I have the rest of the exhibits,

12    please, so I can give them to the jury?

13         THE COURT:  That's it.  That's it.

14         THE CLERK:  I have one through four up here.

15         THE COURT:  Okay, guys, are we ready to go the jury?

16         THE CLERK:  I was told this morning, Judge, we had

17    Exhibits 1 through 10; Number 6, Page 1 through 6; and 7 was

18    not admitted.

19         THE COURT:  Carter, come explain --

20         MR. WRIGHT:  I am, I need to get the (inaudible,

21    mumbling) --

22         THE COURT:  What have we got here?

23         MR. WRIGHT:  We have Joint Exhibit Number 1, which is

24    Number 1 in here.  We have Joint Exhibit Number 2, which is Tab

25    Number 2 here.  We didn't put Dr. Hontas and Dr. Butler in

1   this, but they're exhibits.

2          What do you want to do, do you want to call it Joint

3   Exhibits 3 and 4?

4          MR. MAXWELL:  Well, you've got Tab 3 and 4 here --

5   yeah, just call them three and four.

6          MR. WRIGHT:  Joint Exhibit 3 and 4 is Dr. Hontas and

7   Butler.  Then we have Number 5, which is actually --

8          MR. KELLY:  He read it in his case, I mean I think --

9          MR. MAXWELL:  I know, but I'm saying we're going to

10  have -- that's not listed.

11         THE COURT:  What's not listed?

12         MR. MAXWELL:  Dr. Larcena's deposition.

13         THE COURT:  No, but we're just trying to get the

14  jury's book together.

15         MR. MAXWELL:  Okay.

16         THE COURT:  Let's not --

17         MR. MAXWELL:  Well, I think this is -- we've got the

18  jury's book.

19         THE COURT:  I know.  Guys, listen to me.  Is that a

20  complete jury book for them --

21         MR. MAXWELL:  Yes.

22         THE COURT:  -- to consider?

23         MR. MAXWELL:  Yes.

24         THE COURT:  Okay, Cecil, you've got yourself a

25  complete jury book and you've got the interrogatory.

1          THE CLERK:  No, I don't, Judge.  I don't have it.

2    He's still --

3          THE COURT:  Yeah, you do, Cecil.

4          THE CLERK:  Ma'am?

5          MR. MAXWELL:  This is it.

6          MR. WRIGHT:  This is all we have.

7          THE COURT:  The other things that were deleted,

8    Cecil, are the depositions which we're not giving to the jury.

9          THE CLERK:  That doesn't go, just this?

10          THE COURT:  Just that.

11          MR. MAXWELL:  Just this, with this off the cover.

12          THE COURT:  Okay.  So, it's 4:52 and we're sending

13   the jury book in.

14          MR. MAXWELL:  There you are.

15          THE COURT:  Okay, Cecil, I think you're in business.

16          MR. MAXWELL:  Now, the only thing, Judge --

17          THE COURT:  No, don't talk until Cecil goes to the

18   jury room, please.

19          MR. MAXWELL:  Okay, let Cecil go.

20          MR. KELLY:  Your Honor, the one thing that's

21   confusing is they didn't have Larcena on in the joint bench

22   book.

23          THE COURT:  I understand.

24          Now, let's talk about the exhibits that are coming in

25   to the record as opposed to going to the jury, which is where

1    you were going with it, Bob.

2            MR. MAXWELL:  Yes, ma'am.

3            THE COURT:  Okay, let's go ahead and still on the

4    record let's talk about what's going into the record and what

5    we've given to the jury.  Okay?

6            MR. WRIGHT:  Joint Exhibit Number 1, which is the big

7    pack of medical records.

8            THE COURT:  And that went to the jury and that's

9    being introduced into the record.

10            MR. WRIGHT:  Correct.

11            Joint Exhibit Number 2, which are the medical tests.

12    There's only five documents, a myelogram, a CT scan, MRI, EMG,

13    nerve conduction study, and the -- well, that's it.

14            THE COURT:  Okay.

15            MR. WRIGHT:  That's Joint Exhibit 2.

16            THE COURT:  That's Joint Exhibit 2.  That's going to

17    the jury and it's being filed in the record.

18            MR. WRIGHT:  Joint Exhibit Number 3 is Dr. Hontas'

19    deposition, which is not going to the jury.

20            THE COURT:  And is being filed in the record.

21            MR. WRIGHT:  And Joint Exhibit Number 4 is Dr. James

22    Butler's deposition, which is being admitted into the record,

23    but not going to the jury.

24            THE COURT:  Good.

25            MR. WRIGHT:  And then Joint Exhibit Number 5 are the

1    wage documents.  Only the ones that we --

2            THE COURT:  Have agreed to.

3            MR. WRIGHT:  -- have agreed upon, which were the W-2s

4    at Extreme Nissan and Crescent City Nissan, the W-2 from Bryan

5    Harris, the 1099 for Hey Jude, and the pay stubs for All Star

6    Toyota and Slidell Ford.

7            THE COURT:  Okay, and those are going to the jury and

8    going into the record.

9            MR. WRIGHT:  Correct.

10            And then we had -- we jump to the workmen's comp

11    record and I'm not sure if we gave that a number.

12            MR. MAXWELL:  We'll just give it the next number.

13            MR. WRIGHT:  Okay, we'll call that Joint Exhibit

14    Number 6.

15            MR. MAXWELL:  And that was the Employer's First

16    Report of Injury.

17            MR. WRIGHT:  Right.

18            THE COURT:  All right.

19            MR. WRIGHT:  And that actually went to the jury.

20            MR. MAXWELL:  And then Exhibit 7, Judge, would be

21    Dr. Allan Larcena's deposition dated September 11, 2003.

22            THE COURT:  Okay.  And, Carter, I'm going to make you

23    responsible for making sure that Cecil understands what you've

24    done and has a full set of Joint Exhibits Number 1 through 7.

25            MR. WRIGHT:  I'll do that.

1          THE COURT:  Because he'll get mad at me, so --

2          MR. WRIGHT:  That's all right.

3          THE COURT:  I think we can go off the record now.  I

4     think it's at least clear for the record.

5          **(Jury deliberating from 4:55 p.m., until 6:10 p.m.)**

6          (Jury enters courtroom)

7          THE COURT:  All right, ladies and gentlemen, you

8     really have put in a long day, haven't you?  Please have a

9     seat.

10         Ms. McKay, may I assume you're the jury foreperson?

11         JURY FOREPERSON:  Yes, ma'am.

12         THE COURT:  Okay.  Have you deliberated and reached a

13    unanimous verdict?

14         JURY FOREPERSON:  Yes, we have.

15         THE COURT:  All right, I'm going to ask the Deputy

16    Clerk to get it from you.

17         All right, and, Ms. McKay, this was signed and dated

18    by you as the foreperson as the deliberations, is that correct?

19         JURY FOREPERSON:  Yes, Your Honor.

20         THE COURT:  All right, Cecil.

21         THE CLERK:  "Civil Action 02-1436 Section B,

22    Magistrate Judge 1, <u>Mark Evans v Ford Motor Company, Inc.</u>, Jury

23    Interrogs:

24         "What amount of compensatory damages, if any, do you

25    find from a preponderance of the evidence would fairly and

249

1  adequately compensate Mark Evans for the wrongful conduct of

2  the Defendants?

3          "Question A:  Past medical expenses," naturally

4  that's typed in $16,371.07.

5          "B:  Future medical expenses, $28,000.

6          "Past lost earnings, $15,000.

7          "Future lost earnings and earning capacity, $10,500.

8          "Past and future general damages including physical

9  and mental pain and suffering, disability, disfigurement, and

10 loss of capacity for enjoyment of life, $50,000.

11         "Please sign and date the form."  The form is signed,

12 "New Orleans, Louisiana, this 8th day of March 2004, Anita M.

13 McKay, Foreperson."

14         Ladies and gentlemen of the jury, is that your

15 verdict?

16      (Jurors respond, "Yes, it is.")

17         THE COURT:  All right, ladies and gentlemen, first of

18 all let me thank you for your service as jurors.  I really

19 appreciate it, the attorneys appreciate it and the parties

20 appreciate it.

21         Pursuant to this Court's rules, I instruct you that

22 none of you have an obligation to speak to anyone with regard

23 to this case.  You may refuse all interviews or comments, and

24 no person may make repeated requests for interviews or

25 questions after a juror has expressed his or her desire not to

1    be interviewed.  Under no circumstances, except by court order,

2    should any juror consent to be interviewed disclose any

3    information with respect to either the specific vote of any

4    juror other than the juror being interviewed, and the

5    deliberations of the jury itself.

6            Finally, no party or their attorney shall personally

7    or through another person contact, interview, or examine any

8    juror except by my order.

9            Again, I want to thank you for your service as

10   jurors.  Your patience and attention today has let us get this

11   case tried and tried fairly and we appreciate your time and

12   attention.  I know you all have a long way to go to get home

13   and I appreciate it very much.  Thank you for your service.

14           Have a good evening and be careful going home.  Thank

15   you.

16       (Jury exits courtroom)

17           THE COURT:  Well, all I can tell you guys is it's

18   amazing what two different juries can do.

19           MR. WRIGHT:  That's right.

20           THE COURT:  Cecil, could I have a copy of that and

21   I'll get copies for the guys?

22           THE CLERK:  Sure, Judge.

23           THE COURT:  Okay, I'll make copies for everybody.

24                     (Trial is Concluded)

25                 *    *    *    *    *